UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| CHRISTOPHER DAVIS; WILLIAM J. THOMPSON, JR.; RANDY COLE, JR.; WILSON LOBAO; ROBERT CAPONE; RYAN SHAUGHNESSY; and COMMONWEALTH SECOND AMENDMENT, INC., Plaintiffs, -against- RICHARD C. GRIMES, in his Official Capacity as Chief of the Weymouth Police Department, and ROBERT L. CHAMPAGNE, in his Official Capacity as Chief of the Peabody Police Department, Defendants, - and - COMMONWEALTH OF MASSACHUSETTS, Intervenor. | CIVIL ACTION NO. 1:13-cv-10246 |

_____

**DEFENDANTS' RICHARD C. GRIMES'S AND ROBERT L. CHAMPAGNE'S
MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

On February 7, 2013, Plaintiffs in this action filed suit seeking declaratory and injunctive relief for deprivation of civil rights alleging that certain aspects of Massachusetts' Gun Control Act of 1998, Mass. Gen. Laws ch. 140, §121 et. seq. (hereinafter "the Act"), impose an undue burden on their Second Amendment rights pursuant to the United States Supreme Court's decisions in *McDonald v. City of Chicago,* 130 S. Ct. 3020 (2010) and *Heller v. District of Columbia,* 554 U.S. 570 (2008). Plaintiffs also claim an Equal Protection violation. Plaintiffs claim the Act is both facially unconstitutional and as applied by the two Defendant-Chiefs of

Police.  It is the Defendants' position that all of the Plaintiffs' arguments fail as a matter of law.[1]

The relief Plaintiffs are seeking is extraordinary, that is, the "right" to carry a loaded, concealed gun wherever they want, whenever they want.  Currently, the limited "restriction" imposed on the Plaintiffs' Class A License To Carry Firearms ("LTC"), prevents them from doing so.  Far from running afoul of the Second Amendment, the Act is a proper public-safety oriented licensing scheme, not a total ban law like the cases of *McDonald* and *Heller*.  Moreover, the Supreme Court has stated that the scope of the Second Amendment is the "right of law-abiding, responsible citizens to use arms in the defense of hearth and home." *Heller*, 554 U.S. at 635.  In doing so, it has also clarified that the right is "not unlimited." *Id.* at 626.  This interpretation of the Second Amendment torpedoes Plaintiffs' constitutional challenge since, as Plaintiffs concede, they *have received* a License To Carry Firearms from the Defendants *which allows* them to own and operate a firearm including a handgun in their homes and to carry a concealed gun to-and-from the permitted restriction, e.g. Target & Hunting.[2]  As will be discussed more thoroughly below, the condition or restriction attached to Plaintiffs' License To Carry are constitutionally permissible because:

1.      Plaintiffs do not have standing to challenge the constitutionality of Section

---

[1] Chief Richard C. Grimes (Weymouth) and Chief Robert L. Champagne (Peabody) will not respond to Plaintiffs' facial challenge herein.  Instead, they defer to and incorporate by reference the legal position espoused by the Commonwealth of Massachusetts in opposition to the Plaintiffs' Motion for Summary Judgment.  Suffice to say, however, "[i]n a facial attack case, it is the plaintiff's burden to show that the law has *no* constitutional application." *DelGallo v. Parent,* 557 F.3d 58, 68 (1st Cir. 2009) (citing cases).  It is also worth noting that both the First Circuit and the Supreme Judicial Court have *rejected* similar facial challenges to the Act. *Hightower v. City of Boston,* 693 F.3d 61, 76-83 (1st Cir. 2012) (rejecting facial challenge to Section 131's "suitability" requirement); and, *Commonwealth v. Loadholt,* 460 Mass. 723, 726 (2011) (rejecting facial challenge to Massachusetts' law which makes it a crime to carry firearms without a license).

[2] For purposes of ease, the terms "firearm," "weapon" and "gun," will be used interchangeably.  Their precise definitions are found in G.L. c. 140, §121.

131 of the Act ("Section 131") because they have not established a "real

and immediate" injury flowing from the Defendants' conduct;[3]

2.      Nothing in the United States Supreme Court decisions in *Heller or*

*McDonald* bar the Act's licensing scheme which is designed to promote

public safety;

3.      Section 131 of the Act is constitutional under the intermediate scrutiny

standard; and

4.      The discretion afforded local police chiefs under Section 131 does not run

afoul of the Equal Protection Clause.[4]

## II.  MOTION FOR SUMMARY JUDGMENT STANDARD

The Defendants incorporate the standard of review enunciated by this Court in *Bolduc v.*

*Town of Webster*, 629 F. Supp. 2d 132, 144 (D. Mass. 2009).

