UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTOPHER DAVIS; WILLIAM J. THOMPSON, JR.; WILSON LOBAO; ROBERT CAPONE; and COMMONWEALTH SECOND AMENDMENT, INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| -against- | ) ) | |
| | ) | CIVIL ACTION NO. |
| RICHARD C. GRIMES, in his Official Capacity as Chief of the Weymouth Police Department; and ROBERT L. CHAMPAGNE, in his Official Capacity as Chief of the Peabody Police Department, | ) ) ) ) ) ) | 1:13-cv-10246 |
| | ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| COMMONWEALTH OF MASSACHUSETTS, | ) ) | |
| | ) | |
| Intervenor. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

STATUTORY BACKGROUND.................................................................................................. 1

PERTINENT FACTS .......................................................................................................... 2

ARGUMENT ...................................................................................................................... 5

(I)   THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY GUNS FOR
      SELF-DEFENSE ........................................................................................................ 5

  A.   The Right to Bear Arms is the Right to Carry Guns, and the Core Purpose
       of the Right is Self-Defense ................................................................................ 5

  B.   *Heller*'s Discussion of Permissible Restrictions Recognizes a General Right
       to Carry Guns, Subject to Restrictions in Specified Places ............................. 7

(II)  DEFENDANTS' POLICIES OF IMPOSING "TARGET & HUNTING" RESTRICTIONS
      VIOLATE THE RIGHT OF ARMED SELF-PROTECTION ..................................................... 11

  A.   The First Circuit's Approach to Second Amendment Burdens ...................... 11

  B.   In Context, the "Target & Hunting" Restriction is a Severe Burden ........... 13

    1.   *Heller's Presumptive Lawful Restrictions*...................................................... 14

    2.   *Analogous Laws* ............................................................................................ 14

    3.   *Historical Authorities* .................................................................................. 15

  C.   Defendants' Practices do Not Further Important Governmental Interests ...... 17

    1.   *Caselaw Requires that the Burden Advance Important Governmental Interests*........... 17

    2.   *Defendants' Practices are Not Adequately Related to Public Safety*............................. 19

CONCLUSION ..................................................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

Andrews v. State, 50 Tenn. 165 (1871) ............................................................... 16

Bliss v. Commonwealth, 12 Ky. 90 (1822) ......................................................... 16

Commonwealth v. Gouse, 965 N.E.2d 774, 461 Mass. 787 (2012) ............................ 10

Commonwealth v. McGowan, 982 N.E.2d 495, 464 Mass. 232 (2013)........................ 10

District of Columbia v. Heller, 554 U.S. 570 (2008)................................................ *passim*

Doughty v. Underwriters at Lloyd's, 6 F.3d 856 (1st Cir. 1993) ................................ 7

Ezell v. Chicago, 651 F.3d 684 (7th Cir. 2011)...................................................... 18

Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012) ........................................ 10, 13, 17

In re Brickey, 70 P. 609, 8 Idaho 597 (1908) ....................................................... 17

In re McIntyre, 552 A.2d 500 (Del. Super. Ct. 1988).......................................... 15-16

Kachalsky v. Westchester, 701 F.3d 81 (2d Cir. 2012) ............................................ 10

Kunz v. New York, 340 U.S. 290 (1951) ............................................................... 20

Lakewood v. Pillow, 501 P.2d 744, 180 Colo. 20 (1972)......................................... 16

Las Vegas v. Moberg, 485 P.2d 737, 82 N.M. 626 (App. Ct. 1971) ........................... 17

McCoy v. MIT, 950 F.2d 13 (1st Cir. 1991)........................................................... 10

McDonald v. Chicago, 130 S. Ct. 3020 (2010) ...................................................... *passim*

Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012)................................................... *passim*

Morris v. State, 342 So. 2d 417 (Ala. Cr. App. 1977) ............................................. 15

Nunn v. State, 1 Ga. 243 (1846) ................................................................... 9, 16

Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007),
    aff'd sub nom. Heller, 554 U.S. 570 ............................................................... 6

People v. Dawson, 934 N.E.2d 598, 403 Ill. App. 3d 499 (App. Ct. 2010) ................. 10

Peruta v. San Diego, 678 F. Supp. 2d 1046 (S.D. Cal. 2010)................................... 9, 15

Pineiro v. Gemme, no. 10-40262, 2013 U.S. Dist. LEXIS 42626
    (D. Mass. Mar. 26, 2013) ........................................................................... 1

Rossiter v. Potter, 357 F.3d 26 (1st Cir. 2004) .................................................. 5, 10

Sarnoff v. Am. Home Prods. Corp., 798 F.2d 1075 (7th Cir. 1986)............................ 7

Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996)............................................. 5

Shuttlesworth v. Birmingham, 394 U.S. 147 (1969) ............................................... 20

Sims v. United States, 963 A.2d 147 (D.C. 2008) .................................................. 10

State ex rel. Princeton v. Buckner, 377 S.E.2d 139, 180 W. Va. 457 (1988)............................... 16

State v. Buzzard, 4 Ark. 18 (1842) ............................................................................................... 16

State v. Chandler, 5 La. Ann. 489 (1850) ....................................................................................... 9

State v. Jumel, 13 La. Ann. 399 (1858) ........................................................................................ 16

State v. Mitchell, 3 Blackf. 229 (Ind. 1833) ................................................................................. 16

State v. Reid, 1 Ala. 612 (1840)..................................................................................................... 16

State v. Rosenthal, 55 A. 610, 75 Vt. 295 (1903) ......................................................................... 16

United States v. Armstrong, 706 F.3d 1 (1st Cir. 2013) .................................................. 11, 13, 17

United States v. Bloom, 149 F.3d 649 (7th Cir. 1998) .................................................................. 11

United States v. Booker, 644 F.3d 12 (1st Cir. 2012).............................................................. *passim*

United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006) .................................................... 10

United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010) ............................................................. 8

United States v. McAndrews, 12 F.3d 273 (1st Cir. 1993)............................................................. 5

United States v. Miller, 307 U.S. 174 (1939) ................................................................................. 8

United States v. Rehlander, 666 F.3d 45 (1st Cir. 2012) ..................................................... 8, 12-13

United States v. Rene E., 583 F.3d 8 (1st Cir. 2009)...................................................... 5, 9, 11-12

United States v. S. Union Co., 630 F.3d 17 (1st Cir 2010)........................................................... 10

