UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                            )
CHRISTOPHER DAVIS; WILLIAM J.               )
THOMPSON, JR.; RANDY COLE, JR.; WILSON      )
LOBAO; ROBERT CAPONE; RYAN                  )
SHAUGHNESSY; and COMMONWEALTH               )
SECOND AMENDMENT, INC.,                     )
         Plaintiffs,                        )
                                            )
   -against-                                )   CIVIL ACTION NO. 1:13-cv-10246
                                            )
RICHARD C. GRIMES, in his Official Capacity as )
Chief of the Weymouth Police Department, and )
ROBERT L. CHAMPAGNE, in his Official        )
Capacity as Chief of the Peabody Police     )
Department,                                 )
         Defendants,                        )
                                            )
   - and -                                  )
                                            )
COMMONWEALTH OF MASSACHUSETTS,              )
         Intervenor.                        )
_____ )

**DEFENDANTS' RICHARD C. GRIMES'S AND ROBERT L. CHAMPAGNE'S
MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**<u>Preliminary Statement</u>**

No recognized Second Amendment right currently permits an individual to drive or walk down Main Street with a loaded firearm. Yet, this is precisely what Plaintiffs press in this action. Such an expansive view of the Second Amendment is not supported by the Supreme Court's decisions in *Heller* or *McDonald* nor in the vast majority of federal court decisions decided since. Given the parties very different interpretation of the decisions in *Heller* and *McDonald*, the Defendants will start with a detailed discussion of what the Supreme Court held (and did not hold) in those decisions. Assuming *arguendo* the right of "self protection" discussed in *Heller*

and *McDonald* extends beyond one's home, the Defendants maintain that the licensing regime challenged here is still constitutionally sound.

## LEGAL ARGUMENT

### I.  A Closer Look at the Decisions in *Heller* and *McDonald*.

As stated by Justice Scalia in *Heller*, "[w]e consider whether a District of Columbia prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution." *District of Columbia v. Heller,* 554 U.S. 570, 572 (2008). The Court concluded, by parsing the language in the operative clause of the Second Amendment, that the Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," a codification, the Court said, of a "pre-existing" right. *Heller, supra,* at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."). The Court explained that "the inherent right of self-defense has been central to the Second Amendment" and that this right attaches with particular force "to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628. However, the Court explicitly limited this individual right by reference to other individual Constitutional rights and by reference to the Second Amendment itself. "Like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. ("Of course the right was not unlimited, just as the First Amendment's right of free speech was not."). As the Supreme Court does not "read the First Amendment to protect the right of citizens to speak for any purpose," similarly, it does not "read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation." *Id.* at 595. Specifically, the Court made it clear that the right embodied in the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Of

particular relevance here, the Court stated approvingly that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* at 626.[1] Noting that its list of "presumptively lawful regulatory measures" was not "exhaustive," the Court stated, "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n. 26.[2] The Court concluded with the following observation:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see *supra*, at 2816-2817 and n. 26. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense *in the home*. *Id.* at 637 (emphasis added).

Two years later, the Supreme Court decided *McDonald v. City of Chicago*, ___ U.S. ___, 130 S.Ct. 3020, 128 S.Ct. 2783 (2010), in which the Court held that the Second Amendment is fully applicable to the States. Like *Heller*, the plaintiffs in *McDonald* challenged a municipal ordinance which effectively banned handgun possession by almost all private citizens. Otis

---

[1] It is significant that possession of firearms in Massachusetts has been subject to licensing by local officials for over a century. Mass. St. 1906, c. 172 (requiring license for carrying a loaded gun). Although the Target & Hunting and other restrictions appear to be of more recent vintage, the First Circuit has stated, "[o]ur decision in *Rene E* should not be taken to suggest, however, that a law may only be found constitutional by reference to its historical provenance." *United States v. Booker,* 644 F.3d 12, 24 n.15 (1st Cir. 2011).

[2] The Defendants submit that it is nearly impossible to reconcile this statement with Plaintiffs' argument that *Heller* "recognized a general right to carry firearms" in public without any restrictions whatsoever. Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment ("Plaintiffs' Memorandum"), p. 7.

