UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTOPHER DAVIS, *et al.*,

                    Plaintiff,

              v.                          CIVIL ACTION
                                          NO. 13-10246-FDS
RICHARD C. GRIMES, in his official capacity as
CHIEF OF THE WEYMOUTH POLICE
DEPARTMENT, *et al.*,

                    Defendants.

---

**MEMORANDUM OF INTERVENOR
COMMONWEALTH OF MASSACHUSETTS
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

---

MARTHA COAKLEY
ATTORNEY GENERAL

William W. Porter
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108-1598
(617) 727-2200, ext. 2976
BBO No. 542207
Bill.Porter@state.ma.us

July 31, 2013

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATEMENT OF THE CASE.......................................................................................1

    Massachusetts Firearms Licensing Framework ........................................................1

    Statement of Undisputed Facts .................................................................................4

ARGUMENT ...............................................................................................................7

    I.    The Restrictions That Plaintiffs Challenge Do Not Implicate the
        Second Amendment. .........................................................................................7

        A.    Heller does not recognize a Second Amendment right to
            carry firearms outside the home................................................................7

        B.    Plaintiffs Have No Second Amendment Right to Carry
            Concealed or High Capacity Weapons. ....................................................10

    II.    Even If The Second Amendment Applied, the Restrictions
        Challenged in this Action Would Be Constitutionally Permissible.......................12

        A.    The Challenged Restrictions are Subject to, at Most,
            Intermediate Judicial Scrutiny. .................................................................13

        B.    Restrictions of the Type Challenged Here Easily Satisfy
            Intermediate Scrutiny...............................................................................16

        1.    The Objective of the Massachusetts Gun Control Laws is to
            Protect the Health, Safety and Welfare of the Public. ..............................17

        2.    The Challenged Restrictions Are Substantially Related to
            Protecting Public Safety Because TheThreat to Public
            Safety From Carrying Loaded, Concealed and High-
            Capacity Firearms in Public is Well-Established.......................................18

CONCLUSION.............................................................................................................21

## INTRODUCTION

This is an action by four individuals and a non-profit organization seeking a declaration that the chiefs of police in two Massachusetts communities have violated the Second Amendment by placing certain restrictions on plaintiffs' licenses to carry loaded, concealed firearms in public.  The Commonwealth has intervened to defend the statute, Mass. Gen. Laws c. 140, § 131, which expressly grants licensing authorities the discretion to place restrictions on licenses.

In their motion for summary judgment, the plaintiffs have failed to establish a violation of the Second Amendment.  First, the decision in District of Columbia v. Heller, 554 U.S. 570 (2008), is properly read to protect a responsible, law abiding citizen's right to possess an operable handgun *in the home for self-defense,* a conclusion supported by lower courts since 2008.  It is also established that the Second Amendment does not grant a right to carry concealed or high-capacity weapons, which are two main features of the licenses plaintiffs seek.  The restrictions that plaintiffs challenge do not burden the Second Amendment because they do not prevent them from exercising their right to self-defense in the home.

Second, even if the restrictions were found to implicate the Second Amendment, they are subject to, at most, intermediate judicial scrutiny.  The restrictions easily survive such review because they promote substantial public safety benefits by carefully limiting the carrying of concealed firearms outside the home to eligible persons with a demonstrated and proper need to do so.

## STATEMENT OF THE CASE

### Massachusetts Firearms Licensing Framework

Mass. G.L. c. 140, § 131, was originally enacted in 1906 as "An Act to Regulate By License the Carrying of Concealed Weapons."  See Ch.172, § 1, 1906 Mass. Acts 150.  The act authorized certain public officials to issue a license "to carry a loaded pistol or revolver . . . if it appears that the applicant has good reason to fear an injury to his person or property, and that he is a suitable person to be so licensed."  Id. §1  Carrying a covered firearm without a license was

punishable by fine or imprisonment up to one year.  Id. § 2.  Since 1906, the law has been

amended on various occasions, but still retains the original requirements that the applicant be a

suitable person and have a proper purpose for licensure.  See Powell v Tompkins, 2013 WL

765339, *17 (D. Mass.), appeal pending First Cir. No. 13-1310 (tracing history of Massachusetts

concealed-carry statute).

**License to Carry**.  Today, Massachusetts law establishes two categories of licenses to

carry firearms in public (Class A and Class B).  Mass. G.L. c. 140, § 131(a) and (b).  Holders of

either license may possess and carry "firearms," "rifles," or "shotguns" in their home or in

public.  Id.[1]  The holder of a Class A license may also (1) "carry or possess a loaded firearm in a

concealed manner in any public place or way," or (2) obtain, possess, or carry any "large

capacity" firearm.  Id.[2]  Both Class A and Class B licenses may be issued subject to restrictions

imposed by the licensing authority.  Id.  See Chardin v. Davis, 989 N.E. 2d 392, 394-94 (Mass.

2013) (describing statutory scheme).

Mass. G.L. c. 140, § 131(d), disqualifies certain categories of persons from obtaining a

firearm license.  These include persons:  (i) convicted of a felony, a firearms-related offense, a

misdemeanor punishable by imprisonment for more than two years, or a violent crime; (ii) who

have been hospitalized for mental illness and are still disabled by it; (iii) who have been treated

or confined for drug addiction or habitual drunkenness, and are not yet cured; (iv) less than 21

years of age; (v) who are aliens; or (vi) currently the subject of an abuse prevention restraining

order or an outstanding arrest warrant.  Mass. G.L. c. 140, § 131(d).

**Application Process**.  Subject to the disqualifications discussed above "[a]ny person

residing or having a place of business" in Massachusetts may apply for a Class A or Class B

---

[1]  A "firearm" is, in general, a "pistol, revolver or other weapon of any description, loaded or
unloaded, from which a shot or bullet can be discharged" and with a barrel less than 16 inches.
G.L. c. 140, § 121.