## III.  DISCUSSION

A.  The *Heller and McDonald* Decisions.

In *Heller,*[5] the United States Supreme Court held that the District of Columbia's "ban on

handgun possession in the home violates the Second Amendment, as does its prohibition against

rendering any lawful firearm in the home operable for the purpose of immediate self-defense."

---

[3] For the Court's convenience, a copy of Mass. Gen. Laws ch. 140, §131, is annexed hereto as Exhibit A.  In particular, Section 131(d) provides that the licensing authority (local police chief) "may issue . . . a [LTC] if it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear for injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized by this section . . .."  Mass. Gen. Laws ch. 140, §131(d).

[4] The Defendants incorporate by reference the Parties' Stipulated-To Joint Statement of Facts filed separately herewith.

[5] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

554 U.S. at 635.   At issue in the *Heller* case was the constitutionality of several firearm restrictions – most notably, a blanket ban on the ownership of handguns – enacted by the District of Columbia.  *Id.* at 574-75.  In determining that the ban violated the Constitution, the Supreme Court announced for the first time that the Second Amendment protects an individual's right to keep and bear firearms <u>in one's home for the purpose of self-defense</u>, not simply a collective right to possess and carry arms for the purpose of maintaining a State militia. *See Id.* at 594-620. The Court characterized this right as "the right of law-abiding, responsible citizens of use arms in defense of hearth and home."  Therefore, "unless the plaintiff was disqualified from the exercise of Second Amendment rights" for some reason, such as a felony conviction, the District had to permit him to register his handgun.  *Id.* at 635.

The Supreme Court, however, qualified this right, stating that it is "not unlimited."  *Id.* at 626.  The Court affirmed its prior precedent saying that the rights protected by the Second Amendment involve only the bearing of arms for a lawful purpose, *see id.* at 617-618, and explained, "we do not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation."  *Id.* at 595.  In addition, the Court affirmed its prior precedent limiting the Second Amendment's reach with respect to the types of weapons possessed or carried, explaining, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," *id.* at 625, or "the carrying of 'dangerous and unusual weapons,'" *id.* at 627, quoting 4 Blackstone 148-149 (1769).  The Court declared that a citizen's Second Amendment right did not prohibit laws regulating who may possess and carry weapons or purchase them, or where such weapons may be carried.  The Court explained: "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be

taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and

government buildings, or laws imposing conditions and qualifications on the commercial sales of

arms."  *Heller, supra* at 626-627.  The Court noted: "We identify these presumptively lawful

regulatory measures only as examples; our list does not purport to be exhaustive."  *Id.* at 627 n.

26.[6]

On June 28, 2010, the Supreme Court decided *McDonald.*[7]  The Court explained that the

Second Amendment right to keep and bear arms is "among those fundamental rights necessary to

our system of ordered liberty."  *McDonald, supra* at 3042.  The Court stated that the right

"applies equally to the Federal Government and the States" and Justice Alito, writing the

plurality opinion, concluded that the Second Amendment right is incorporated to the States

through the due process clause of the Fourteenth Amendment.  *Id.* at 3050.  Of significance, the

plurality opinion did not disturb the conclusion in *Heller* that a citizen's rights under the Second

Amendment are limited.  The Court explained:

> "It is important to keep in mind that *Heller,* while striking down a law that
> prohibited the possession of handguns in the home, recognized that the right to
> keep and bear arms is not 'a right to keep and carry any weapon whatsoever in
> any manner whatsoever and for whatever purpose.' [*Heller, supra* at 626, 128
> S.Ct. 2783].  We made it clear in *Heller* that our holding did not cast doubt on
> such longstanding regulatory measures as 'prohibitions on the possession of
> firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms
> in sensitive places such as schools and government buildings, or laws imposing

---

[6] As explained by another member of this Court, Section 131 and, in particular, the  "suitable
person" requirement, "finds its origins in a piece of 1926 legislation informally titled 'An Act to
Regulate by License the Carrying of Concealed Weapons.'"  *Powell v. Tompkins,* __ F.Supp.2d
___ 2013 WL  765339 *17.  With respect to plaintiff's Second Amendment-based challenge to
his conviction for carrying a firearm without a license, Judge Young stated, "[a]bsent evidence to
the contrary, this Court is inclined to presume that the Commonwealth's regulation of firearms
by means of a comprehensive licensing scheme falls within the band of governmental action
allowable under the Second Amendment."  *Id.,* *9.

[7] *McDonald v. City of Chicago,* ___ U.S. ___, 130 S.Ct. 3020 (2010).

conditions and qualifications on the commercial sale of arms.' [*Id.* at 626-627, 128 S.Ct. 2783.]   <u>We repeat those assurances here.</u>   Despite municipal respondents' doomsday proclamations, <u>incorporation does not imperil every law regulating firearms.</u>" *McDonald, supra* at 3047.  (Emphasis added).