United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) (en banc).............................. 11-12, 17, 19

United States v. Torres-Rosario, 658 F.3d 110 (1st Cir. 2011) ..................................................... 8

Williams v. State, 10 A.3d 1167, 417 Md. 479 (2011).................................................................... 9

Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013)................................................................... 10

## STATUTES

18 U.S.C. § 922(g) .................................................................................................................... 12-13

18 U.S.C. § 922(x) .................................................................................................................... 11-12

Ala. Code § 13A-11-73.................................................................................................................. 15

Ala. Code § 13A-11-75.................................................................................................................. 15

Alaska Stat. § 18.65.700................................................................................................................ 15

Ariz. Rev. Stat. § 13-3112 ............................................................................................................ 15

Ark. Code Ann. § 5-73-309 .......................................................................................................... 14

Cal. Penal Code § 26150................................................................................................................ 14

Cal. Penal Code § 26200................................................................................................................ 14

Colo. Rev. Stat. Ann. § 18-12-203 ............................................................................................... 14

Conn. Gen. Stat. § 29-32b ................................................................................ 14

11 Del. Code Ann. § 1441 ................................................................................ 15

11 Del. Code Ann. § 1442 ................................................................................ 15

Fla. Stat. Ann. § 790.06 ................................................................................... 15

Ga. Code Ann. § 16-11-129 ............................................................................. 15

Haw. Rev. Stat. § 134-9 ................................................................................... 14

Idaho Code Ann. § 18-3302 ............................................................................. 15

720 Ill. Comp. Stat. 5/24-1 ............................................................................. 15

720 Ill. Comp. Stat. 5/24-1.6 .......................................................................... 15

Ind. Code Ann. § 35-47-2-3............................................................................. 15

Iowa Code Ann. § 724.7 .................................................................................. 15

Kan. Stat. Ann. § 75-7c03 ............................................................................... 15

Ky. Rev. Stat. Ann. § 237.110.......................................................................... 15

La. Rev. Stat. Ann. § 40:1379.3 ...................................................................... 15

25 Me. Rev. Stat. Ann. § 2003 ......................................................................... 15

M.G.L. c. 140, § 129B ....................................................................................... 2

M.G.L. c. 140, § 129C ....................................................................................... 1

M.G.L. c. 140, § 131 ................................................................................. *passim*

M.G.L. c. 140, § 131C ....................................................................................... 2

M.G.L. c. 269, § 10........................................................................................... 1

Md. Code Ann., Pub. Safety § 5-306 .............................................................. 14

Md. Code Ann., Pub. Safety § 5-307 .............................................................. 14

Mich. Comp. Laws Ann. § 28.422.................................................................... 15

Minn. Stat. § 624.714 ...................................................................................... 15

Miss. Code Ann. § 45-9-101 ............................................................................ 15

Mo. Ann. Stat. § 571.101 ................................................................................ 15

Mont. Code Ann. § 45-8-321 ........................................................................... 15

N.H. Rev. Stat. Ann. § 159.6 ........................................................................... 15

N.J. Stat. Ann. § 2C:58-4 ................................................................................ 14

N.M. Stat. Ann. § 29-19-4 ............................................................................... 15

N.Y. Penal L. § 400.00 ..................................................................................... 14

N.C. Gen. Stat. § 14-415.11 ............................................................................ 15

N.D. Cent. Code § 62.1-04-03........................................................................... 15

Neb. Rev. Stat. § 69-2430 ................................................................................................ 15

Nev. Rev. Stat. Ann. § 202.3657 ..................................................................................... 15

Ohio Rev. Code Ann. § 2923.125 ..................................................................................... 15

21 Okla. Stat. Ann. § 1290.12 .......................................................................................... 15

Or. Rev. Stat. Ann. § 166.291 .......................................................................................... 15

18 Pa. Cons. Stat. Ann. § 6109 ........................................................................................ 15

R.I. Gen. Laws § 11-47-11 ............................................................................................... 15

S.C. Code Ann. § 23-31-215 ............................................................................................ 15

S.D. Codified Laws § 23-7-7 ............................................................................................ 15

Tenn. Code Ann. § 39-17-1351 ........................................................................................ 15

Tex. Gov't Code § 411.177 ............................................................................................... 15

Utah Code Ann. § 53-5-704 .............................................................................................. 15

Va. Code Ann. § 18.2-308 ................................................................................................. 15

W. Va. Code Ann. § 61-7-4 .............................................................................................. 15

Wash. Rev. Code Ann. § 9.41.070 ................................................................................... 15

Wis. Stat. § 175.60 ........................................................................................................... 15

Wyo. Stat. Ann. § 6-8-104 ................................................................................................ 15

## OTHER AUTHORITIES

James Kent, Commentaries on American Law (O. Holmes ed. 1873) ............................... 9

Brian MacQuarrie, "Want a gun license in Massachusetts?  Much depends on where
     you live," Boston Globe (Mar. 10, 2013) ..................................................................... 5

The American Students' Blackstone (G. Chase ed. 1884) ................................................. 9

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II ................................................................................................ passim

People enjoy the constitutional right to both possess and carry handguns – and to do so for the "core purpose" of protecting themselves and their families from harm.  See McDonald v. Chicago, 130 S. Ct. 3020, 3036 (2010); District of Columbia v. Heller, 554 U.S. 570, 592 (2008).  However, Defendants have polices of imposing "Target & Hunting" restrictions on licenses to carry handguns, which preclude the carry of handguns for self-defense anywhere away from the home.  Defendants only allow people to carry handguns for protection if they have a law enforcement or military background, own a business, or have prior experience carrying guns.

This brief shows that Defendants' policies impermissibly infringe the right of armed self-defense that the Second Amendment secures.  First, Part I shows that the right to bear arms is *not* homebound, and that the carry of guns in public falls directly within its scope.  Part II then shows that Defendants' policies impermissibly infringe the right to bear arms, as they broadly preclude the bearing of arms for protection by all persons who do not fall into one of the categories of citizens that Defendants have deemed eligible.  The enshrinement of a constitutional right necessarily eliminates "the power to decide on a case-by-case basis whether the right is really worth insisting upon."  Heller, 554 U.S. at 634 (emphasis omitted).

### STATUTORY BACKGROUND

The Court recently detailed the handgun licensing laws of Massachusetts in Pineiro v. Gemme, no. 10-40262, 2013 U.S. Dist. LEXIS 42626, *6-10 (D. Mass. Mar. 26, 2013).  Assuming familiarity with this decision, Plaintiffs focus on issues that warrant further discussion.