McDonald and the other plaintiffs were all Chicago residents "who would like to keep handguns in their homes for self-defense but are prohibited from doing so by Chicago's firearms laws." *McDonald, supra*, 130 S.Ct. at 3026. The Court (Alito, J.) engaged in a fairly long discussion of the incorporation doctrine under the Due Process clause and concluded that the Due Process clause "incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3050. Justice Alito repeated the Court's admonition from its decision in *Heller* that ". . . incorporation does not imperil every law regulating firearms." *Id.* at 3047.

Of particular importance here are the Court's comments about incorporation and principles of federalism as they apply to the Second Amendment. At this juncture, Justice Alito stated as follows:

> Municipal respondents point out – quite correctly – that conditions and problems differ from locality to locality and that citizens in different jurisdictions have divergent views on the issue of gun control. Municipal respondents therefore urge us to allow state and local governments to enact any gun control law that they deem to be reasonable, including a complete ban on the possession of handguns in the home for self-defense.
>
> Time and again, however, those pleas failed. Unless we turn back the clock or adopt a special incorporation test applicable only to the Second Amendment, municipal respondents' argument must be rejected. Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective, then, unless stare decisis counsels otherwise, that guarantee is fully binding on the States and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values. As noted by the 38 States that have appeared in this case as *amici* supporting petitioners, "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *Id.* at 3046. (emphasis in original).[3]

---

[3] The Court's statement and tacit approval of the notion that "reasonable firearms regulations will continue under the Second Amendment," certainly suggests that the Second Amendment does not go as far as Plaintiffs suggest, to wit, the right to carry a loaded weapon in public, any time, any where. Presumably, Plaintiffs would concede this does not extend to "sensitive" places such as schools, courthouses, and houses of worship. In any event, at this juncture, any further discussion of this particular concern is unnecessary.

While the precise scope of the *Heller* and *McDonald* decisions remains uncertain, there is no doubt that the Supreme Court did not hold that the rights secured by Second Amendment include the right to carry a loaded firearm (concealed or not) *outside* of the home without limitation.[4]  Moreover, contrary to the Plaintiffs' assertion, with perhaps one exception, no federal appeals court including the First Circuit has held "that the carry of guns in public falls directly within [the Second Amendment's] scope."  Plaintiffs' Memorandum, p.1.  On the contrary, a number of post-*Heller* decisions have confirmed its far more limited meaning, *i.e.* that the Second Amendment secures the right of law abiding citizens to own and operate a firearm in their home for purposes of self-protection.[5]  In other words, exactly what Plaintiffs <u>concede</u> is provided by the Licenses to Carry Firearms which they now posses.  Plaintiffs' Memorandum, p. 2 ("This restriction authorizes Plaintiffs to engage in recreational shooting, hunting and collecting – but it only allows Plaintiffs the right of self-protection 'in the home.'").

**II.    Post-*Heller* and *McDonald* Decisions Overwhelmingly Have Not Extended The Right to Carry A Firearm Outside of the Home.**

Due to this uncertainty, federal courts have proceeded cautiously when addressing Second Amendment rights beyond the right to possess a handgun in the home.  In fact, the vast majority of courts have found no such right exists outside of the home or suggested as much

---

[4] Plaintiffs maintain that "[a]ny doubt that Heller recognized a general right to carry guns dissolves when one considers the guidance the Court provided with its discussion of 'presumptively lawful' gun regulations that it left intact." Plaintiffs' Memorandum, p.7. The majority opinions in *Heller* and *McDonald* run a combined 75 pages. Nowhere did the Supreme Court state that the Second Amendment provides or secures a "general right to carry" outside of the home without any limitation. To state the obvious, if the Supreme Court had intended to cast Second Amendment rights in such sweeping terms, it would have done so.