[2]  A "large capacity weapon" is, in general, "any firearm, rifle or shotgun" that is
"semiautomatic with a fixed large capacity feeding device . . . or capable of accepting . . . any
detachable large capacity feeding device."  G.L. c. 140, § 121.

license to their local police chief or the State Police colonel.  Id. § 131(d).[3]  If an applicant is not statutorily disqualified, the licensing authority may issue a license to carry if "it appears that the applicant is a suitable person to be issued such license,[4] and that the applicant has good reason to fear injury to his person or property, or for any other reason . . . . subject to such restrictions expressed or authorized under this section."  Id. § 131(d).  See id. § 131(a) and (b) (Class A and B licenses issued "subject to such restrictions relative to the possession, use or carrying [of firearms] as the licensing authority deems proper").  A licensing authority may "limit any license granted under § 131 to a specified purpose."  Ruggiero v. Police Comm'r of Boston, 464 N.E.2d 104, 107 (Mass. App. 1984).

**Denial of Application; and Revocation or Suspension**.  "A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license."  Mass. G.L. c. 140, § 131(f).  If a license holder becomes statutorily disqualified, the license must be revoked or suspended.  Id.  A license applicant or holder may "file a petition to obtain judicial review" in Massachusetts district court within "90 days after receiving notice of such denial, revocation or suspension."  Mass. G.L. c. 140, § 131(f).  An applicant may also petition for review of a decision to issue a restricted, as opposed to unrestricted, license.  Ruggiero, 464 N.E.2d at 105-06.  The court may order that the license be issued or reinstated if, "after a hearing," it "finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same."  Mass. G.L. c. 140, § 131(f).  A party may seek further review in Superior Court in an action in the nature of certiorari under Mass. G.L. c. 249, § 4.  Godfrey v. Chief of Police of Wellesley, 616 N.E.2d 485, 487 (Mass. App. 1993).

---

[3]  Nonresidents may apply for a renewable one-year Class A or Class B license to the Firearms Records Bureau, which has been authorized by the State Police colonel to issue such licenses under Mass. Gen. L. c. 140, § 131F.

[4]  A "suitable" person is "a sufficiently responsible person to be entrusted with a license to carry firearms."  Hightower v. City of Boston, 822 F. Supp. 2d 38, 44 (D. Mass. 2011) aff'd, 693 F.3d 61 (1st Cir. 2012).

**Statement of Undisputed Facts**

Each of the individual plaintiffs seeks a license to carry a loaded, concealed, large-capacity firearm in public for "self-protection."   Joint Statement of Undisputed Facts ("JS") (Doc. 34) ¶23.  Plaintiffs Wilson Lobao and Robert Capone are residents of Peabody, Massachusetts.  JS ¶2.  They were denied unrestricted Class A Licenses to Carry (LTC) by defendant Robert Champagne, Chief of the Peabody Police Department, who is responsible for issuing firearms licenses in Peabody under Mass. G.L. c. 140, §131(d).  JS ¶6.  Plaintiff Christopher Davis is a resident of Weymouth, Massachusetts.  JS ¶1.  He was denied an unrestricted Class A License to Carry by defendant Richard C. Grimes, Chief of the Weymouth Police Department, who is the firearms licensing authority for Weymouth.  JS ¶5.  Plaintiff William Thompson is a former resident of Weymouth, who now seeks an unrestricted Class A license in Halifax, Massachusetts.  JS ¶¶ 3, 17.  None of the plaintiffs sought judicial review under Mass. G.L. c. 140, § 131(f), of the denial of their application for an unrestricted Class A LTC.

**Peabody**.  In Peabody, Chief Champagne generally does not issue an unrestricted LTC to persons who have no prior licensed firearm experience.  Instead, he issues a license restricted to personal protection in the home and "Target & Hunting" uses.  JS ¶ 10.  The license:

> Restricts possession to the purpose of lawful recreational shooting or competition; for use in the lawful pursuit of game animals and birds; for personal protection in the home; and for the purpose of collecting (other than machine guns). It includes travel to-and-from the activity Location.

JS ¶8.  In certain cases, Chief Champagne will issue an unrestricted Class A LTC where a first-time applicant documents that he requires the license for employment or business purposes, or where an applicant not previously licensed in Massachusetts has held an unrestricted license in another state or the military.  JS ¶10.   If an applicant remains statutorily qualified, and suitable, Chief Champagne ordinarily issues renewal LTC's without restrictions.  Id.

Plaintiffs Lobao and Capone are first-time applicants for firearms licenses. JS ¶¶18, 22. Both "desire to carry a handgun for the purpose of self-protection outside of their home." JS ¶23. Neither of them, however, even asserted that they had a special need to be armed in public or that they faced any particular or immediate threat to their safety. On his application, Lobao stated that the reasons he requested a license were "carry to and from home to club range and boat – self protection." JS ¶18 and Joint Ex. S. In a letter submitted with his application, Lobao also stated that he wanted to participate in pistol and rifle teams at the Haverhill Hound Rod & Gun Club. Joint Ex. T. On his application, Capone stated that he requested an LTC "[f]or personal protection in and out of the house and sport and target. (Business capacity.)" JS ¶21 and Joint Ex. I.

In 2008, Chief Champagne issued a Class B LTC to Lobao restricted to "Target & Hunting." JS ¶19 and Joint Ex. R. In 2012, Chief Champagne issued a Class A LTC to Capone, also restricted to "Target & Hunting." JS ¶21 and Joint Ex. H.

**Weymouth**. In Weymouth, Chief Grimes ordinarily imposes a Target & Hunting restriction on first-time applicants for a Class A LTC. JS ¶21. Weymouth uses the same, standard definition of this restriction as Peabody, quoted above. JS ¶¶ 7, 8. In Weymouth, unrestricted licenses for first-time applicants are usually issued to persons with law enforcement or military experience, and business owners who substantiate that they handle large amounts of cash. Chief Grimes also issues licenses restricted to "employment" to people who are required to carry a firearm by their employer and submit documentation from their employer. JS ¶9. Grimes will also issue unrestricted licenses to first-time applicants "who have been victims of violent crime or had threats against them." Davis. Decl. (Doc. 39) ¶7. Prior to the expiration of the initial six-year licensing period, Chief Grimes will also consider lifting license restrictions where the applicant shows a change of circumstance which warrants the change. JS ¶9 and Joint Ex. D.