Here, although Plaintiffs have been granted a Class A License To Carry Firearms, they contend that the "Target & Hunting" restriction imposed by the local police chiefs "prohibit[s] them from carrying and using handguns for the purpose of self-defense and thereby deprive Plaintiffs of their right to keep and bear arms."  Amended Comp., ¶59.  However, as evident from the decisions in *Heller* and *McDonald*, this was not the intention of the Supreme Court when it interpreted the scope of the Second Amendment and made it applicable to the states.  To the contrary, *McDonald* did not disturb the *Heller* pronouncement and precisely made clear that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller, supra* at 626.  Moreover, as Plaintiffs concede, the "Target & Hunting" restriction does not prohibit them from owning and using firearms at home and/or while they are traveling to-and-from their chosen activity, *i.e.* target shooting or hunting.  *See* Stipulated-To Joint Statement of Facts ("SOF"), No. 8.

B.  <u>The Massachusetts Gun Licensing Scheme</u>.

Given this Court's familiarity with Mass. General Laws, Chapter 140, the Defendants recitation will be brief.  Massachusetts has three categories of licenses available for the carrying of firearms: a firearms identification card (FID card), a Class B license, and a Class A license. *See* Mass. Gen. Laws. Ch. 140 §§129B, 131.[8]  While they are similar in certain respects, Class A licenses provide the same privileges as Class B licenses, except that the holder of a Class A license may possess "large capacity firearms" and a Class A license also allows for the

---

[8] The Massachusetts licensing scheme defines a firearm as "a pistol, revolver or other weapon of any description" with a barrel of "less than 16 inches" in length.  Mass. Gen. Laws ch. 140, §121.

possession or carrying of *concealed* weapons in public.  *Id.* §131(a).  All three are issued by the relevant "licensing authority," which is defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them." *Id.*  §121.  The Massachusetts Legislature has delegated broad discretion to municipalities' police chiefs to limit access to firearms in order to promote public safety and prevent violent crime – the goal of the state's gun regulation scheme.   This discretion includes the ability to limit a license to a particular, specified purpose.  *Id.*, §131(d).

        In *Ruggiero v. Police Commission of Boston,* 18 Mass. App. Ct. 256, 260 (1984),  the Appeals Court interpreted the Act to allow the licensing authority to place enforceable restrictions on an issued license.  The Supreme Judicial Court declined to review the Appeals Court decision, allowing the *Ruggiero* holding to maintain its precedential value of upholding the validity of the Commonwealth's license restrictions.  However, the *Ruggiero* court anticipated the confusion that would arise from attempting to enforce undefined restrictions and recommended that the executive branch provide a statement or set of guidelines to aid future licensees in understanding the Commonwealth's gun regulations.   Subsequently, the Massachusetts Executive Office of Public Safety issued a set of nonbinding guidelines in response, in which EOPS provided suggested definitions for license restrictions.   These guidelines are found in the MIRCS system used by the defendant Police Chiefs. It is these restrictions with which Plaintiffs take issue.  Since Plaintiffs are not challenging any other provisions of the Act, the Defendants will now proceed to the merits of their claims.[9]

---

[9] The Defendants pause, however, to make one important point.  As this Court observed in *Pineiro v. Gemme*, 2011 WL 4853019 *7 (D. Mass. 2011), "the statute requires the applicant to demonstrate some specific circumstance giving rise to fear beyond those risks faced by the public large."  With the possible exception of Christopher Davis, none of the Plaintiffs have made such a showing.  SOF Nos. 11, 14, 18 & 21.  As for Mr. Davis, he requested an unrestricted LTC because someone (unnamed) was "harassing" himself and his family, and for

C.      Plaintiffs Do Not Have Standing: All of the Plaintiffs Already Have A
        License To Carry, And Have Suffered No Tangible Injury.

Plaintiffs' argument seems to be that, having been found "suitable" by the Defendant-police chiefs, the Defendants do not have the discretion to impose *any* restrictions on their licenses to carry firearms – it's an all or nothing proposition.  As a threshold matter, Plaintiffs lack standing to pursue these claims.  "Article III of United States Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471 (1982).  A crucial part of the case and controversy limitation is the requirement that a plaintiff must have standing to invoke federal jurisdiction.  *Id.* at 471-73.  "Standing is a threshold issue" and determines "whether the court has the power to hear the case, and whether the putative plaintiff is entitled to have the court decide the merits of the case."  *Libertad v. Welch*, 53 F. 3d 428, 436 (1st Cir. 1995) (internal quotations omitted).  Therefore, if plaintiff lacks standing to bring a matter to federal court, the court lacks jurisdiction to decide the merits of the case and should dismiss the complaint.  *United States v. AVX Corp.*, 962 F. 2d 108, 113 (1st Cir. 1992).