Massachusetts law prohibits people from possessing handguns – anywhere – unless they hold a license to carry firearms ("LTC") issued pursuant to M.G.L. c. 140, § 131.[1]  The statute makes Police Chiefs the officials responsible for issuing licenses.  See M.G.L. c. 140, § 131(d).

---

[1] M.G.L. c. 269, § 10(a) prohibits people from possessing handguns without LTC's, but it applies only away from one's home.  However, M.G.L. c. 140, § 129C separately prohibits the

Section 131 provides that LTC's "shall be designated Class A or Class B." Id. § 131.  A "Class B" license is a limited version of a "Class A" license.  With regards to carry, Class A LTC's (not otherwise restricted) allow people to carry handguns in any manner, including concealed, while Class B LTC's prohibit the concealed carry of loaded handguns, but allow their carry in open view, except when in a vehicle.  See id. §§ 131(a)-(b), 131C(b).  A Class B LTC offers no benefit or advantage over a Class A LTC.

Finally, aside from establishing background requirements and procedures for obtaining LTC's, § 131 separately provides that LTC's are "subject to such restrictions relative to the possession, use or carrying of [handguns] as [the Police Chief] deems proper."  Id. § 131(a), (b).  Police Chiefs have the same authority to impose restrictions, regardless of whether they designate LTC's to be of Class A or Class B.  See id.  A person who violates an LTC restriction faces suspension or revocation of his or her LTC and a fine of up to $10,000.  See id.

### PERTINENT FACTS

Plaintiffs are four law-abiding private citizens who applied for LTC's from the Defendants or their predecessors.  Each of the Plaintiffs stated that he wanted an LTC that would allow him to carry a handgun in public for the purpose of self-defense.  As discussed below, Defendants have general practices of placing "Hunting & Target" restrictions on LTC's, unless applicants qualify for an exception.  None of the Plaintiffs qualified for an exception from the default practice, and as a result, each received an LTC restricted to "Target & Hunting" purposes.  JS[2] ¶¶ 11-12, 14, 18-19, 21.  This restriction authorizes Plaintiffs to engage in recreational shooting, hunting, and collecting – but it only allows Plaintiffs the right of self-defense "in the home."  JS ¶¶ 7-8.

---

possession of any gun (in any place) without either an LTC or a firearms identification card ("FID").  M.G.L. c. 140, § 129B(6) then provides that FID's do not allow handgun possession.

[2] The Parties' Stipulated-to Joint Statement of Material Facts (Doc. No. 34).

Defendant Chief Grimes and Defendant Chief Champagne are the "licensing officers" that M.G.L. c. 140, § 131 vests with authority to issue LTC's, and impose restrictions, in Weymouth and Peabody (respectively).  JS ¶¶ 5-6.  The restriction policy of Defendant Chief Grimes has been somewhat unclear in the past.  When Plaintiff Chris Davis applied in March 2012, the instructions posted on the Weymouth Police Department's website said:  "New & Renewals for a Class A LTC for Protection of Life or All Lawful Purposes must . . . be able to document that you have 'good reason to fear injury' as required by MGL Ch 140, Sec 131.  Other permits will be for hunting and target."  PS[3] ¶ 1.  However, when Mr. Davis showed this policy to Chief Grimes's designee, the designee said it was *not* the Police Department's current policy, and that the current policy had not been reduced to writing.  PS ¶ 2.  One year later, the instructions posted on the Police Department's website now say:  "New & Renewal Class A&B LTC's will be issued for Hunting and Target only."  PS ¶ 3.  However, Chief Grimes disclaimed this policy in discovery.  PS ¶ 4.  The policy that Chief Grimes disclosed in discovery is as follows:

> Chief Grimes ordinarily imposes a restriction for first-time applicants of a Class A LTC, to wit, Target & Hunting. Unrestricted licenses for first-time applicants are usually for law enforcement, military, and business owners who substantiate they handle large amounts of cash.  Licenses restricted to Employment are issued to people who are required to carry a firearm by their employer and submit documentation from their employer.  Prior to the expiration of the initial six-year period, Chief Grimes will also consider lifting this restriction where the applicant shows a change of circumstance which, in his view, warrants such a result.  [JS ¶ 9]

Defendant Chief Champagne's policy is somewhat different:

> Chief Champagne ordinarily imposes a restriction for first-time applicants of a Class A LTC, to wit, Target & Hunting.  Chief Champagne will consider issuing an unrestricted Class A LTC where a first-time applicant requires such a license to carry for

---

[3] Plaintiffs' Statement of Undisputed Material Facts, filed herewith.

> employment or business purposes and supporting documentation is
> provided, or if a first-time applicant has a history of being licensed
> unrestricted in his home state or the military.  In such cases, Chief
> Champagne may issue a first-time applicant an un-restricted Class
> A LTC.  Chief Champagne ordinarily issues renewal LTC's
> without restrictions, unless a suitability condition exists.  [JS ¶ 10]

Thus, both Defendants' general practice is to impose a "Target & Hunting" restriction, unless there is some factor that causes them to depart from this default practice.  Moreover, both Defendants agree it is appropriate to issue unrestricted LTC's to applicants with military backgrounds or who own businesses, and both issue licenses required for employment.  Beyond this, however, Defendants' policies diverge.  The most notable difference is that Chief Champagne "ordinarily" removes restrictions from LTC's after their initial six-year term, when the person applies to renew.  In addition, Chief Champagne may forego this six-year "waiting period" when an applicant has been licensed in a prior state.  Chief Grimes, in contrast, makes no firm commitment to remove restrictions, saying only that he will "consider" the request "where the applicant shows a change of circumstance which, in his view, warrants such a result."

LTC restriction policies vary widely between Police Chiefs across Massachusetts.  One of the Plaintiffs in this case (William Thompson) became eligible for an unrestricted LTC merely by moving 20 miles.  JS ¶¶ 16-17.  A former defendant in this case – Chief Gemme of the Worcester Police Department – was dismissed after changing his policy of presumptively imposing sporting-type restrictions on first-time licenses.  PS ¶ 5.  During the pendency of this case, the *Boston Globe* published an article that detailed some Chiefs' practices, observing that some routinely issue unrestricted LTC's to qualified applicants, while others are "reluctant" to do so, others require a special showing, and still others have adopted blanket policies.[4]  PS ¶ 6.