[5] Of course, the Defendants have no reason to doubt that Plaintiffs are law-abiding citizens. But, this is not the point. As a Tennessee court recently observed in rejecting a Second Amendment challenge similar to that made here, "a view to *prevent* crime could entail regulations that must be adhered to by people without criminal backgrounds." *Embody v. Cooper,* 2013 WL 2295671 *6 (Tenn. App. Ct., May 22, 2013).

without deciding the issue directly.  *See, e.g., Nichols v. Brown,* 2013 WL 3368922 (C.D. Cal. July 13, 2013); *Williams v. Puerto Rico,* 910 F.Supp.2d 386 (D.P.R. 2012) (Puerto Rico statutes which "regulate" the carrying of guns outside of the home do not violate the Second Amendment); *Piszczatoski v. Filko*, 840 F.Supp.2d 813, 820 (D.N.J. 2012) ("[t]he Second Amendment does not protect an absolute right to carry a gun for self-defense outside of the home, even if the Second Amendment may protect a narrower right to do so for particular purposes under certain circumstances"); *Richards v. County of Yolo,* 821 F.Supp.2d 1169, 1174 & n.4 (E.D. Cal. 2011) (In both *Heller* and *McDonald*, the Supreme Court ". . . took pain-staking effort to clearly enumerate that the scope of *Heller* extends only to the right to keep a firearm <u>in the home</u> for self-defense purposes") (emphasis in original);[6] *Kachalsky v. Cacace,* 817 F.Supp.2d 235, 258 (S.D.N.Y. 2011) ("[*Heller's*] emphasis on the Second Amendment's protection of the right to keep and bear arms for the purpose of 'self-defense in the home' permeates the Court's decision and forms the basis for its holding – which, despite the Court's broad analysis of the Second Amendment's test and historical underpinnings, is actually quite narrow."); *United States v. Tooley,* 717 F.Supp.2d 580, 596 (S.D.W.Va.2010) ("[P]ossession of a firearm outside the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller.*"), *aff'd* 468 Fed. Appx. 357 (4th Cir. 2012), *cert. denied,* ___ U.S. ___, ___ S.Ct. ___, 184 L.Ed.2d 109 (Oct. 1, 2012); and, *United*

---

[6] It is worth noting that the gun licensing scheme challenged in *Yolo* is substantially similar to the one challenged here.  In rejecting plaintiffs' Second Amendment challenge, the District Court made the following observation:

> In fact, the [Supreme] Court was careful to explain that their decision did not, in any way, invalidate many of the longstanding state and federal prohibitions on firearm possession.  Based upon this, *Heller* cannot be read to invalidate Yolo County's concealed weapon policy, as the Second Amendment does not create a fundamental right to carry a concealed weapon in public.  *Yolo*, *supra,* 821 F.Supp.2d at 1174 (internal citations omitted).

*States v. Hart,* 726 F.Supp.2d 56, 60 (D. Mass. 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional . . .. Therefore, it was not a violation of [defendant's] Second Amendment rights to stop him on the basis of the suspicion of carrying a concealed weapon."), *aff'd* 674 F.3d 33 (1st Cir. 2012), *cert. denied*, ___ U.S. ___, ___ S.Ct. ___, 184 L.Ed.2d 118 (Oct. 2012). *Cf., Commonwealth v. Perez,* 80 Mass. App. Ct. 271, 282 (2011) ("The Second Amendment does not protect the defendant in this case because he [was caught] in possession of the firearm outside of his home.").[7]

In particular, courts have found that *Heller* did not reach, much less settle "beyond debate," the issue of whether and when open carry regulations are unconstitutional. *See, e.g., Kachalsky v. County of Westchester,* 701 F.3d 81, 94 (2nd Cir. 2012), *cert. denied*, 2013 WL 127129 (U.S. 2013) ("The states ability to regulate firearms and, for that matter, conduct, is qualitatively different in public than in the home. *Heller* reinforces this view."); *United States v. Masciandaro,* 648 F.Supp.2d 779, 788 (E.D.Va. 2009) ("[A]lthough *Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside the home, *Heller's* dicta makes pellucidly clear that the Supreme Court's holding should not be read by lower courts as an invitation to invalidate the existing universe of public weapons regulations.") (emphasis in original) (footnotes omitted), *aff'd,* 638 F.3d 458, 470 (4th Cir. 2011) ("[W]e assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny. But, as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense."); *Peruta v. County of San Diego,* 758 F.Supp.2d 1106, 1117 (S.D.Cal.

---

[7] The First Circuit has not decided the scope of the Second Amendment "as to carrying firearms outside the vicinity of the home without any reference to protection of the home." *Hightower v. City of Boston,* 693 F.3d 61, 72 n. 8 (1st Cir. 2012). Still, in *Hightower* the First Circuit did state, "[l]icensing of the carrying of concealed weapons is presumptively lawful, and *Hightower* makes no serious argument to the contrary." *Hightower, supra,* 693 F.3d at 73-74.