In March 2012, Davis submitted an application to the Weymouth Police Department to renew his Class B LTC, which was issued in Foxborough. Davis requested an unrestricted Class

A LTC. JS ¶11 and Joint Ex. M.  In his application, Davis stated that he "was a victim of identity theft as well as criminal harassment by an individual who was deemed 'unfit to stand trial' for . . . psychological reasons.  This person was shipping items to my house and I fear for my safety and for the safety of my family."  Id.  Davis did not, however, assert that the individual had threatened Davis or his family.  Id.  In a subsequent letter, Davis also said he desired to carry a firearm for protection while hiking and camping with his family in remote areas.  JS ¶ 11.  The licensing officer in Weymouth informed Davis that, generally, the Town's policy for first-time Class A applicants was to issue unrestricted licenses only to law enforcement, military personnel and business owners, or to persons who have been victims of violent crime or had threats against them.  JS ¶11; Davis. Decl. (Doc. 39) ¶ 7.  On July 3, 2012, Chief Grimes issued Davis a Class A LTC with the restriction of "Target & Hunting."  JS ¶12 and Joint Ex. L.

Plaintiff William Thompson is a resident of Halifax, Massachusetts, who lived in Weymouth before this action was filed.  In April 2008, the then-Weymouth Police Chief issued him a license to carry restricted to "Target and Hunting," which will expire in October 2013.  JS ¶14.[5]  Thompson has applied for an unrestricted LTC from the Halifax Police Department. Thompson asserts that Halifax cannot issue an LTC unless Thompson's Weymouth-issued LTC is first "expired."  JS ¶17.  Chief Grimes has declined to "expire" the LTC and has left the decision to the licensing authority in Halifax, where Thompson now lives.  Id.; Grimes Aff. (Doc. 33) ¶ 9.[6]

Many residents of both Weymouth and Peabody possess unrestricted licenses to carry firearms.  In Weymouth, which has a population of 53,743, Chief Grimes has issued 1,078 LTCs

---

[5]   Thompson has not filed the 2008 application in this case; it appears that he requested the license for "all lawful purposes" but did not document any particular need for self-protection.  JS ¶14.

[6]   In their motion for summary judgment, defendants Champagne and Davis urge that the plaintiffs lack standing.  See Mem. in Support of Mot. for Sum. Judg. (Doc. 31) at 8-10.  The Commonwealth adopts and joins in this argument, which has particular force with respect to Thompson, who does not reside in Weymouth and seeks a license in another community.

(as of April 17, 2013), 485 of which carry some restriction, the majority of which are "Target & Hunting."  In Peabody, which has a population of 51, 251, Chief Champagne has issued 1,633 LTCs (as of May 22, 2013); 475 carry the restriction "Target & Hunting."  JS ¶¶ 25, 26.[7]

## ARGUMENT

In this action, plaintiffs challenge only the imposition of a "Target and Hunting" restriction on their licenses-to-carry, which the defendant chiefs have done in an exercise of their discretion under Mass. G.L. 140, § 131(d).  See Amended Compl., ¶¶1, 25.  The plaintiffs do not challenge any other feature of the Massachusetts firearms licensing scheme, including its requirements that a person: (1) not be disqualified by, for example, prior criminal conduct or other enumerated circumstances; (2) demonstrate that he is "suitable" to hold a firearms license, and (3) demonstrate a proper purpose to hold a license.  Mass. G.L. 140, § 131(d).  See Ruggiero, 464 N.E.2d 104 at 107.  All of these provisions, including the statutory grant of discretion to police chiefs to restrict licenses-to-carry, are "presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record."  Heller v. Doe, 509 U.S. 312, 320–21 (1993) (internal quotations and citations omitted).

**I.      The Restrictions That Plaintiffs Challenge Do Not Implicate the Second Amendment.**

**A.      Heller does not recognize a Second Amendment right to carry firearms outside the home.**

This Court should consider plaintiffs' constitutional claim only as it applies to "the characteristics of the license" [that plaintiffs sought] — a Class A unrestricted license that allows for carrying of concealed, large capacity weapons outside the home."  Hightower v. Boston, 693 F.3d 61, 70 (1st Cir.2012).  Although the Supreme Court has held that the Second Amendment

---

[7]  The population figures are from the 2010 U.S. Census.  See http://quickfacts.census.gov/qfd/states/25000.html, accessed July 30, 2013.

forbids statutes that bar responsible, trustworthy citizens from keeping an operable handgun anywhere in their home for self-defense, the Court has not recognized any constitutional right to carry a weapon outside the home. See United States v. Masciandaro, 638 F.3d 458, 467, 474-476 (4th Cir.), cert. denied, 132 S.Ct. 756 (2011); Commonwealth v. Gouse, 965 N.E.2d 774, 786 (Mass. 2012) (the Court has only "articulated a right 'to possess a handgun in the home for the purposes of self-defense'"). For that reason, the plaintiffs' claims fail at the threshold.

In District of Columbia v. Heller, 554 U.S. 570 (2008), the Court held that a total "ban on handgun possession in the home violates the Second Amendment, as does [a] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." Id. at 635. It ordered the District to allow Heller "to register his handgun and [to] issue him a license to carry it in the home."[8]  Id. In McDonald v. City of Chicago, 130 S.Ct. 3020 (2010), the Court extended Heller to the States. A four-member plurality ruled that the "right to possess a handgun in the home for the purpose of self-defense" is "fundamental from an American perspective" and thus is incorporated into the Due Process Clause of the Fourteenth Amendment. Id. at 3050 (plurality). The justice casting the deciding vote concluded that the right recognized in Heller "is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause." Id. at 3059 (Thomas, J., concurring). McDonald, like Heller, concerned a local ordinance that barred anyone from keeping a handgun in their home. Id. at 3026-27.