As the Supreme Court recently reaffirmed, to establish a case or controversy for Article III purposes, it is not enough that the party invoking federal jurisdiction have a "keen interest" in the issue.  "That party must also have 'standing,' which requires, among other things, that it have suffered a concrete and particularized injury that is fairly traceable to the challenged conduct . . ."  *Hollingsworth v. Perry,* ___ S. Ct. ___, 2013 WL 3196927 *6 (June 2013).  The party invoking federal court jurisdiction ". . . must seek a remedy for a personal and tangible

---

protection while hiking and camping in rustic or remote areas.  SOF No. 11.  However, there is nothing in the record which establishes this harasser posed a continuing threat to Mr. Davis or his family nor does the record indicate whether Mr. Davis sought any other means of protection such as, for example, a non-domestic protective order under Massachusetts law.

harm." *Id.* (citation omitted).   By contrast, the Plaintiffs' constitutional challenge can not proceed because they have not suffered "a concrete and particularized injury."   Plaintiffs are not claiming that they applied for and were denied a License To Carry.   Just the opposite. Similarly, none of the Plaintiffs even allege that the Target & Hunting restriction prevents them from engaging in their chosen careers.   Instead, Plaintiffs only make general allegations about Section 131 being "unduly burdensome" and "unconstitutional," but they have failed to demonstrate how these characterizations have actually affected them in any meaningful way. They claim that "but for the Plaintiffs' fear that their LTCs would be suspended or revoked and/or that they would be fined, each of these plaintiffs would possess, use and carry a handgun for the purpose of self-protection."   Amend. Comp., ¶51.   As Plaintiffs concede, however, neither Chief Grimes nor Chief Champagne has even threatened to do so.   Joint SOF, No. 24.

The Defendants submit that Plaintiffs "fear" alone does not provide standing for purposes of pursing their constitutional claims.   *See, e.g.*, *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990); *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-103 (1983) ("Abstract injury is not enough.   The plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical.").   Moreover, as explained in Chief Grimes's Affidavit, ¶10, because the Plaintiffs do possess a LTC, they would not be subject to arrest (let alone prosecution), for violating the Target & Hunting restriction.   Instead, the Plaintiffs' LTCs could be revoked or suspended by Chief Grimes or Chief Champagne.   Accordingly, Plaintiffs lack standing to challenge Section 131 of the Act.   *Cf. Houston v. Hill,* 482 U.S. 451, 459 (1987) (To have standing an individual who engages in prohibited conduct must establish he can be convicted under a statute, not whether he

might be subject to arrest and prosecution); *Diamond v. Charles,* 476 U.S. 54, 64-65 (1986) (medical doctor, who faced no threat of prosecution, lacked standing to challenge constitutionality of Illinois Abortion Law).

      D.    <u>Intermediate Scrutiny and the Act's Licensing Requirements.</u>

It is the Defendants' position that Plaintiffs do not have standing to challenge Section 131. The restrictions that Plaintiffs challenge to not burden conduct falling within the scope of the Second Amendment's guarantee because *Heller* does not extend outside the home, and, even if it did, Plaintiffs have no right under the Second Amendment to carry a concealed weapon. *See Peterson v. Martinez,* 707 F.3d 1197 (10th Cir. 2013). Nonetheless, Defendants will analyze the merits of their claim regarding the constitutionality of the Act and, in particular, the provision in Section 131 which authorizes local police chiefs to attach "such restrictions" as they deem proper. Although the Supreme Court has left open this question, Defendants submit that the proper standard of review is intermediate scrutiny. *See, e.g., National Rifle Assn. v. Bureau of Alcohol, Tobacco, Firearms, And Explosives*, 700 F.3d 185, 207-208 (5th Cir. 2012); *Hightower v. City of Boston,* 693 F.3d 61, 73-74 (1st Cir. 2012) and *Fletcher v. Haas,* 851 F.Supp.2d 287, 302-303 (D. Mass. 2013). This interpretation goes hand-in-hand with the explicit scope of *Heller* and the construal of other courts post-*Heller*. As many courts have recognized, the Supreme Court did not explicitly hold that the Second Amendment right is a fundamental right. If the Court had wanted to, it would have done so explicitly. *See*, *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 187 (2010). *See also United States v. Miller,* 604 F.Supp.2d 1162, 1170 n. 10 (citing *United States v. Darrington,* 351 F.3d 632, 635 (5th Cir.2003) (stating that "if [a court] intended to recognize that the individual right to keep and bear arms is a 'fundamental right,' in the sense that restrictions on this right are subject to 'strict scrutiny' by the courts and require a 'compelling state interest,' it would have used these constitutional terms

of art")).[10]