---

[4] See Brian MacQuarrie, "Want a gun license in Massachusetts?  Much depends on where you live," Boston Globe (Mar. 10, 2013), available at http://www.boston.com/news/local/-

## ARGUMENT

**(I)   THE SECOND AMENDMENT SECURES THE
RIGHT TO CARRY GUNS FOR SELF-DEFENSE**

### A.  The Right to Bear Arms is the Right to Carry Guns, and the Core Purpose of the Right is Self-Defense

The Second Amendment protects "the right of the people to keep *and bear* Arms."  U.S. Const. amend. II (emphasis added).  In <u>Heller</u>, the Supreme Court interpreted this protection for the first time in modern jurisprudence. "The Court read the operative clause to 'guarantee the individual right to possess *and carry* weapons in case of confrontation.'"  <u>United States v. Rene E.</u>, 583 F.3d 8, 11 (1st Cir. 2009) (quoting <u>Heller</u>, 554 U.S. at 592) (emphasis added)).  The Court's decision rested on the rationale that self-defense is the "the *central component* of the right itself."  <u>Heller</u>, 554 U.S. at 599 (emphasis in source); <u>see also</u> <u>Rene E.</u>, 583 F.3d at 11.

Both of these issues – the meaning of the right to "bear arms," and the purpose that it serves – underpinned <u>Heller</u>'s resolution.  As such, they form a part of Heller's actual holding. <u>See</u> <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").  These are "part of the court's holding" because they were "essential to the result reached in the case."  <u>Rossiter v. Potter</u>, 357 F.3d 26, 31 (1st Cir. 2004); <u>see also</u> <u>United States v. McAndrews</u>, 12 F.3d 273, 278-79 (1st Cir. 1993) (court is bound to "the rationale on which [a decision] rests").

The meaning of "bear arms" was always central to <u>Heller</u>, as the District Court had concluded that "bear" was a military term involving no right to arms unconnected to military service, and the Court of Appeals had reversed this (specific) conclusion in a 2-1 decision.  <u>See</u>

---

massachusetts/2013/03/10/want-gun-license-massachusetts-much-depends-where-you-live/04SFWtTEpGdtEHm5mTQuSO/singlepage.html (last visited Jun. 29, 2013).

<u>Parker v. District of Columbia</u>, 478 F.3d 370, 374, 384-86 (D.C. Cir. 2007), <u>aff'd sub nom.</u>

<u>Heller</u>, 554 U.S. 570.  The Supreme Court dedicated 8 pages of its decision to interpreting the

meaning of this phrase, <u>see Heller</u>, 554 U.S. at 584-92, and found that the right to bear arms is

the right to carry weapons, and to do so in the event of confrontation:

> At the time of the founding, as now, to "bear" meant to "carry."
> When used with "arms," however, the term has a meaning that
> refers to carrying for a particular purpose – confrontation. . . .
> Although the phrase implies that the carrying of the weapon is for
> the purpose of "offensive or defensive action," it in no way
> connotes participation in a structured military organization.

<u>Id.</u> at 584.  The Court relied on its conclusion – that the right to bear arms is the personal right to

carry guns – to reject the District of Columbia's argument that the Second Amendment protected

only the keeping and bearing of arms for military purposes.  <u>See id.</u> at 586-92.

The purpose the right serves was also squarely before the Court, and in more than one

respect.  Part of <u>Heller</u> addressed a District of Columbia law that prohibited people from keeping

guns in loaded and operable condition.  <u>See id.</u> at 630.  The Court's analysis was succinct:  the

restriction "makes it impossible for citizens to use [guns] for the *core lawful purpose of self-*

*defense* and is hence unconstitutional."  <u>Id.</u> (emphasis added).

The importance of self-defense also underlay the Court's rejection of the District's

argument that it could ban handguns because it still permitted people to own both rifles and

shotguns.  <u>See id.</u> at 628-29.  Because the Court had found that "the inherent right of self-defense

has been central to the Second Amendment right," it therefore found handguns could not banned

as they are "the quintessential self-defense weapon" and "the most popular weapon chosen by

Americans for self-defense in the home."  <u>Id.</u>

The Supreme Court eliminated any doubt that self-defense is central to the Second

Amendment's protection when it decided <u>McDonald</u>.  There, the Court described <u>Heller</u> as

having "held" both "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense," and also "that individual self-defense is 'the *central component*' of the Second Amendment right."" McDonald, 130 S. Ct. at 3026, 3036 (quoting Heller, 554 U.S. at 599) (emphasis in source). For that matter, an essential ground of McDonald itself was the Court's recognition that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day. . . ." Id. at 3036.

Both of these conclusions of Heller – that the right to bear arms is the right to carry guns, and that self-defense lies at the core of the Second Amendment – are binding as "antecedent holdings." They are antecedent holdings because "deleting [them] would have impaired the analytical foundation of the Court's ultimate decision." Doughty v. Underwriters at Lloyd's, 6 F.3d 856, 861 (1st Cir. 1993); see also Sarnoff v. Am. Home Prods. Corp., 798 F.2d 1075, 1084 (7th Cir. 1986) (whether a statement "could have been deleted without seriously impairing the analytical foundations of the holding").

**B.** ***Heller*'s Discussion of Permissible Restrictions Recognizes a General Right to Carry Guns, Subject to Restrictions in Specified Places**

Any doubt that Heller recognized a general right to carry guns dissolves when one considers the guidance the Court provided with its discussion of "presumptively lawful" gun regulations that it left intact. See Heller, 554 U.S. at 626-27 & n.26. These examples illustrate not only permissible regulations, but also the scope of the right itself – and they show that the Court clearly understood it was recognizing a right to carry guns in public. After concluding its analysis of the meaning of the right "to keep and bear Arms," the Court cautioned that:

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or *laws forbidding the carrying of firearms in sensitive places such as schools and government buildings*, or laws imposing conditions and qualifications on the commercial sale of arms.

Heller, 554 U.S. at 626-27 (emphasis added); see also McDonald, 130 S. Ct. at 3047.  Of course, the Court's statement that it is permissible to prohibit the carry of guns in *sensitive* places necessarily presupposes a right to carry guns places that are *not* sensitive.