2010) ("regulations restricting the carrying of firearms in public are constitutional so long as there is a reasonable fit between the regulation and a significant, substantial, or important governmental interest, such as interests "in public safety and in reducing the rate of gun use in crime."). Thus, with the possible exception of the Seventh Circuit, a distinct majority of federal courts that have addressed the issue have found that the Second Amendment does not afford one the unfettered "right" to carry a concealed weapon in public as Plaintiffs urge here.[8]  Because it addressed and rejected several of the same arguments as Plaintiffs make here, a more detailed discussion of the Second Circuit's recent decision in *Kachalsky* is in order.

The plaintiffs in *Kachalsky* challenged, on Second Amendment grounds, a New York law which, subject to certain exemptions, prevents individuals from obtaining an unrestricted or "full-carry" license to carry a concealed firearm in public except upon a showing of "proper cause" as interpreted by New York courts.  Licensing officers, often local judges, are "vested with considerable discretion" in deciding whether to grant a license application, particularly in determining whether proper cause exists for the issuance of a full-carry license.  *Kachalsky, supra,* 701 F.3d at 87.  All of the plaintiffs' applications were denied for the same reason:  failure to show any facts demonstrating a need for self-protection distinguishable from that of the general public.  *Id.* at 88.  Invoking *Heller,* plaintiffs argued that New York's "proper cause" requirement runs afoul of the Second Amendment.  Plaintiff-*Kachalsky*, in particular, asserted that the Second Amendment *alone* "entitles him to an unrestricted permit without further establishing 'proper cause.'" *Id.* at 87.

---

[8] But see *Moore v. Madigan,* 702 F.3d 933, 936 (7th Cir. 2012) (holding that the Second Amendment "implies a right to carry a loaded gun outside of the home").  In *Moore*, the Seventh Circuit invalidated an Illinois statute that "flat[ly] ban[ned] . . . carrying ready-to-use guns outside the home" with no self-defense exception and no provision for obtaining concealed-carry licenses.  *Id.* at 940-41.  *Moore* is thus inapposite because, as was discussed in the Defendants' principal Memorandum, the Illinois law at issue in *Moore* is far more burdensome than the limited restrictions imposed on Plaintiffs' Class A LTCs.

Assuming that the Second Amendment must have "<u>some</u> application in the [sic] context of the public possession of firearms," *id.* at 89 (emphasis in original), the Second Circuit nonetheless rejected plaintiffs' constitutional challenge. Initially, the Court stated that because the proper cause requirement "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public," some form of heightened scrutiny was appropriate. *Id.* at 93. Still, under this standard of review, the Court noted that the New York law "need only be <u>substantially related</u> to the state's important public safety interest. A perfect fit between the means and the governmental objective is not required." *Id.* at 98 (emphasis in original). Although the plaintiffs argued that their "desire for self-defense . . . is all the 'proper cause' required . . . by the Second Amendment to carry a firearm," the Court rejected that argument. *Id.* at 99-100. After noting that "State regulation under the Second Amendment has always been more robust than of other enumerated rights," in terms equally applicable here, the Court stated as follows:

> Moreover, as discussed above, extensive state regulation of handguns has never been considered incompatible with the Second Amendment or, for that matter, the common-law right to self-defense. This includes significant restrictions on how handguns are carried, complete prohibitions on carrying the weapon in public, and even in some instances, prohibitions on purchasing handguns. In this vein, handguns have been subject to a level of state regulation that is stricter than any other enumerated right.
>
> In light of the state's considerable authority – enshrined within the Second Amendment – to regulate firearm possession in public, requiring a showing that there is an objective threat to a person's safety – a "special need for self-protection" – before granting a carry license is entirely consistent with the right to bear arms. Indeed, there is no right to engage in self-defense with a firearm until the objective circumstances justify the use of deadly force. *Id.* at 100 (internal citations omitted).[9]

---

[9] It is worth noting that Massachusetts makes a distinction between the use of deadly force inside the home (where there is no duty to retreat) and the use of even non-deadly force outside of the home (where there is a duty to retreat). *Compare Commonwealth v. McKinnon,* 446 Mass. 263, 266-267 (2006) (home), *with Commonwealth v. Toon,* 55 Mass. App. Ct. 642, 653-54 (2002) (outside the home).