The Supreme Court has stressed that "'the need for defense of self, family, and property is most acute' in the home," McDonald, 130 S.Ct. at 3036 (majority) (quoting Heller, 554 U.S. at 628), and held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635. "[A]s we move

---

[8]      Although the Court construed the Second Amendment's use of the verb to "bear" arms as referring to a right to "carry" arms whether or not one is part of an organized militia, Heller, 554 U.S. at 584, the issue in that case was whether Heller had a constitutionally-protected "right to render a firearm operable and carry it about his home," id. at 576. The Court's interpretation of the verb to "bear" did not resolve whether the Second Amendment protects any rights outside one's home.

outside the home, firearm rights have always been more limited, because public safety interests

often outweigh individual interests in self-defense." <u>Masciandaro</u>, 638 F.3d at 470.  Accord

<u>Hightower</u>, 693 F.3d at 72-73.  This Court should not extend <u>Heller</u> and <u>McDonald</u> in the

manner suggested by the plaintiffs.  As the Fourth Circuit warns:

> This is serious business. We do not wish to be even minutely responsible for some
> unspeakably tragic act of mayhem because in the peace of our judicial chambers we
> miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller*
> Court wished to leave open the possibility that such a danger would rise exponentially as
> one moved the right from the home to the public square.

<u>Id</u>. at 475-476.

Even after <u>Heller</u>, state and local governments retain substantial latitude to regulate the

possession, use and sale of firearms.  "The <u>Heller</u> Court was careful to note that the rights

guaranteed by the Second Amendment were 'not unlimited.'" <u>United States v. Rene E.</u>, 583 F.3d

8, 12-16 (1st Cir. 2009), <u>cert</u>. <u>denied</u>, 130 S.Ct. 1109 (2010) (quoting <u>Heller</u>, 554 U.S. at 626).

"[T]he right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in

any manner whatsoever and for whatever purpose.'"  <u>McDonald</u>, 130 S.Ct. at 3047 (plurality)

(quoting <u>Heller</u>, 554 U.S. at 626).  "As examples of 'longstanding' restrictions that were [and

are] 'presumptively lawful' under the Second Amendment, the Court listed: (1) laws prohibiting

the carrying of ***concealed weapons***, (2) laws prohibiting the possession of firearms by felons and

the mentally ill, (3) laws prohibiting the carrying of firearms 'in sensitive places such as schools

and government buildings,' (4) laws imposing conditions and qualifications on the commercial

sale of arms, and (5) laws prohibiting the carrying of '***dangerous and unusual weapons***.'"  <u>Rene

E.</u>, 583 F.3d at 12 (quoting <u>Heller</u>, 554 U.S. at 626-27 & n.26) (emphasis added). [9]  This "list

does not purport to be exhaustive."  <u>Id</u>. (quoting <u>Heller</u>, n.26).  <u>McDonald</u> "repeat[ed] those

---

[9]   Indeed, the "longstanding" prohibitions on the possession of firearms by felons and the
mentally ill that <u>Heller</u> identified as "presumptively lawful" were not enacted until the early
twentieth century.  <u>Kachalsky v. Cnty. of Westchester</u>, 701 F.3d 81, 90 n.11 (2d Cir.2012), <u>cert</u>.
<u>denied</u> 133 S.Ct 1806 (2013).  The statute at issue in this case, Mass. G.L. c. 140, § 131, was
enacted originally in 1906.  <u>See</u> Ch.172, § 1, 1906 Mass. Acts 150.  As <u>Kachalsky</u> explained,
there is a "longstanding tradition of states regulating firearm possession and use in public
because of the dangers posed to public safety."  701 F.3d at 94-96.

assurances" and stressed that applying the Second Amendment to the States "does not imperil every law regulating firearms." <u>McDonald</u>, 130 S.Ct. at 3047 (plurality).[10]  <u>See</u> <u>United States v. Marzzarella</u>, 614 F.3d 85, 92-93 (3d Cir. 2010) (the Second Amendment leaves intact "additional classes of restrictions" beyond those identified in <u>Heller</u>).

In <u>Heller</u>, the Court went only so far as to identify an individual right under the Second Amendment to possess a firearm (1) by law abiding, responsible citizens, (2) in the home.  554 U.S. at 635.  The plaintiffs, however, seek an unrestricted Class A license to carry a loaded, concealed (and potentially large-capacity) weapon in public.  Because that is not a protected use under <u>Heller</u>, the restrictions imposed by Peabody and Weymouth did not implicate plaintiffs' rights under the Second Amendment.

> **B.    Plaintiffs Have No Second Amendment Right to Carry Concealed or High Capacity Weapons.**

By asking the court to require the defendants to grant them unrestricted Class A licenses, the plaintiffs seek relief that goes far beyond any recognized right protected by the Second Amendment.  Such a license would allow plaintiffs to carry any lawful gun in public, including large-capacity weapons capable of holding more than ten rounds of ammunition, and to do so in a concealed manner.  G.L. c. 140, § 131(a).  The Second Amendment does not confer such rights.