Under the intermediate scrutiny analysis, a court must determine whether the asserted governmental purpose is "substantially related to an important governmental objective." *Clark v. Jeter,* 486 U.S. 456, 461 (1988).  That is, the District Court must find there is a reasonable "fit" between the gun license restrictions and an important or substantial governmental interest, a fit "that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 480 (1989); *see also Ward,* 491 U.S. at 782-83 ("The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest").  The licensing requirements with which Plaintiffs take issue are reasonable and they easily pass the intermediate scrutiny standard: the purpose of the statute is to protect the public safety.  *See Ruggiero v. Police Comm'r of Boston, supra; Commonwealth v. Davis,* 396 Mass. 886, 888-889 (1976).  This goal obviously constitutes an important governmental interest for the purpose of intermediate scrutiny analysis. *See United States v. Salerno,* 481 U.S. 739, 748-50 (1987) (noting that "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and holding that the government's interest in preventing crime is not only important, but compelling); *Schall v. Martin,* 467 U.S. 253, 264 (1984) (remarking that "[t]he legitimate and compelling state interest in protecting the community from crime cannot be

---

[10] Of course, even those constitutional rights deemed "fundamental," are not absolute.  *See, e.g., Chaplinsky v. New Hampshire,* 315 U.S. 568 (1942) (free speech rights do not protect "fighting words"); *United States v. Lee,* 455 U.S. 252 (1982) (imposition of social security tax does not violate plaintiff's – member of Amish Order – free exercise of religion); *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) (compulsory vaccination to protect public health does not violate "liberty interest" embodied in the Fourteenth Amendment).

doubted" (citations and quotation marks omitted)); *Heller v. District of Columbia, supra,* 698 F. Supp. 2d at 199.  Given the demonstrated compelling and important government interest in protecting the public from deadly violence,[11] Defendants will proceed to analyze the reasonableness of Section 131 to the extent it allows local chiefs of police to restrict one's LTC as they deem appropriate.

### i.  First and Second Cause of Action: Constitutionality of S e c t i o n  1 3 1 o f  t h e  A c t .

Plaintiffs claim that "restrictions" authorized by Section 131 are unconstitutional because they violate the Second Amendment.  To begin with, Plaintiffs' Second Amendment rights are safeguarded by the Licenses to Carry which they already possess.  *See Heller* at 594-620 (the Second Amendment protects an individual's right to keep and bear firearms <u>in one's home</u> for the purpose of self-defense).  The Plaintiffs' LTCs allow them to own and operate firearms in their homes and while traveling to-and-from a target and shooting range, gun competition and/or hunting.  Clearly, nothing in their current position prevents them from possessing a firearm in their home for the purpose of self-defense.  As interpreted by the Supreme Court, the Second Amendment requires no more.  The Supreme Court explained in *Heller* that, "we do not read the Second Amendment to protect the rights of citizens to carry arms for *any* sort of confrontation".  *Heller, supra* at 595.  The idea that "longstanding presumptively lawful regulatory measures" is part of the articulated language in the *Heller* opinion necessarily means that regulation of

---

[11] *See* Gun Violence Statistics, L. Center to Prevent Gun Violence, http://smartgunlaws.org/category/gun-studies-statistics/gun-violence-statistics/ (last visited Jan. 27, 2013) (finding firearms third-leading cause of injury-related deaths nationwide in 2009).  The Law Center to Prevent Gun Violence (formerly known as the Legal Community Against Violence), a gun control organization, states that for the years 1993-2001, handguns were seven times more likely to be used to commit violent crimes than other firearms.  *Id.*

firearms is by definition constitutional. *Heller, supra* at 626-627.[12]   Plaintiffs challenge the Act's license scheme only to the extent it allows local police chiefs to attach certain restrictions to their License to Carry.   Plaintiffs contend that the statute is invalid because it "prohibits them from carrying and using handguns for the purpose of self-defense."   Amended Comp., ¶59.[13]   The Supreme Court's decisions in *McDonald* and *Heller*, however, do not support their assertion.  To the contrary, the Supreme Court in *Heller* identified an individual right to carry and bear arms that is limited in scope. The Court explained that a citizen's Second Amendment right did not prohibit laws regulating who may possess and carry weapons or purchase them, or where such weapons may be carried.  Significantly, the Court noted: "We identify these presumptively lawful regulatory measures only as examples; our list *does not* purport to be exhaustive." *District of Columbia v. Heller,* 554 U.S. 570, 627 n. 26 (2008) (emphasis added).