The Court of Appeals for the First Circuit has recognized that these examples illustrate "*categories* of regulations that Heller suggested would be 'presumptively lawful.'"  United States v. Booker, 644 F.3d 12, 24 (1st Cir. 2012) (emphasis added).  The Court's statement that these regulations are "presumptively" lawful "reserves the possibility of yet to be developed qualifications."  United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011).  The First Circuit has indicated that a felon may not be completely outside the scope of the Second Amendment's protection, and also that a person who has been "mentally ill" still enjoys some degree of protection.  See id.; see also United States v. Rehlander, 666 F.3d 45, 48-50 (1st Cir. 2012) (construing ban on possession by anyone "who has been committed to a mental institution" to include *ex parte* orders of commitment would violate due process).  Likewise, while it is true that conditions and qualifications can be imposed on the commercial sale of firearms, it would be "untenable" to construe this language to allow "*prohibiting* the commercial sale of firearms."  See United States v. Marzzarella, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (emphasis added).  So equally, the Court's statement that it is permissible to prohibit the carry of guns in *sensitive* places necessarily presupposes that it is not permissible to ban the carry of guns in *all* places.  See Moore v. Madigan, 702 F.3d 933, 940-41 (7th Cir. 2012).

At the same time it identified these three regulations, the Court also discussed two other types of laws:  "prohibitions on carrying concealed weapons" and bans on weapons not "'in common use at the time.'"  Heller, 554 U.S. at 626-27 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).  The First Circuit has explained that these also illustrate "presumptively

lawful" regulations under <u>Heller</u>.  <u>See</u> <u>Rene E.</u>, 583 F.3d at 12.  As such, they also serve to show the scope of the Second Amendment's protection.

The pertinent issue is concealed carry,[5] which <u>Heller</u> introduced as an "example" showing that the right to keep and bear arms was historically "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  <u>Heller</u>, 554 U.S. at 626.  The Court explained that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues," and the Court cited four authorities to support this point  <u>See</u> <u>Heller</u>, 554 U.S. at 626.  All four of these authorities had reasoned that bans on concealed carry were valid because people remained free to carry guns in open view.  <u>See</u> <u>State v. Chandler</u>, 5 La. Ann. 489, 489-490 (1850); <u>Nunn v. State</u>, 1 Ga. 243, 251 (1846); <u>The American Students' Blackstone</u>, 84 n.11 (G. Chase ed. 1884); 2 James Kent, <u>Commentaries on American Law</u> *340 n. 2 (O. Holmes ed. 1873) ; <u>see also</u> <u>Peruta v. San Diego</u>, 678 F. Supp. 2d 1046, 1052-53 (S.D. Cal. 2010).

To be sure, many courts in the post-<u>Heller</u> world have resolved Second Amendment questions by finding the right limited to the home.  However, these courts often place little significance on the guidance that the Court provided in its discussions of permissible gun regulations.  For example, when the Court of Appeals of Maryland held that the act of carrying a firearm outside the home was "outside the scope" of the Second Amendment, it dismissed the Court's dicta and reasoned that if the Court "meant its holding to extend beyond home possession, it will need to say so more plainly."  <u>Williams v. State</u>, 10 A.3d 1167, 1177, 417 Md. 479, 496 (2011).  When the Supreme Judicial Court found that <u>Heller</u> and <u>McDonald</u> stood only

---

[5] The Court's discussion of weapons "in common use" pertains to "M-16 rifles and the like" and does not provide direct guidance on the issue here (the right to carry guns in public).  <u>See</u> <u>Heller</u>, 554 U.S. at 627.

for "a right 'to possess a handgun in the home for the purposes of self-defense,'" it did not

address the presumptively lawful regulations at all.  See Commonwealth v. Gouse, 965 N.E.2d

774, 786, 461 Mass. 787, 801 (2012) (quoting McDonald, 130 S. Ct. at 3050; Heller, 554 U.S. at

635); see also Sims v. United States, 963 A.2d 147 (D.C. 2008); see also People v. Dawson, 934

N.E.2d 598, 605, 403 Ill. App. 3d 499, 508 (App. Ct. 2010).  In later decisions, the Supreme

Judicial Court has minimized the presumptively lawful restrictions as showing examples of

conduct that lie *outside* the scope of the Second Amendment's protection.  See Commonwealth

v. McGowan, 982 N.E.2d 495, 500, 464 Mass. 232, 239 (2013).  This cannot be reconciled with

the approach that First Circuit precedent counsels.  And it is noteworthy that no federal appellate

court, when faced with the question, has ruled that the Second Amendment is limited to the

home.  See Moore, 702 F.3d at 937 ("To confine the right to be armed to the home is to divorce

the Second Amendment from the right of self-defense described in Heller and McDonald.");

Kachalsky v. Westchester, 701 F.3d 81, 89 (2d Cir. 2012) ("the Amendment must have *some*

application in the very different context of the public possession of firearms").  But see Woollard

v. Gallagher, 712 F.3d 865, 875 (4th Cir. 2013) (concluding that burden passes muster and

declining to reach issue of how the right to bear arms applies away from the home); Hightower v.

Boston, 693 F.3d 61, 74 (1st Cir. 2012) (same).

     First Circuit precedent directs paying close attention to "considered dicta" in Supreme

Court decisions, which binds courts "*almost as firmly* as . . . the Court's outright holdings,

particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent

statement."  McCoy v. MIT, 950 F.2d 13, 19 (1st Cir. 1991) (emphasis added); accord United

States v. S. Union Co., 630 F.3d 17, 34 (1st Cir 2010); Rossiter, 357 F.3d at 31 n.3; see also

United States v. Jimenez-Beltre, 440 F.3d 514, 517 (1st Cir. 2006) ("effectively binding");

United States v. Bloom, 149 F.3d 649, 653 (7th Cir. 1998) (the Supreme Court "expects

['informed' dictum] to be followed").  As the Court of Appeals for the Seventh Circuit has

observed, Heller's discussion of "presumptively lawful" restrictions "is the sort of message that,

whether or not technically dictum, a court of appeals must respect, given the Supreme Court's

entitlement to speak through its opinions as well as through its technical holdings."  United

States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).

### (II)  DEFENDANTS' POLICIES OF IMPOSING "TARGET & HUNTING" RESTRICTIONS VIOLATE THE RIGHT OF ARMED SELF-PROTECTION

The First Circuit has declined to adopt the categorical framework of "intermediate" and

"scrutiny" to review burdens on the right to keep and bear arms.  See United States v.