### III. Chapter 140 Is Constitutional Even If the Second Amendment Secures "Some" Right to Carry Outside of the Home.

Assuming *arguendo* that the Second Amendment provides "some" personal rights outside of the home for purposes of self-protection, the Defendants submit that Chapter 140 still passes constitutional muster. Plaintiffs argue that because the restrictions on their LTCs "preclude a broad swath of protected conduct . . . they must be necessary to the achievement of important government interests." Plaintiffs' Memorandum, p. 11. Plaintiffs cannot seriously dispute that the Commonwealth's efforts to ensure that only qualified individuals can legally carry a loaded gun is "an important government interest." As the Massachusetts Appeals Court has noted, "the goal of firearms control legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons . . . It has been said about §131 that it was intended 'to have local licensing authorities employ every conceivable means of preventing deadly weapons in the form of firearms [from] coming into the hands of evildoers.'" *Ruggiero v. Police Comm'r of Boston,* 18 Mass. App. Ct. 256, 258-259 (1984) (internal citations omitted). Indeed, the Appeals Court specifically <u>rejected</u> the argument, made by Plaintiffs here, that once an applicant for a License to Carry is deemed a suitable person for one purpose, he must be considered suitable for all purposes. *Ruggiero, supra,* 18 Mass. App. Ct. at 260 n. 5. What Plaintiffs really take issue with is the discretion which Chapter 140, Section 131, affords local police chiefs to issue an unrestricted LTC or to attach some restrictions thereto. "A person's 'status' does not relate to legitimate public safety concerns." Plaintiffs' Memorandum, p. 11.[10] For starters, a number of statutory disqualifications (which Plaintiffs are not challenging) are, in fact, based on one's

---

[10] Statutes, too numerous to mention, vest local boards with the authority to issue, deny, restrict, suspend or revoke a license or permit. *See, e.g.,* M.G.L. c. 40A, §§ 7 & 8 (variance or special permit); M.G.L. c. 94, §§ 2-6, 9F-9J (retail bakeries); M.G.L. c. 111, §§ 31-31A, *et. seq.* (landfills); M.G.L. c. 138, § 23 (liquor license); and M.G.L. c. 140, §§ 57 & 59 (used car dealer).

"status." See M.G.L. c. 140, §131(a). Perhaps more germane, when it comes to first-time applicants such as the Plaintiffs, Chief Grimes and Chief Champagne have little, if any, knowledge or history of their firearms proficiency or their sensibility. In terms of maintaining public order and limiting the collateral damage and fatalities from the misuse of firearms, it makes little difference to Chief Grimes or Chief Champagne that, according to Plaintiffs, "*Heller* was only concerned with laws that regulate the places and manner of carry—but which leave people free to carry guns in places and manners that are not proscribed." Plaintiffs' Memorandum, p. 14. As one court recently observed, "the strength of the interests are comparable, and whether a permit is required to carry a handgun either openly or concealed (as in New Jersey) or only to carry one concealed (as in California and New York) makes no difference to whether the law requiring a permit and setting out conditions for such permit is sufficiently tailored to the state's asserted interests." *Piszczatoski, supra*, 840 F.Supp.2d at 836.

The fact that they (Chief Grimes and Chief Champagne) make exceptions for persons who have already demonstrated a proficiency with firearms, e.g. veterans and police officers, or for persons who have demonstrated a genuine security concern based on the fact they carry large amounts of cash or valuables, does not mean that their individual licensing policies are not substantially related to public safety.[11] On the contrary, their general policy of denying first-time applicants an unrestricted Class A LTC does just that: it requires first-time gun license applicants

---

[11] Plaintiffs contend that the Defendants do not issue unrestricted LTCs on the basis of proficiency. "A police officer who could not pass firearm qualifications exams, or a deskbound military officer with little firearm experience, would both qualify for unrestricted licenses – while a private citizen with extensive training and proficiency would not." Plaintiffs' Memorandum, p. 19. This strains credulity to the breaking point. A police officer "who could not pass firearm qualifications exams" would not be a police officer. In any event, the Court is respectfully referred to Affidavit of Chief Ronald Glidden (retired) for a discussion between the extensive firearms training required of a Massachusetts police officer (which requires extensive live firing), as compared to the four-hour course required by one seeking a LTC (which requires no live firing).