One "important limitation on the right to keep and carry arms" is that the Second Amendment only protects the carrying of "the sorts of weapons protected … 'in common use at the time'" the amendment was enacted.  <u>Heller</u>, 554 U.S. at 627 (quoting <u>United States v. Miller</u>, 307 U.S. 174, 179 (1939)).  "[D]angerous and unusual" weapons—including "M-16 rifles and the like"—"may be banned" without violating the Second Amendment.  <u>Id</u>.  Furthermore, "the Second Amendment does not protect those weapons not typically possessed by law-abiding

---

[10]   A court "must give this language great weight," even though these statements in *Heller* and *McDonald* were dicta.  <u>See</u> <u>United States v. Southern Union Co.</u>, 630 F.3d 17, 34 (1st Cir. 2010).

citizens for lawful purposes." Id. at 625.  Because firearms with "large capacity ammunition feeding devices" were not in common use in the eighteenth century, are unusually dangerous, and are typically not needed for lawful purposes, the Second Amendment does not protect possession or carrying of such weapons.  Heller v. District of Columbia, 698 F.Supp.2d 179, 193-95 (D.D.C. 2010), aff'd on other grounds, 670 F.3d 1244, 1260-1264 (D.C. Cir. 2011) ("Heller II") (upholding new firearm licensing ordinance passed after Supreme Court decision); accord United States v. Fincher, 538 F.3d 868, 873-874 (8th Cir. 2008), cert. denied, 129 S.Ct. 1369 (2009) (same for machine guns).  Alternatively, state laws prohibiting such weapons are permitted because they have a "substantial relationship" to "the objectives of protecting police officers and controlling crime."  Heller II, 670 F.3d at 1263-1264.   Firearms with "large-capacity magazines tend to pose a danger to innocent people and particularly to police officers," whether they are used by "mass shooters" like the gunman who attacked Congresswoman Giffords and others in Tucson, Arizona, in January 2011, used to commit other kinds of crimes, or used "in self-defense situations."  Id.

Plaintiffs also have no constitutional right to carry a concealed weapon.  Heller, 554 U.S. at 626 ("the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"); Robertson v. Baldwin, 165 U.S. 275, 281-282 (1897) ("[T]he right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." (dictum)).  Indeed, "[m]ost states enacted laws banning the carrying of concealed weapons" in the nineteenth century.  Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 95 (2d Cir.2012), cert. denied 133 S.Ct 1806 (2013); see id. at 95 n. 21 (collecting statutes).  After examining these authorities, Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013), held that the denial of a concealed handgun license to the plaintiff, a Washington resident, under a Colorado law that limits such licenses to Colorado residents, did not violate the Second Amendment.  The Court concluded that bans on carrying concealed weapons were a "longstanding" and "presumptively lawful" regulation under Heller, and held that "the Second Amendment does not confer a right to

carry concealed weapons." Id. at 1211.  See also Rene E., 583 F.3d at 12 ("laws prohibiting the

carrying of concealed weapons" are an "example[] of 'longstanding' restrictions that [are]

'presumptively lawful' under the Second Amendment") (quoting Heller, 554 U.S. at 626);

Richards v. County of Yolo, 821 F.Supp.2d 1169, 1174 (E.D. Cal. 2011) ("[T]he Second

Amendment does not create a fundamental right to carry a concealed weapon in public").[11]

Because the challenged restrictions are beyond the scope of the Second Amendment, the

Court should enter summary judgment for the defendants.

## II.    Even If The Second Amendment Applied, the Restrictions Challenged in this Action Would Be Constitutionally Permissible.

Even those courts that have not decided whether the Second Amendment grants an

individual right that extends outside the home "have consistently recognized that Heller

established that the possession of operative firearms for use in defense of the home constitutes

the 'core' of the Second Amendment."  Hightower, 693 F.3d at 72, citing United States v.

Booker, 644 F.3d 12, 25 n. 17 (1st Cir.2011), cert. denied,132 S.Ct. 1538 (2012) (other citations

omitted).  See, e.g., Kachalsky, 701 F.3d at 89 ("What we know . . . is that Second Amendment

guarantees are at their zenith within the home.").  Thus, the interest plaintiffs assert "in carrying

concealed weapons outside the home is distinct from this core interest emphasized in Heller."

Hightower, 693 F.3d at 72.  For that reason, the First Circuit has concluded that, under Heller,

"the government may regulate the carrying of concealed weapons outside of the home" and,

indeed, that the "[l]icensing of the carrying of concealed weapons is presumptively lawful . . . ."

Id. at 73-74.  See Commonwealth v. Loadholt, 954 N.E.2d 1128, 1130 (Mass. 2011) (Heller

explained "that a citizen's Second Amendment right did not prohibit laws regulating who may

possess and carry weapons . . . or where such weapons may be carried").  See, e.g., Williams v

---

[11]    The plaintiffs gain nothing by asserting that laws banning concealed-carry were historically upheld because the open carrying of firearms was permissible.  Pl. Mem. 9.  As the Second Circuit has explained: "[T]his was hardly a universal view.  Other states read restrictions on the public [i.e. open] carrying of weapons as entirely consistent with constitutional protections of the right to keep and bear arms."  Kachalsky, 701 F.3d at 90.

Puerto Rico, 910 F. Supp. 2d 386, 394 (D.P.R. 2012) (upholding Puerto firearms licensing scheme).  As explained below, restricting certain firearms licenses to possession of the weapon at home, and for target shooting or hunting, substantially relates to the Commonwealth's interest in protecting public safety, and is constitutionally permissible. [12]

### A.  The Challenged Restrictions are Subject to, at Most, Intermediate Judicial Scrutiny.

The First Circuit has not resolved the question of what level of judicial scrutiny applies to regulations that govern licensing of firearms outside the home.  In Hightower, the Court rejected facial and as-applied challenges under the Second Amendment to the suspension of a license-to-carry based on the police commissioner's determination that the plaintiff was not "suitable" for licensure under Section 131 because she included materially false information on her license application.  693 F.3d at 74.  The Court held that Hightower's "claim fails whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue.  We do not reach the question of what standard of scrutiny applies here."  Id., citing United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir.2011), cert. denied, 132 S.Ct. 756 (2011) (declining to answer the question of how Heller applies to possession of firearms outside of the home or "what sliding scales of scrutiny might apply.").

In two recent cases, federal appellate courts have upheld requirements for licenses to carry concealed weapons that track, in many ways, the restrictions challenged here.  In each case, the court (1) assumed, without deciding, that the Second Amendment applies outside the home, and (2) subjected the challenged laws to "intermediate" judicial scrutiny.  Woollard v. Gallagher,

---

[12]   If the Court agrees that the restrictions meet intermediate scrutiny, as explained below, it may rule for the defendants without deciding whether the Second Amendment applies to the carrying of firearms outside the home.  See Hightower, 693 F.3d at 72, n.8; Masciandaro, 638 F.3d at 467, 474-476.  Under that approach, the Court would adhere to "the 'long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" Sony BMG Music Entertainment v. Tenenbaum, 660 F.3d 487, 511 (1st Cir. 2011) (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988)).