In *McDonald,* the Court cited to this specific language in *Heller* and stated: "We repeat those assurances here."   Despite plaintiff's doomsday proclamations, incorporation does not imperil every law regulating firearms." *McDonald, supra* at 3047. Thus, the requirement of "a citizen to obtain a license for the exercise of a fundamental right" or a licensing system, does not by itself render the statute unconstitutional on its face and given that the underlying licensing regime is lawful the "restriction" provision is also enforceable.  Nothing in the *McDonald* and

---

[12] The Supreme Judicial Court has reached the same conclusion. *Commonwealth v. Powell,* 459 Mass. 572, 589 (2011) ("We note initially that the Defendant overlooks the right secured by the Second Amendment is not unlimited.  Both *Heller* and *McDonald* made that point clear.").

[13] Plaintiffs concede, however, that "the States retain the ability to regulate the manner of carrying handguns within constitutional parameters;  to prohibit the carry[ing] of handguns in specific, narrowly defined sensitive places . . ."  Amended Comp., ¶21.  Whether the North Shore Mall or Gillette Stadium, for example, constitutes such a "sensitive place," it is inconceivable that the Second Amendment <u>requires</u> Chief Grimes and Chief Champagne to issue plaintiffs an LTC which would allow them to carry a loaded, concealed weapon in these and comparable venues.

*Heller* decisions has altered or abrogated the state of the law concerning the statutory presumptions set forth in the Act.  Moreover, if not with a licensing scheme, how else are local officials going to determine not only that those who possess concealed weapons are law-abiding, responsible citizens, but also that those same individuals have the common sense not to carry a concealed or unconcealed weapon while walking down Main Street.[14]  In any event, post-*Heller,* federal courts around the country have consistently rejected arguments comparable to those posited by Plaintiffs here.  *Peterson v. Martinez* 707 F.3d 1197 (10th Cir. 2013) (Colorado law, which limits issuing LTCs to state residents, does not violate the Second Amendment); *Wollard v. Gallagher*, 712 F. 3d 865 (4th Cir. 2013) (Maryland statute which requires applicant to establish "good and substantial reason" for handgun permit, does not violate the Second Amendment); *Kachalsky v. County of Westchester,* 701 F.3d 81, 96 (2d Cir. 2012) (New York law which prohibits individuals from obtaining a full-carry concealed handgun except upon a showing of "proper cause," does not violate the Second Amendment); *Hightower, supra,* 693 F.3d at 73-74 ("Under our analysis of *Heller* the government may regulate the carrying of concealed weapons outside of the home."); and, *Pineiro v. Gemme,* 2013 WL 1285475, at *1 (local licensing authority may properly restrict a license to sport and/or target shooting); *but see, Moore v. Madigan,* 702 F.3d 933 (7th Cir. 2012) (Illinois's "flat ban" on carrying ready-to-use guns outside of the home, violates the Second Amendment).

### ii.  Second Cause of Action:  Plaintiffs' Equal Protection Claim

Plaintiffs have also brought an Equal Protection claim challenging the discretion

---

[14] This kind of display – even if permitted with an unrestricted LTC – can hardly be reconciled with the notion that the Second Amendment was intended to protect "the right of law-abiding, <u>responsible</u> citizens to use arms in the defense of hearth and home."  *Heller*, 554 U.S. at 635 (emphasis added).

accorded local police chiefs under Section 131.[15]   To begin with, since the Plaintiffs are relying

on another, specific constitutional provision (Second Amendment), this Court need not entertain

Plaintiffs' Equal Protection challenge.   *See Pagan v. Calderon,* 448 F.3d 16, 33 n. 7 (1st Cir.

2006).   Should this Court do so, however, Plaintiffs are not members of a suspect class and, as

set forth above, Section 131 does not infringe on any fundamental right.   Consequently, this

Court should analyze the Plaintiffs' challenge to the Act under rational basis review.   *See*

*Medeiros v. Vincent*, 431 F.3d 25, 29 (1st Cir. 2005); *Gun Owners' Action League v. Swift*,

284 F.3d 198, 213-214 (1st Cir. 2002).   Rational basis review "is a paradigm of judicial

restraint."   *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314 (1993).   "The general rule is that

legislation is presumed to be valid and will be sustained if the classification drawn . . . is rationally

related to a legitimate state interest."   *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473

U.S. 432, 440 (1985).   If any such ground exists to support the classification employed, the

regulation must be upheld even if it is drawn from "rational speculation unsupported by

evidence or empirical data."   *Beach Commc'ns*, 508 U.S. at 315.   In this case, the public

interest served by the Act, including Section 131, is unarguably legitimate.   The Massachusetts

Legislature, when enacting the Act, understood that the functions and duties of certain

government officials were of such importance that it delegated to local police chiefs the

discretion and authority to issue an LTC with such restrictions as they deem appropriate.   This

delegation of authority by the Legislature is presumed to be valid and must be sustained given