Armstrong, 706 F.3d 1, 8 (1st Cir. 2013); Hightower, 693 F.3d at 74; Booker, 644 F.3d at 25.  In

most cases, the First Circuit proceeds in two analytic steps.  First, the court compares the burden

at issue with Heller's presumptively lawful regulations, analogous state and federal laws, and

traditional understandings of the right.  Next, the court uses this context to determine whether or

not societal interests sufficiently justify the burden.

Defendants' policies do not pass scrutiny under this approach.[6]  Because the policies

preclude a broad swath of protected conduct – any ability to bear arms for protection outside the

home – they must be necessary to the achievement of very important government interests.

However, the lines Defendants have drawn bely any such connection.  A person's "status" does

not relate to legitimate public safety concerns.

### A.  The First Circuit's Approach to Second Amendment Burdens

The First Circuit's first post-Heller case concerned 18 U.S.C. § 922(x)(2)-(3), which

(with exceptions) sets a minimum age of 18 to possess a handgun.  See Rene E., 583 F.3d at 9.

---

[6] While acknowledging binding Circuit authority, Plaintiffs maintain that text and historical
understanding should govern, and that if a "level" of scrutiny is required, it should be "strict."

To review this burden, the court considered the contours of other contemporary gun laws, how state courts had treated analogous legal issues, and finally, what historical sources from the eighteenth and nineteenth centuries revealed about the Founders' attitudes.  See id. at 12-16.  The court upheld the law because it found there was "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns."  Id. at 12.

In its next significant Second Amendment case, the First Circuit reviewed 18 U.S.C. § 922(g)(9), which prohibits domestic violence misdemeanants from possessing guns.  See Booker, 644 F.3d at 13.  The court declined to apply either strict scrutiny or intermediate scrutiny – although both parties had urged the approach.  See id. at 25.  Citing Rene E., the court also disclaimed the idea "that a law may only be found constitutional by reference to its historical provenance."  Id. at 24 n.15.  Instead, the court began its analysis by considering how the law at issue compared with Heller's presumptively lawful restrictions.  See id. at 22-25.  While the domestic violence ban "appears consistent with" these restrictions, the court elected to follow the approach the Seventh Circuit had articulated in Skoien:  "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective."  See Booker, 644 F.3d at 25 (quoting Skoien, 614 F.3d at 641).  After considering the purposes of the law, the court concluded that it "substantially promotes an important government interest in preventing domestic gun violence."  Id. at 26.

The First Circuit next addressed 18 U.S.C. § 922(g)(4), which prohibits gun possession by anyone "who has been committed to a mental institution."  See Rehlander, 666 F.3d at 46.  The issue in Rehlander was *ex parte* commitment, without an adversarial court hearing.  See id. at 46-47.  The court reasoned that in light of Heller, "the right to possess arms (among those not

properly disqualified) is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due process." Id. at 48.  The court then relied on procedural due process principles, reasoning that "to work a permanent or prolonged loss of a constitutional liberty or property interest, an adjudicatory hearing, including a right to offer and test evidence if facts are in dispute, is required." Id.  The court ultimately invoked constitutional avoidance and limited § 922(g)(4) to only reach "commitments" that involved adversarial court proceedings that comported with due process.  See id. at 49-50.

The First Circuit addressed the power to revoke LTC's pursuant to M.G.L. c. 140, § 131(f) for making false statements in applications.  See Hightower, 693 F.3d at 70.  Finding that the challenge would fail "whatever standard of scrutiny is used," the court concluded to "not reach the question of what standard of scrutiny applies here." Id. at 74.  The court found that the power served "a variety of important purposes," and it relied on analogous state and federal laws, and their treatment in the courts, to support its conclusion.  See id. at 74-75 & n.12.

Finally, the First Circuit's most recent decision again addressed domestic violence misdemeanors and gun possession.  See Armstrong, 706 F.3d at 2.  The court reiterated that it had not adopted intermediate scrutiny in Booker.  See id. at 8.  Relying on Booker, it upheld the conviction "because a sufficient nexus exists here between the important government interest and the disqualification of domestic violence misdemeanants like Appellant." Id.

**B.  In Context, the "Target & Hunting" Restriction is a Severe Burden**

The first consideration is how the burden of a license restriction that precludes the carry of guns everywhere but the home compares with the presumptively lawful restrictions, analogous state laws, and historical precedent.  This comparison shows that the burden of a near-complete preclusion on bearing arms is severe, and that it does not comport with historical or contemporary understandings of the right.

-13-

1. *Heller*'s Presumptive Lawful Restrictions

Two of the restrictions that <u>Heller</u> discussed concern the carry of guns:  "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" and "prohibitions on carrying concealed weapons."  <u>See</u> <u>Heller</u>, 554 U.S. at 626.  These are laws that regulate the *places* and *manners* of carry – but which leave people free to carry guns in places and manners that are not proscribed.  The practices at issue here are qualitatively different:  each Plaintiff received an LTC that confines their right to bear arms to the home.  This burden is much more severe than a ban on carrying guns in designated sensitive areas.  <u>See</u> <u>Moore</u>, 702 F.3d at 940 ("guns [banned] merely in particular places, such as public schools" are a "lesser burden" than a "blanket prohibition on carrying gun in public [that] prevents a person from defending himself anywhere except inside his home").

2. *Analogous Laws*

Defendants' policies, which deprive Plaintiffs of the right to carry handguns for protection in all places but the home, impose a much more severe burden than most other Americans face if they choose to exercise their right to bear arms.  Aside from Massachusetts, there are only five other states that grant officials discretion to withhold and/or restrict licenses to carry handguns.[7]  In the *remaining 43 states*, qualified adults who meet reasonable conditions are entitled to carry handguns for their protection.  While most of these states require licenses and impose requirements and qualifications, their laws *require* officials to issue licenses to qualified applicants, and do not give officials discretion to impose restrictions.[8]  The only state that

_____

[7] Cal. Penal Code § 26150(a)(2); <u>id.</u> § 26200; Haw. Rev. Stat. § 134-9(a); Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii); <u>id.</u> § 5-307(b); N.J. Stat. Ann. § 2C:58-4(c), (d); N.Y. Penal L. § 400.00(2)(f).
[8] Thirty-seven states issue licenses to carry handguns on nondiscretionary terms.  <u>See</u> Ark. Code Ann. § 5-73-309; Colo. Rev. Stat. Ann. § 18-12-203(1); Conn. Gen. Stat. § 29-32b(b); Fla. Stat.

completely prohibits carry (outside the home) is Illinois,[9] and the Seventh Circuit has ordered

this state to adopt a carry licensing law – failing which an injunction will prohibit it from

enforcing its carry prohibitions against lawful gun owners.  See Moore, 702 F.3d at 942.