(with certain exceptions) demonstrate to Chief Grimes and Chief Champagne over time that, first, they can carry and use firearms responsibly with the Target & Hunting restriction. Then, once this has been so demonstrated to the Chiefs' satisfaction, they will ordinarily receive an unrestricted Class A LTC.[12] Moreover, that there is no "assurance" that "a person will become proficient with handguns during the duration of their first LTC," augurs in favor of leaving the decision to issue an unrestricted Class A LTC to local officials. Plaintiffs' Memorandum, p. 20. This speaks of no Second Amendment or Equal Protection violation. *See, e.g., Peterson v. Martinez,* 707 F.3d 1197, 1120-21 (10th Cir. 2013) (rejecting constitutional challenge to Colorado law which limits issuance of license to carry concealed handguns to Colorado residents and noting the importance of an individual county sheriff's ability ". . . in assessing whether an individual *is qualified* to possess a CHL, and in monitoring whether CHL holders *maintain* their qualifications") (emphasis added); and, *Richards v. County of Yolo*, *supra,* 821 F.Supp.2d at 1177-78 (rejecting equal protection challenge to California statute which authorizes each county sheriff to determine the appropriate criteria for issuing a license to carry and the discretion to impose "reasonable restrictions" on the licensee). And, even if this results in some disparity of treatment among the several hundred police chiefs across the Commonwealth, the Defendants submit this result does not violate the Equal Protection clause. *See, e.g., United States v. Marathon Development Corp.,* 867 F.2d 96, 100-01 (1st Cir. 1989) (Clean Water Act provision

---

[12] The very real dangers of allowing someone to carry a loaded gun in public, concealed or not, are described more fully in the Supplemental Affidavit of Chief Richard Grimes. While Chief Grimes's Affidavit discusses, in part, a number of situations which have not come to fruition in his Town (Weymouth), courts have upheld – over Second Amendment challenge – regulations which purpose is "limiting *potential* violence within those areas" effected by those regulations. *See, Doe v. Wilmington Housing Authority,* 880 F.Supp.2d 513, 536 (D. Del. 2012) (no Second Amendment violation where residents of public housing authority were prohibited from displaying or carrying a firearm "in any common area" except when traveling to or from the resident's own unit) (emphasis added).

that allows individual states to impose their own more stringent water quality standards than the federal government, "hardly amounts to a denial of equal protection"); *Golden v. Board of Selectmen of Falmouth,* 358 Mass. 519, 526-527 (1970) (while state law sets minimum standards for preserving coastal wetlands, it "[left] local communities free to adopt more stringent standards."); *cf., Collins v. Nuzzo,* 244 F.3d 246, 251 (1st Cir. 2001) ("We have warned that if disgruntled permit applicants could create constitutional claims merely by alleging that they were treated differently from a similarly situated applicant, the correctness of virtually any state permit denied would become subject to litigation in federal court.") (citations omitted).[13]

## CONCLUSION

WHEREFORE, the Defendants submit that their Motion for Summary Judgment should be allowed in its entirety and the Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted,
The Defendants,
RICHARD C. GRIMES, in his Official Capacity as Chief of the Weymouth Police Department, and
ROBERT L. CHAMPAGNE, in his Official Capacity as Chief of the Peabody Police Department,
By their attorneys
**PIERCE, DAVIS & PERRITANO, LLP**

/s/ Adam Simms
John J. Davis, BBO #115890
Adam Simms, BBO #632617
90 Canal Street
Boston, MA 02114
(617) 350-0950
jdavis@piercedavis.com
asimms@piercedavis.com

---

[13] Plaintiffs make no argument in support of their nascent Due Process claim and, accordingly, it should be deemed waived. In any event, "where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a Plaintiff's claims under that explicit provision and not under the more generalized notion of 'substantive due process.'" *Gardner v. Vespia,* 252 F.3d 500, 503 (1st Cir. 2001), *citing Conn v. Gabbert,* 526 U.S. 286, 293 (1999) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)).

**CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing document filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on July 31, 2013.

                                              /s/ Adam Simms
                                              Adam Simms