712 F.3d 865 (4th Cir. 2013), pet. for cert. filed July 9, 2013 (no. 13-42); Kachalsky, 701 F.3d at

89. If the Second Amendment is implicated at all, this Court should, at most, apply intermediate

scrutiny to evaluate "Target and Hunting" restrictions on the carrying of concealed weapons

outside the home, because the restrictions fall far outside the "core" protection of the Second

Amendment. Id. at 93-94, n. 17 (citing Second Amendment cases applying intermediate

scrutiny).

In Kachalsky, the Second Circuit upheld New York's licensing scheme for full-carry

handgun permits, which requires individuals to demonstrate "proper cause" (i.e. a special need

for protection) in order to obtain an unrestricted license to carry. 701 F.3d at 86, 101. The court

assumed that the Second Amendment has "some application" outside of the home but,

recognizing that "our tradition so clearly indicates a substantial role for state regulation of the

carrying of firearms in public," concluded that intermediate scrutiny was appropriate and that the

challenged regulation survived such scrutiny. Id. at 89, 96.

In Woollard, the Fourth Circuit upheld a Maryland law that "conditions eligibility for a

permit to carry, wear, or transport a handgun in public on having 'good and substantial reason' to

do so." 712 F.3d at 868. Under the law, applicants must demonstrate "that the permit is

necessary as a reasonable precaution against apprehended danger," which is determined by an

objective inquiry and is not established by a "vague threat" or a general fear of "liv[ing] in a

dangerous society." Id. at 869-70. The Court held that Maryland satisfied intermediate scrutiny

by demonstrating that the good-and-substantial-reason requirement for obtaining a Maryland

handgun permit, as applied to Woollard, "is reasonably adapted to Maryland's significant

interests in protecting public safety and preventing crime" — particularly violent crime

committed with handgun. Id. at 882.

The requirements that New York and Maryland impose on public-carry licenses are, if

anything, more demanding than the "target and hunting" restrictions in Peabody and Weymouth.

As such, these restrictions deserve, at most, intermediate scrutiny. The restrictions are focused

on first-time applicants in the two municipalities and permit unrestricted possession in the home,

and use of the firearm for target shooting and hunting, for the period of the license.  Both Chief Champagne and Chief Grimes generally lift the restriction when a person applies for renewal (assuming no then-disqualifying circumstances) and Chief Grimes will consider lifting it earlier if circumstances warrant.  JS ¶¶9, 10.  Each chief makes exceptions for individuals who have law enforcement or military experience, on the reasonable assumption that they will have had firearms training and experience.  Id.  And each chief will issue a license that permits the holder to carry a firearm for business or employment, when that need is clearly documented.  Id.  In contrast, in Maryland and New York, every time a person applies for, or renews, a license to carry he or she must demonstrate with particularity a special need for self-protection in order to qualify for a permit to carry a concealed weapon in public.  Woollard, 712  F.3d at 868-70; Kachalsky, 701 F.3d at 85-87.  Although each of the plaintiffs in the present case desires to carry a concealed weapon for self-protection, on the record in this case none of them would meet the specific Maryland or New York requirements.[13]

This Court should not accept plaintiffs' invitation to apply strict scrutiny, which plaintiffs base on the argument that the challenged restrictions implicate a "fundamental" right under the Second Amendment.  As explained above, the Second Amendment does not confer a right to carry loaded, concealed, high-capacity firearms in public.  Or, at a minimum, that activity is far beyond the "core" right recognized in Heller.  Hightower, 693 F.3d at 72.  See Masciandaro, 638 F.3d at 470-71 ("as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense").  Where federal courts have applied strict scrutiny, the case concerned a regulation that, unlike here, broadly infringed the core Second Amendment rights of law-abiding and responsible citizens. See, e.g., Ezell v. City of Chicago, 651 F.3d 684, 708-09 (7th Cir.2011) (applying strict scrutiny

---

[13]   See Woollard, 712 F.3d at 871 (denying renewal of handgun permit in 2009 to applicant who was victim of a "harrowing" home invasion in 2002, where perpetrator (the applicant's son-in-law) had not been in contact in seven years and applicant documented no threats beyond his residence); Kachalsky, 701 F.3d at 88 (denying permit to applicant who asserted "that as a transgender female, she is more likely to be the victim of violence" but reported no specific threats to her safety).

and striking down Chicago ordinance requiring firing-range training for licensure but prohibiting firing ranges from operating in the city).[14]  Unlike the laws struck down by the Supreme Court in Heller and McDonald, Massachusetts law does "not operate to totally ban handgun possession in the home or elsewhere."  Commonwealth v. Gouse, 965 N.E.2d at 785-86.  Indeed, a substantial number of firearms licenses are issued in both Weymouth and Peabody and, in each municipality, the majority of these are unrestricted licenses.  JS ¶¶ 25, 26.  The restrictions challenged here do not warrant strict scrutiny.

### B.    Restrictions of the Type Challenged Here Easily Satisfy Intermediate Scrutiny.

Under "intermediate" judicial scrutiny, the government must demonstrate a "substantial relationship between the [challenged] restriction and an important governmental objective."  Booker, 644 F.3d at 25.[15]  As explained below, the restrictions challenged in this case readily survive this review.