---

[15] The Amended Complaint, ¶64, also mentions the Due Process Clause.  If necessary, the Defendants will address this claim in their opposition to Plaintiffs' Motion for Summary Judgment.  Suffice to say, however, there is nothing in the record which suggests, let alone establishes, that the Defendants' actions were "arbitrary in the constitutional sense."  *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998) (citations and internal quotation marks omitted); *Pagan v. Calderon*, *supra*, 448 F. 3d at 33 ("[we] have held, with a regularity bordering on the monotonous, that the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decision makers, whether those decisions are right or wrong.").

the fact that it is rationally related to a legitimate state interest.  Moreover, even if – as Plaintiffs claim – this results in residents of differing communities receiving slightly different treatment, this does not run afoul of the Equal Protection clause.[16]

Viewing this discretion within the scope of the *Heller* and *McDonald* decisions, the discretion afforded to local police chiefs passes constitutional muster because it responds to a legitimate purpose that is reasonably related to the right at issue.  *Heller* precisely pointed to the fact that the Second Amendment right applied to "<u>law-abiding, responsible citizens</u> to use arms  in defense of hearth and home."  *Heller* 554 U.S. at 635. The discretion accorded to local police chiefs to add a restriction to a LTC takes into account factors that go to the heart of the *limit* of the right.  As the Supreme Judicial Court recently recognized, because Section 131 and the decisions made by local licensing authorities made under Section 131, "do not burden conduct that falls within the scope of the Second Amendment,  but rather consist of long-standing and well-recognized prohibitions on the possession of firearms which are clearly encompassed within the presumptively lawful regulatory measures that *Heller* has declared to be outside the ambit of the Second Amendment, [sic] the statute passes constitutional muster… and the Commonwealth may continue to enforce its provisions to protect the health, safety, and

---

[16] Of course, the Equal Protection clause does not require equal treatment of persons from different states.  *Gurley v. Rhoden*, 421 U.S. 200, 211-212 (1975).  Nor does the Equal Protection clause require equal treatment between resident and nonresidents of the same county, for example.  *County Bd. of Arlington County, Va. v. Richards*, 434 U.S. 5, 7 (1977) (*per curiam*) ("[t]he Equal Protection clause requires only that the distinction [between [non]-residents] drawn by an ordinance like Arlington's rationally promote the regulations objectives").  The Defendants are not aware of any constitutional provision which requires local officials from *different* municipalities to treat every gun-license applicant identically.  Among other things, differing crime rates, population density, and available police resources, may result in one police chief's decision to impose a Target & Hunting or other restriction, where another police chief may not.  This imports no Equal Protection violation.  *See, e.g., Cohen v. Board of Water Commr's, Fire Dist. No. 1, South Hadley*, 411 Mass. 744 (1992) (where Water Commission had legitimate reason for doing so, requiring owners of condominiums, but not owners of apartment complexes, to install water meters did not violate Equal Protection clause).

- 16 -

welfare of its citizens." *See Chardin v. Police Commissioner of Boston*, 2013 WL 2382293, at *6.

Although the restrictions contested here may result in different results with respect to the issuance of gun licenses by different licensing authorities, "[i]t is axiomatic that the Equal Protection clause is not offended merely because the classification [or restriction]," as Plaintiffs perceive it, "results in *some* inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (emphasis added). The utilization of different, but otherwise constitutionally adequate, licensing rubrics for residents of different localities does not, by itself, trigger heightened scrutiny under the Equal Protection Clause. *See id; See also Koscielski v. City of Minneapolis,* 393 F. Supp. 2d 811, 816 n. 4 (D. Minn. 2005) ("While the Equal Protection Clause prohibits government officials from selectively applying the law in a discriminatory way, unequal application of the law does not violate equal protection 'unless there is shown to be present in it an element of intentional or purposeful discrimination,'") (citation and internal quotations omitted); *Cotter v. City of Boston,* 323 F.Supp.2d 160, 168 (D. Mass. 2003) (Equal Protection clause does not "mandate that every citizen be treated identically, rather, it requires an adequate explanation for treating groups differently."). Indeed, the Supreme Judicial Court has long held that where Chapter 140 vests local officials with discretion in determining whether to issue a license required by that Chapter, the exercise of such discretion to deny a license which might have been granted in another locale does not violate any provisions of the Fourteenth Amendment. *See Marchesi v. Selectmen of Winchester*, 312 Mass. 28, 30-32 (1942). In *Marchesi*, the plaintiff had applied for licenses to operate two bowling alleys in the Town of Winchester, as he was required to do by Mass. Gen. Laws ch. 140, § 177. Under Section 177, such licenses were to be "granted, suspended, or revoked at pleasure by selectmen [of the town in which the license was sought or

held], 'upon such terms and conditions as they deem proper.'" *Id.* at 30, quoting Mass. Gen. Laws ch. 140, § 177 (emphasis added).   The selectmen of the Town of Winchester, exercising the discretion afforded to them under Section 177, denied both of the plaintiff's applications.  *Id.* at 29.   In rejecting the plaintiff's equal protection challenge, the Court made the following observation, which is equally applicable here:

> One of the present means of regulation is the requirement of a license, which in towns may be granted, suspended or revoked at pleasure by the selectmen, 'upon such terms and conditions as they deem proper.' The selectmen, who may be assumed to be familiar with local conditions and with what will best serve the public interests of their communities, are granted broad discretionary powers. *Id.* at 30.