   3.  *Historical Authorities*

   The burden that Defendants' practices impose – a preclusion on bearing arms for self-

defense outside the home – goes far beyond the non-preclusive regulations that have historically

been upheld as being consistent with the right to bear arms.  As Heller's rationale observes, state

courts upholding bans on concealment have done so on the rationale that people remained free to

carry guns in open view.  See Heller, 554 U.S. at 613-14, 626, 629; Peruta, 678 F. Supp. 2d at

1052-54.  Indeed, during the nineteenth century, a number of state courts upheld prohibitions on

concealed carry on just this rationale.  The Kentucky Court of Appeals upheld a concealment

prohibition in 1822 because "though the citizens are forbid wearing weapons concealed in the

manner described in the act, they may, nevertheless, bear arms in any other admissible form."

---

Ann. § 790.06(2); Ga. Code Ann. § 16-11-129(d)(4); Idaho Code Ann. § 18-3302(1); Ind. Code
Ann. § 35-47-2-3(e); Iowa Code Ann. § 724.7(1); Kan. Stat. Ann. § 75-7c03(a); Ky. Rev. Stat.
Ann. § 237.110(4); La. Rev. Stat. Ann. § 40:1379.3(A)(1); 25 Me. Rev. Stat. Ann. § 2003(1);
Mich. Comp. Laws Ann. § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Miss. Code Ann. §
45-9-101(2); Mo. Ann. Stat. § 571.101(1); Mont. Code Ann. § 45-8-321(1); Neb. Rev. Stat. §
69-2430(3); Nev. Rev. Stat. Ann. § 202.3657(2); N.H. Rev. Stat. Ann. § 159.6(I); N.M. Stat.
Ann. § 29-19-4(A); N.C. Gen. Stat. § 14-415.11(b); N.D. Cent. Code § 62.1-04-03(1); Ohio
Rev. Code Ann. § 2923.125(D)(1); 21 Okla. Stat. Ann. § 1290.12(A)(12); Or. Rev. Stat. Ann. §
166.291(1); 18 Pa. Cons. Stat. Ann. § 6109(e); R.I. Gen. Laws § 11-47-11(a); S.C. Code Ann. §
23-31-215(A); S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351(b); Tex. Gov't
Code § 411.177(a); Utah Code Ann. § 53-5-704(1)(a); Va. Code Ann. § 18.2-308(D); Wash.
Rev. Code Ann. § 9.41.070(1); W. Va. Code Ann. § 61-7-4(f); Wis. Stat. § 175.60(2)(a).
Alabama and Delaware have discretionary statutes for licensing the carry of concealed handguns,
but do not, without more, ban private citizens from openly carrying handguns.  See Ala. Code §§
13A-11-73, 75; Morris v. State, 342 So. 2d 417, 418 (Ala. Cr. App. 1977); 11 Del. Code Ann. §§
1441-42; In re McIntyre, 552 A.2d 500, 501 n.1 (Del. Super. Ct. 1988).  Four states (Alaska,
Arizona, Vermont, and Wyoming) do not require licenses at all, although some issue licenses to
individuals who wish to travel out-of-state.  See Alaska Stat. § 18.65.700(a); Ariz. Rev. Stat. §
13-3112(A); Wyo. Stat. Ann. § 6-8-104(b).
[9] See 720 Ill. Comp. Stat. 5/24-1(a)(4); id. § 5/24-1.6.

Bliss v. Commonwealth, 12 Ky. 90, 91 (1822); see also State v. Jumel, 13 La. Ann. 399, 400 (1858); State v. Buzzard, 4 Ark. 18, 27-28 (1842); State v. Reid, 1 Ala. 612, 616-17 (1840); State v. Mitchell, 3 Blackf. 229 (Ind. 1833).

In contrast, bans on carrying guns in *any* manner violate the right to bear arms.  In 1846 the Supreme Court of Georgia found that a law that banned the carry of handguns in *any* manner violated the right to bear arms.  See Nunn v. State, 1 Ga. 243, 251 (1846).  The court found the prohibition valid "so far as [it] seeks to suppress the practice of carrying certain weapons *secretly*, . . . [b]ut that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and void."  Id.  Likewise, in 1871 Tennessee's high court overturned a law that prohibited the carry of handguns in *any* manner as "too broad to be sustained."  Andrews v. State, 50 Tenn. 165, 187-88 (1871) (but acknowledging that the legislature "may by a proper law regulate the carrying of this weapon publicly").

This understanding of the distinction between regulations on the manner of bearing arms and prohibitions on bearing arms entirely has continued into the twentieth century.  See In re McIntyre, 552 A.2d 500, 501 n.1 (Del. Super. Ct. 1988) ("'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed").  But see State v. Rosenthal, 55 A. 610, 611, 75 Vt. 295, 298-99 (1903) (ordinance prohibiting concealed carry without a license violated right to bear arms).  At least four state appeals courts overturned state or local laws that prohibited carry in any manner.  See State ex rel. Princeton v. Buckner, 377 S.E.2d 139, 146, 180 W. Va. 457, 464 (1988) ("the legitimate governmental purpose in regulating the right to bear arms cannot be pursued by means that broadly stifle the exercise of this right where the governmental purpose can be more narrowly achieved"); Lakewood v. Pillow, 501 P.2d 744, 745, 180 Colo. 20, 23 (1972) (although the state's interest in regulating the carry of guns is

"legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved"); Las Vegas v. Moberg, 485 P.2d 737, 438-39, 82 N.M. 626, 628-29 (App. Ct. 1971); In re Brickey, 70 P. 609, 609, 8 Idaho 597, 599 (1908).

### C. Defendants' Practices do Not Further Important Governmental Interests

After placing a regulatory burden in its proper historical and contemporary context, First Circuit precedent teaches that a reviewing court should determine whether societal interests of sufficient importance justify the burden.  Seventh Circuit cases provide further guidance, and they are appropriate to consult, as the Seventh Circuit has also eschewed categorical standards of scrutiny, and the First Circuit first adopted its approach to burden analysis from Seventh Circuit authority.  See Booker, 644 F.3d at 25.  Simply put, a general ban on bearing arms requires a very high showing of necessity – and one that cannot be meant where the basis for abridgement is (at best) only indirectly correlated with any public safety concern.