---

[14]    Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012), held unconstitutional an Illinois statute that imposes "a flat ban on carrying ready-to-use guns outside the home."  Id. at 940.  Although the Court held that the Second Amendment recognizes a right to bear arms for self-defense outside the home, its "analysis is not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states."  Id. at 941.  The Court stayed its mandate "to allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with the public safety and the Second Amendment . . . on the carrying of guns in public."  Id. at 942.  Thus, the decision "leaves the State a good deal of constitutional room for reasonable public safety measures concerning public carrying of firearms."  Moore v. Madigan, 708 F.3d 901, 903 (7th Cir. 2013) (Hamilton, Circuit Judge, joined by Rovner, Wood and Williams, Circuit Judges, dissenting from denial of rehearing en banc).  See Williams v Puerto Rico, 910 F. Supp. 2d 386, 395 (D.P.R. 2012) (distinguishing Moore in upholding Puerto Rico firearms licensing scheme).

[15]    The government has some latitude in how it establishes the "substantial relationship."  While, under intermediate scrutiny, the state's "burden is not satisfied by mere speculation or conjecture," Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001), it may justify its "restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . . based solely on history, consensus, and 'simple common sense'."  Florida Bar v. Went for It, Inc., 515 U. S. 627, 628 (1995) (quoting Burson v. Freeman, 504 U.S. 191, 211 (1992))(other citations omitted).  See United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) ("Heller did not suggest that disqualifications would be effective only if the statute's benefits are first established by admissible evidence.").

1.      **The Objective of the Massachusetts Gun Control Laws is to
        Protect the Health, Safety and Welfare of the Public.**

The general purpose of the licensing provisions of Mass. Gen. Laws c. 140, § 131, is "to

protect the health, safety, and welfare of [Massachusetts] citizens." Chardin v. Davis, 989 N.E.

2d at 403.  Among the underlying purposes of the licensing scheme is "to prevent. . . the ability

to use firearms to inflict harm, be it negligently or intentionally, on another or on oneself."

Commonwealth v. Lee, 409 N.E.2d 1311, 1315 (Mass. App. 1980).  Another purpose is "to

assuage 'the societal concern with weapons reaching the hands of unauthorized users.'"

Commonwealth v. Reyes, 982 N.E. 2d 504 (2013), quoting Jupin v. Kask, 849 N.E.2d 829, 840

(Mass. 2006).  See Ruggiero, 464 N.E. 2d at 106 ("goal of firearms control legislation is to limit

access to deadly weapons by irresponsible persons").  Accord MacNutt v. Police Comm'r of

Boston, 572 N.E.2d 577, 579 (Mass. App. 1991) rev. denied 577 N.E. 2d 309 (Mass. 1991).  The

Massachusetts Legislature "has attempted to effectuate [these purposes] through the enactment

of a wide ranging, but coherent, regulatory scheme that includes licensing requirements for the

sale and possession of firearms and ammunition."  Reyes, 982 N.E. 2d at 507.

The Commonwealth's interest in protecting public safety is compelling.  State and local

governments have "cardinal civic responsibilities" to protect the public and law enforcement

personnel from gun violence.  Department of Revenue of Ky. v. Davis, 553 U.S. 328, 342

(2008).  In that regard, the Commonwealth may properly seek to reduce the number of concealed

weapons in public.  The district court in Peruta v. County of San Diego, 758 F. Supp. 2d 1106,

1117 (S.D. Cal. 2010), well summarized a State's compelling interest in regulating public carry

of firearms:

> In particular, the government has an important interest in reducing the number of
> concealed weapons in public in order to reduce the risks to other members of the public
> who use the streets and go to public accommodations.  The government also has an
> important interest in reducing the number of concealed handguns in public because of
> their disproportionate involvement in life-threatening crimes of violence, particularly in
> streets and other public places.

Id. (internal citations omitted).  The promotion of public safety is a basic and well-settled

exercise of a state's police power, and states are generally afforded "great latitude" in exercising

"police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons . . ." Gonzales v. Oregon, 546 U.S. 243, 270 (2006) (internal quotations and citation omitted). Thus, reasonable and effective gun regulations are integral to the state's exercise of that power. See Woollard, 712 F.3d at 877 ("we can easily appreciate Maryland's impetus to enact measures aimed at protecting public safety and preventing crime, and we readily conclude that such objectives are substantial governmental interests"), citing Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 376 (1997) (referring to "the significant governmental interest in public safety"). "[T]he public interest at issue is one of the utmost importance, as the statute governing who may lawfully carry a firearm directly affects the physical safety of the citizenry." Dupont, 57 Mass. App. Ct. at 693.

The Commonwealth's public safety objectives are not, as plaintiffs argue, trumped by plaintiffs' rights under the Second Amendment.  Indeed, a local police chief may  impose any restriction that is reasonably adapted to advancing public safety or crime prevention, or otherwise protecting the public welfare.  "States have long chosen to regulate the right to bear arms because of the risks posed by its exercise.  As . . . Heller strongly suggests, the state may ban firearm possession in sensitive places, presumably on the ground that it is too dangerous to permit the possession of fire-arms in those locations. 554 U.S. at 626-27,  [* * *]  Thus, as the Supreme Court has implicitly recognized, regulating firearms because of the dangers posed by exercising the right is entirely consistent with the Second Amendment."  Kachalsky, 701 F.3d at 99.

> **2.     The Challenged Restrictions Are Substantially Related to Protecting Public Safety Because The Threat to Public Safety From Carrying Loaded, Concealed and High-Capacity Firearms in Public is Well-Established.**

Applying intermediate scrutiny, the plaintiffs constitutional challenge fails because the imposition of "Target and Hunting" restrictions on first-time licenses to carry "'promotes a substantial governmental interest that would be achieved less effectively absent the regulation,

and the means chosen are not substantially broader than necessary to achieve that interest.'"
Heller II, 670 F.3d at 1258 (citing Ward v. Rock Against Racism, 491 U.S. 781, 892-83 (1989)).