Here, the Legislature authorized local police chiefs to issue firearm licenses as they "deem proper," because the local police chiefs may be assumed to be more familiar with the pertinent conditions within their jurisdictions, such as the character of residents, the volume and type of gun violence, and an individual's genuine need to possess guns for self-defense or in his business.  For example, even if an applicant has never actually been arrested or convicted, a local chief of police is in the best position to know if that individual has a history of drug use, domestic violence, or the like.   Since police chiefs are allocated with the tasks of enforcing firearm laws and dealing with the repercussions of gun violence or accidents, and because municipalities might have different and discrete interests with respect to firearm laws, it was certainly rational for the Legislature to have delegated discretion to local police chiefs.  *See Citizens for Cmty. Action at Local Level, Inc.*, 430 U.S. at 268-69.   Moreover, that the Defendants may ordinarily limit first-time applicants to a restricted LTC versus someone renewing his/her LTC, is of no moment.   As explained in Chief Grimes's and Chief Champagne's Affidavits, with a renewal licensee, they have six years in which to evaluate someone to determine if the Target & Hunting restriction should be lifted. This is exactly what

the Tenth Circuit described as the ability "to monitor <u>continued</u> <u>qualification</u> after a [LTC] is issued." *Peterson*, 707 F. 3d at 1221 (emphasis added); *See also Bach v. Pataki*, 408 F.3d 75, 88-91 (2d Cir. 2005) (discussing the importance of the "ongoing" flow of information to a licensing officer); and, *Osterweil v. Bartlett*, 819 F. Supp.2d 72, 85-86 (N.D.N.Y 2011) (same).

The Supreme Court has acknowledged that inherent in state statutory schemes which vest local officials with broad discretion as to the issuance of licenses or permits "is the obvious danger to the right of a person or group not to be denied equal protection of the laws." *Cox v. State of Louisiana*, 379 U.S. 536, 557 (1965). However, the denial of equal protection feared by the Supreme Court in *Cox* was that of a *single* public official engaging in invidious discrimination among persons or groups. *Id.* On the other hand, the Supreme Court seemed to be accepting of some variance, from locality to locality, that would naturally result from *differing* public officials of such localities exercising independent judgment in processing applications, so long as each official engaged in a "systematic, consistent and just order of treatment" of the applications before him, "free from improper or inappropriate considerations and from unfair discrimination." *Id.* at 558, *quoting Cox v. State of New Hampshire*, 312 U.S. 569, 576 (1941). Indeed, the Supreme Court would not have advised that "appropriate, limited discretion, under properly drawn statutes… may be vested in [local] officials" for the purposes of processing applications if it were the case that that every exercise of discretion which happens to differ from that of neighboring municipalities constitutes a violation of the Equal Protection Clause. *Cox*, 379 U.S. at 558. In sum, Plaintiffs have failed to establish that the State's "legitimate government purpose . . . in protecting the safety of citizens" is not served by the discretion afforded local police chiefs under Section 131. *Pineiro v. Gemme,* __ F.Supp.2d ___, 2013 WL 1285475 *12 (D. Mass. 2013).

## CONCLUSION

In *Hightower,* the First Circuit observed that, "[l]icensing of the carrying of concealed weapons is presumptively valid, and *Hightower* makes no serious argument to the contrary." 693 F.3d at 73-74. Indeed, the First Circuit's decision in *Hightower* all but forecloses Plaintiffs' constitutional challenge here. Accordingly, the Defendants respectfully submit that this Court should allow their Motion for Summary Judgment together with such additional relief as this Court deems just and proper.

<div style="margin-left: 40%;">

Respectfully submitted,

The Defendants,
RICHARD C. GRIMES, in his Official Capacity as
Chief of the Weymouth Police Department, and
ROBERT L. CHAMPAGNE, in his Official
Capacity as Chief of the Peabody Police
Department,
By their attorneys
PIERCE, DAVIS & PERRITANO, LLP


/s/ Adam Simms
John J. Davis, BBO #115890
Adam Simms, BBO #632617
90 Canal Street
Boston, MA 02114
(617) 350-0950
jdavis@piercedavis.com
asimms@piercedavis.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on July 1, 2013.

<div style="margin-left: 40%;">

/s/ Adam Simms
Adam Simms

</div>