1.  *Caselaw Requires that the Burden Advance Important Governmental Interests*

The First Circuit's most extensive discussion of the rigor of scrutiny is in Booker, where the court reasoned that "a categorical ban on gun ownership by a class of individuals" requires a "'strong showing'" that there is "a substantial relationship between the restriction and an important governmental objective."  Booker, 644 F.3d at 25 (quoting Skoien, 614 F.3d at 641). In Armstrong, the court articulated the requirement as "a sufficient nexus . . . between the important government interest and the disqualification of domestic violence misdemeanants. . . ." Armstrong, 706 F.3d at 8.  And in Hightower, which concerned statements on an application form, the court focused on whether the accurate information was an "important" interest, and on how well the mechanism of revocation served that interest.  See Hightower, 693 F.3d at 74-75.

Two of the Seventh Circuit's post-<u>Skoien</u> decisions provide significant guidance regarding the analysis of burdens on the right to bear arms.  First, in <u>Ezell v. Chicago</u>, 651 F.3d 684 (7th Cir. 2011), the Seventh Circuit reviewed Chicago laws that prohibited the operation of shooting ranges within city limits.  <u>See id.</u> at 689-90.  The court concluded that the appropriate level of scrutiny depends on the severity of a burden and its proximity to "the core Second Amendment right of armed self-defense."  <u>Id.</u> at 708.  A "severe burden . . . will require an extremely strong public-interest justification and a close fit between the government's means and its end."  <u>Id.</u>  In contrast, "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified."  <u>Id.</u>  The level of judicial scrutiny depends on "the relative severity of the burden and its proximity to the core of the right."  <u>Id.</u>

Finally, the Seventh Circuit has also addressed the level of scrutiny that should (specifically) apply to restrictions on the bearing of arms in public.  <u>See</u> <u>Moore</u>, 702 F.3d 933. Relying on <u>Skoien</u> and <u>Ezell</u>, Judge Posner reasoned in <u>Moore</u> that the level of judicial rigor would depend on the extent to which a restriction precluded the carry of guns.  <u>See id.</u> at 939-40. A prohibition that "prevents a person from defending himself anywhere except inside his home" is a "substantial . . . curtailment of the right of armed self-defense [that] requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment."  <u>Id.</u> at 940 (emphasis in source).  However, a ban on guns "in particular places, such as public schools" is "a lesser burden, [for which] the state doesn't need to prove so strong a need."  <u>Id.</u>  A ban on guns in particular places was similar to a ban on possession by felons and domestic violence offender bans, where the prohibition did not apply across-the-board, but

instead to "a class of persons who present a higher than average risk of misusing a gun." Id.

(citing Skoien, 614 F.3d 638).

   2.   *Defendants' Practices are Not Adequately Related to Public Safety*

   Defendants impose "Target & Hunting" restrictions on LTC's by default, unless a

qualifying exception is present.  For each of the Plaintiffs – and for all others living in

Weymouth or Peabody who do not meet one of the exceptions – Defendants' policies completely

preclude the bearing of arms anywhere outside the home.  A broad preclusion like this requires

an exceptional showing of necessity.

   However, the lines on which Defendants have drawn their policies bely any such

showing.  Indeed, given the extent to which Police Chiefs' restriction policies are inconsistent

with each other across Massachusetts – with some Chiefs routinely issuing unrestricted Class A

LTC's, and others refusing to do so except in rare cases – it is difficult to see how any one

particular practice could be found to be truly necessary to the maintenance of order.

   So, while it might be true that individuals who have a background in the military or in

law enforcement are more likely to be proficient with firearms, Defendants do not issue

unrestricted LTC's to these individuals on the basis of proficiency.  A police officer who could

not pass firearm qualification exams, or a deskbound military officer with little firearms

experience, would both qualify for unrestricted licenses – while a private citizen with extensive

training and proficiency would not.  Just the same, while ownership of a business (or of a

successful business, with lots of cash) may improve a person's societal status, it does not show

the person is more qualified to exercise his or her right to bear arms safely.

   Chief Champagne's policy is concededly more reasonable than Chief Grimes's policy, as

Chief Champagne generally issues unrestricted LTC's on renewal – but a six-year "waiting

period" relates only indirectly to public safety concerns.  There is no assurance that a person will become proficient with handguns during the duration of their first LTC, nor is there any assurance that a person will be inept merely because they have not previously been licensed.

This tangential connection to public safety cannot justify Defendants' policies.  However the standard of review is articulated, it always requires burdens to substantially advance – not just relate to – important societal purposes.  See Heller, 554 U.S. at 628 n.27 (the rational basis test cannot "be used to evaluate the extent to which a legislature may regulate a specific, enumerated right"); Booker, 644 F.3d at 25 ("The Court made plain in Heller that a rational basis alone would be insufficient. . . .").  When it comes to the licensure of constitutional rights, the Supreme Court "ha[s] consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." Kunz v. New York, 340 U.S. 290, 294 (1951); accord Shuttlesworth v. Birmingham, 394 U.S. 147, 153 (1969).  Defendants' policies do not serve considerations that are proper to the regulation of public places.

**CONCLUSION**

All the Court needs to find is that the right to bear arms is the right to carry guns, that the core purpose of the right is armed self-defense, and that the Supreme Court did not limit this right to the home.  These premises compel the finding that Defendants' policies are unconstitutional, as constitutional rights cannot be withheld on the basis of criteria that do not advance important public safety considerations.  The "status"-oriented characteristics that Defendants use to dole out the right to bear arms cannot pass muster.

Dated: July 1, 2013

Respectfully submitted,

THE PLAINTIFFS,

By their attorneys,

David D. Jensen, Esq.
Admitted *Pro Hac Vice*
DAVID JENSEN PLLC
111 John Street, Suite 230
New York, New York 10038
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

Patrick M. Groulx, Esq.
BBO No. 673394
POLIS LEGAL
P.O. Box 76056
Melrose, Massachusetts 02176
Tel:  978.549.3124
Fax:  617.500.9955
pgroulx@polislegal.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on 1 July 2013.

/s/ David D. Jensen
David D. Jensen, Esq.