Both Woollard and Kachalsky demonstrate why the local restrictions challenged here, as implemented within the Massachusetts licensing scheme, are substantially related to the Commonwealth's interest in public safety.   Both cases explain that that interest is advanced when the State – by some rational means – limits the number of concealed weapons carried in public.  In Woollard, the State of Maryland "clearly demonstrated that the good-and-substantial-reason requirement advances the objectives of protecting public safety and preventing crime because it reduces the number of handguns carried in public."  712 F.3d at 879.  The Court embraced a number of safety-related benefits identified by the State, including: (1) decreasing the availability of handguns to criminals via theft, especially because criminals often target victims "precisely because they possess handguns," (2) lessening "the likelihood that basic confrontations between individuals would turn deadly," (3) curtailing the presence of handguns during routine police-citizen encounters; (4) reducing the number of "handgun sightings" that must be investigated, and (5) facilitating the identification of those persons carrying handguns who pose a menace.  Id. at 879-80.  On this basis, the Fourth Circuit concluded that "there is a reasonable fit between the good-and-substantial-reason requirement and Maryland's objectives of protecting public safety and preventing crime."  Id. at 880.  Similarly, in Kachalsky the court observed that studies and data "demonstrate[e] that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces."  Id. at 99.  For that reason, "New York determined that limiting handgun possession to persons who have an articulable basis for believing they will need the weapon for self-defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation."  701 F.3d at 100.  Because the "proper cause"

requirement served to limit the volume of concealed-carry licenses, it advanced public safety in New York.  Id. at 98-100.[16]

As in Maryland and New York, Massachusetts licensing authorities may demand a specific showing of need when a person seeks a Class A LTC for self-protection.  Under Mass. Gen. Laws c. 140, § 131(d), a license may issue if the applicant  (1) "is a suitable person to be issued such license," and (2) "has good reason to fear injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized under this section."  As this Court recently explained:

> [W]hen an applicant seeks a license solely for self-protection, the license
> authority may rely on the purpose requirement in demanding that the applicant
> distinguish his or her own needs from those of the general public.  [* * *]  Even
> when an applicant meets the requirements for license approval, the licensing
> authority may issue the license "subject to such restrictions relative to the
> possession, use or carrying of firearms as the licensing authority deems proper."
> Mass. Gen. Laws ch. 140, § 131(a).  Pursuant to this provision, the licensing
> authority may restrict a license to those uses for which the authority determines
> there to be a "proper purpose," even if it is not the purpose proposed by the
> applicant.  Ruggiero, 464 N.E. 2d at 107 (upholding issuance of license for target
> and sport use where applicant requested license for self-defense purposes).

Pineiro v. Gemme, 2013 WL 1285475, *3 (D. Mass. 2013), appeal pending First Cir. No. 13-1532.  Accordingly, Peabody and Weymouth need not issue unrestricted licenses – to allow public carry of concealed weapons for "self-protection" -- to individuals, such as the plaintiffs, who do not establish "a good reason to fear injury" under Section 131(d).

Here, the police chiefs in Peabody and Weymouth have limited the number of licenses in their communities that permit carrying concealed firearms in public, and have thereby advanced public safety interests.  The chiefs have focused their restrictions on first-time applicants in each community.  In doing so, they effectively establish a period during which the plaintiffs have full use of a firearm for defense of the home, and can obtain valuable experience in handling the

---

[16]   The Court added that:  "The connection between promoting public safety and regulating handgun possession in public . . . has [also] served as the basis for other states' handgun regulations, as recognized by various lower courts.  Id. at 98, citing  Piszczatoski v. Filko, 840 F.Supp.2d 813, 835-36 (D.N.J.2012); Richards v. Cty. of Yolo., 821 F.Supp.2d 1169, 1172 (E.D.Cal.2011), and Peruta v. Cty. of San Diego, 758 F.Supp.2d 1106, 1110 (S.D.Cal.2010).

weapon at a licensed shooting range.  Assuming they are still eligible, each plaintiff can seek an unrestricted license upon renewal, or even earlier.  None of the plaintiffs demonstrated, under the "proper purpose" requirement of section 131(d), a special need for self-protection outside the home (such as receipt of threats of violence); and each was permissibly issued a "target and hunting" restricted license.  Ruggiero, 464 N.E. 2d at 107-08.  So, as in Woollard, the local restrictions do not deny a concealed-carry license to persons "in palpable need of self-protection."  712 F.3d at 880.  By granting unrestricted licenses only to "those individuals who have an actual reason . . . to carry the weapon . . . [the defendants'] licensing is oriented to the Second Amendment's protections."  Kachalsky, 701 F.3d at 98.[17]

## CONCLUSION

For the foregoing reasons, the Commonwealth respectfully requests that judgment enter against the plaintiffs and that the Court declare that the challenged restrictions do not violate the Second Amendment.

---

[17]   The plaintiffs' memorandum fails to develop, or even mention, their asserted due process and equal protection claims.  See Am. Compl. (Doc. 6), ¶¶ 58-64.  As a result, these claims are waived.  See Grenier v. Cyanamid Plastics, 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived.").  Even absent waiver, the claims fail on their own terms.  As explained above, plaintiffs have not shown how the actions of the defendants implicate any fundamental right.  "Given that the Second Amendment challenge fails, the equal protection claim is subject to rational basis review," which it fails.  Hightower, 693 F.3d at 83.  Moreover, plaintiffs have not shown that the police chiefs' straightforward application of Mass. Gen. L. c. 140, § 131d, resulted in them being "treated differently from others similarly situated . . . based on impermissible considerations."  Pineiro, 2013 WL 1285475 at *11 (internal quotations and citations omitted).  The statute's partial delegation to local authorities, of the responsibility to accomplish the crucial public safety goal of "prevention of harm" through firearms control legislation, is rational and proper.  See Ruggiero, 18 Mass. App. Ct. at 106.

MARTHA COAKLEY
*ATTORNEY GENERAL OF MASSACHUSETTS*

/s/ William W. Porter
William W. Porter (BBO # 542207)
Assistant Attorney General
Government Bureau
One Ashburton Place
Boston, MA  02108
617.963.2976
July 31, 2013                            bill.porter@state.ma.us

Certificate of Service

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to those indicated on the NEF as non registered participants on or before July 31, 2013.

/s/ William W. Porter
William W. Porter
Assistant Attorney General