UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER DAVIS; WILLIAM J. THOMPSON, JR.; WILSON LOBAO; ROBERT CAPONE; and COMMONWEALTH SECOND AMENDMENT, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> RICHARD C. GRIMES, in his Official Capacity as Chief of the Weymouth Police Department; and ROBERT L. CHAMPAGNE, in his Official Capacity as Chief of the Peabody Police Department, <br><br> Defendants, <br><br> -and- <br><br> COMMONWEALTH OF MASSACHUSETTS, <br><br> Intervenor. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. <br><br> 1:13-cv-10246 |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

**CHIEF GRIMES DOES NOT REMOVE RESTRICTIONS ON RENEWAL** ...................... 1

**ARGUMENT** ................................................................................................................... 2

**(I)   DEFENDANTS' DENIAL OF THE LTC THAT EACH PLAINTIFF
        REQUESTED IS INJURY IN FACT** ................................................................. 2

    **A.   Denial of an Unrestricted LTC is Injury in Fact** ...................................................... 2

    **B.   Defendants Have Not Unequivocally Disavowed Enforcement of § 131** ................. 3

    **C.   Fear of License Suspension or Revocation, and of a Monetary Fine, is Injury** ..... 5

**(II)  DEFENDANTS' RESTRICTIONS COMPLETELY PRECLUDE THE "CORE"
        RIGHT OF SELF-DEFENSE OUTSIDE THE HOME** ................................... 7

    **A.   The Right to Keep and Bear Arms is Not Confined to the Home** ........................... 7

    **B.   The Core of the Second Amendment is Armed Self-Defense – Not Target-
        Shooting and Hunting** ........................................................................................... 9

    **C.   The Burden is Much Broader than a Concealed-Carry and Sensitive-Place
        Restriction** ........................................................................................................... 10

**(III) DEFENDANTS HAVE NOT JUSTIFIED THEIR POLICIES** ...................................... 12

    **A.   Defendants Must Show that Public Safety Concerns Justify their Policies** .......... 12

    **B.   Defendants Have Not Justified Their Policies for Withholding the Right to
        Bear Arms** ........................................................................................................... 14

        1.   *6-Year Waiting Period* ................................................................................... 14

        2.   *"Privileged" Members of Society* ................................................................. 16

        3.   *Naked Discretion* ........................................................................................... 17

    **C.   Courts Have Not "Consistently Rejected" Claims Comparable to Plaintiffs'** ..... 18

**CONCLUSION** ................................................................................................................ 20

### TABLE OF AUTHORITIES

#### CASES

Arizonans for Official English v. Arizona, 520 U.S. 43 (1997) ....................................................... 2

Ashcroft v. ACLU, 542 U.S. 656 (2004) .................................................................................... 13

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1979) .............................................. 3

Bach v. Pataki, 408 F.3d 75 (2d Cir. 2005) ............................................................................... 15

Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469 (1989) ..................................................... 13

Bergemann v. R.I. Dep't of Envt'l Mgmt., 665 F.3d 336 (1st Cir. 2011) ...................................... 8

Bonidy v. United States Postal Serv., no. 10-cv-02408, 2013 U.S. Dist. LEXIS 95435
   (D. Colo. Jul. 9, 2013) ........................................................................................................ 11

Burns v. Fortson, 410 U.S. 686 (1973) ..................................................................................... 15

Cantwell v. Connecticut, 310 U.S. 296 (1940) .......................................................................... 18

Chardin v. Police Commissioner, 989 N.E.2d 392, 465 Mass. 314 (2013) ................................. 8-9

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ....................................................................... 5

Commonwealth v. Reyes, 982 N.E.2d 504, 464 Mass. 245 (2013) ............................................. 4

Cox v. Louisiana, 379 U.S. 536 (1965) .................................................................................... 18

Diamond v. Charles, 476 U.S. 54 (1986) ................................................................................. 5-6

District of Columbia v. Heller, 554 U.S. 570 (2008) ........................................................... passim

Dunn v. Blumstein, 405 U.S. 330 (1972) .................................................................................. 15

Ezell v. Chicago, 651 F.3d 684 (7th Cir. 2011) ......................................................................... 8-9

First English Evangelical Lutheran Church v. County of Los Angeles,
   482 U.S. 304 (1987) ............................................................................................................ 8

Fletcher v. Haas, 851 F. Supp. 2d 287 (D. Mass. 2013) ............................................................ 12

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) ................................................................ 18

Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) ................................................. 14

Heller v. District of Columbia, 698 F. Supp. 2d 179 (D.D.C. 2010),
   aff'd in part & rev'd in part 670 F.3d 1244 (D.C. Cir. 2011) .............................................. 14

Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012) ............................................................... 12, 19

Hollingsworth v. Perry, no. 12-144, 2013 U.S. LEXIS 4919 (Jun. 26, 2013) ............................... 5

Houston v. Hill, 482 U.S. 451 (1987) ........................................................................................ 5

In re R.M.J., 455 U.S. 191 (1982) ........................................................................................... 13

Isaacson v. Horne, no. 12-16670, 2013 U.S. App. LEXIS 10187
   (9th Cir. May 21, 2013) ..................................................................................................... 18

Jackson v. Abercrombie, 884 F. Supp. 2d 1065 (D. Haw. 2012) .................................................. 6

Kachalsky v. Cacace, 817 F. Supp. 2d 235 (S.D.N.Y. 2011)
    aff'd, 701 F.3d 81 (2d Cir. 2012) .................................................................................. 3

Kachalsky v. Westchester, 701 F.3d 81 (2d Cir. 2012) ......................................................... 19-20

Kunz v. New York, 340 U.S. 290 (1951) .................................................................................... 18

Largent v. Texas, 318 U.S. 418 (1943).................................................................................... 18

Lewis v. Continental Bank Corp., 494 U.S. 472 (1990)............................................................ 6

Louisiana v. United States, 380 U.S. 145 (1965)......................................................................... 18

Lujan v. Defenders of Wildlife, 504 U.S. 555 (2007) ................................................................ 2

Marchesi v. Selectmen of Winchester, 42 N.E.2d 817, 312 Mass. 28 (1942) ............................ 17

McDonald v. Chicago, 130 S. Ct. 3020 (2010) ............................................................... *passim*

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007)................................................... 4, 7

Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012)............................................................. 10, 19-20

Morial v. Judiciary Comm'n of Louisiana, 565 F.2d 295 (5th Cir. 1977).................................. 16

N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1 (1st Cir. 2000) ........................................... 3-5

N.H. Right to Life PAC v. Gardner, 99 F.3d 8 (1st Cir. 1999).................................................... 3-4

N.Y. City Transit Auth. v. Beazer, 440 U.S. 568 (1979)............................................................. 16

Nguyen v. INS, 533 U.S. 53 (2001)........................................................................................... 13

O'Connor v. Scarpino, 638 N.E.2d 950, 83 N.Y.2d 919 (1994) ............................................... 3

Osterweil v. Bartlett, 706 F.3d 139 (2d Cir. 2012).................................................................... 15

Osterweil v. Bartlett, 819 F. Supp. 2d 72 (S.D.N.Y. 2011)
    question certified, 706 F.3d 139 (2d Cir. 2012)........................................................... 15

Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007), aff'd sub nom.
    District of Columbia v. Heller, 554 U.S. 570 (2008)................................................... 2

People v. Thompson, 705 N.E.2d 1200, 92 N.Y.2d 957 (1998)................................................... 3

Perry v. Brown, 671 F.3d 1052, 1068 (9th Cir. 2012) vacated sub nom.,
    Hollingsworth v. Perry, no. 12-144, 2013 U.S. LEXIS 4919 (Jun. 26, 2013) ............... 6

Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013) ......................................................... 11, 14

Pineiro v. Gemme, no. 10-40262, 2013 U.S. Dist. LEXIS 42626
    (D. Mass. Mar. 26, 2013) ............................................................................................ 19

R.I. Ass'n of Realtors v. Whitehouse, 199 F.3d 26 (1st Cir. 1999).............................................. 4

Saenz v. Roe, 526 U.S. 489 (1999).......................................................................................... 15

Shuttlesworth v. Birmingham, 394 U.S. 147 (1969) ................................................................. 18

Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd., 502 U.S. 105 (1991) ........................ 18

Stern v. United States, 214 F.3d 4 (1st Cir. 2000) .......................................................... 6

Sullivan v. City of Augusta, 511 F.3d 16 (1st Cir. 2007) ................................................ 2

Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994) .................................................. 13

United States v. Alvarez, 132 S. Ct. 2537 (2012) .......................................................... 13

United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2009) ............................................... 8

United States v. Miller, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ............................... 14

United States v. Rene E., 583 F.3d 8 (1st Cir. 2009) ....................................................... 9

United States v. Torres-Rosario, 658 F.3d 110 (1st Cir. 2011) ...................................... 9

Vlandis v. Kline, 412 U.S. 441 (1973) .......................................................................... 15

Ward v. Rock Against Racism, 491 U.S. 781 (1989) ..................................................... 13

Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) ............................................... 19-20

## STATUTES

Cal. Penal Code § 26150 ............................................................................................... 16

Colo. Rev. Stat. § 18-12-203 ........................................................................................ 14

430 Ill. Comp. Stat. 65/2 .............................................................................................. 11

25 Me. Rev. Stat. Ann. § 2003 ...................................................................................... 17

M.G.L. c. 140, § 131 ...........................................................................................2-4, 12, 17

M.G.L. c. 140, § 131F ................................................................................................... 15

M.G.L. c. 140, § 129B ................................................................................................... 11

M.G.L. c. 140, § 129C ................................................................................................... 11

M.G.L. c. 269, § 10 ...................................................................................................10-11

M.G.L. c. 269, § 10H ..................................................................................................... 10

321 CMR 11.07 .............................................................................................................. 10

740 CMR 30.04 .............................................................................................................. 10

N.Y. Penal L. § 400.00 ..............................................................................................15-16

N.Y. Penal L. § 265.01 .................................................................................................. 11

N.Y. Penal L. § 265.20 .................................................................................................. 11

18 Pa. Cons. Stat. Ann. § 6109 ..................................................................................... 17

Va. Code Ann. § 18.2-308.09 ........................................................................................ 17

## OTHER AUTHORITIES

Robert A. Levy, Second Amendment Redux: Scrutiny, Incorporation, and the
    Heller Paradox, 33 Harv. J.L. & Pub. Pol'y 203, 206 (2010) .................................. 13

Ronald C. Glidden & John M. Collins, <u>Law Enforcement Guide to Firearms Laws</u>
  (14th ed. 2009) ..................................................................................................... 4, 11-12

Stacey L. Sobel, <u>The Tsunami of Legal Uncertainty:  What's a Court to do Post-</u>
  <u>*McDonald?*</u>, 21 Cornell J. L. & Pub. Pol'y 489, 504-05 (2012) ............................................... 13

Plaintiffs do not seek the right to carry guns "wherever they want, whenever they want," nor do they specifically seek the right to bear arms in a concealed manner. See Defendants' Brief (Doc. No. 31) ("Deft. Br.") p. 2. Rather, Plaintiffs seek the right to bear arms in *some* manner, and to do so in the *non-sensitive* places that the laws of Massachusetts otherwise allow. Defendants' claim (p.9) that their "Target & Hunting" restrictions do not "affect[ Plaintiffs] in any meaningful way" is nothing but sophistry. Defendants' restrictions preclude Plaintiffs from bearing arms for self-protection *anywhere* outside the home – even though armed self-defense (not hunting or target-shooting) is the "core lawful purpose" that the Second Amendment protects. See McDonald v. Chicago, 130 S. Ct. 3020, 3036 (2010); District of Columbia v. Heller, 554 U.S. 570, 630 (2008).

In this brief, Plaintiffs first show that they have standing – which is easy, since Plaintiffs have requested licenses that would allow them to bear arms, and Defendants have denied their requests. Plaintiffs then rebut Defendants' claim that their restrictions do not burden Plaintiffs' Second Amendment rights. Rather than imposing a mere regulatory burden comparable to a restriction on concealment or carrying guns in sensitive places, Defendants' polices broadly burden Plaintiffs' constitutional right of armed self-defense.

## CHIEF GRIMES DOES NOT REMOVE RESTRICTIONS ON RENEWAL

One preliminary matter is Defendant Chief Grimes's attempt to contravene the Joint Statement of Facts (Doc No. 34) ("JS") ¶ 9, by asserting that he actually has a policy of removing restrictions when people renew their licenses to carry firearms ("LTC's"). This very clearly is not the case. For example, Plaintiff Chris Davis moved to Weymouth with an *unrestricted* LTC, but when he renewed it in 2012 Chief Grimes *added* a "Target & Hunting" restriction. See JS ¶¶ 11-12; Dec. of Chris Davis (Doc. No. 29) ¶¶ 2-3, 11. Likewise, Jack Darling (who is not a party to this case, but who has supplied a Declaration) moved to

Weymouth over 20 years ago with an unrestricted LTC.  See Dec. of Jack Darling (submitted

herewith) ¶¶ 2-4.  However, when Mr. Darling renewed his LTC, the Weymouth Police

Department also *added* a "Target & Hunting" restriction.  See id. at ¶ 5.  Notwithstanding his

repeated requests, Chief Grimes has refused to remove the restriction on every subsequent

renewal over the past two decades.  See id. ¶¶ 6, 8-11.

## ARGUMENT

### (I)   DEFENDANTS' DENIAL OF THE LTC THAT EACH PLAINTIFF REQUESTED IS INJURY IN FACT

Plaintiffs applied for LTC's that would allow them to carry guns for self-defense, but

Defendants instead issued them LTC's with "Target & Hunting" restrictions that do not allow the

activity – on pain of a monetary fine of $1,000 to $10,000, and suspension or revocation of their

LTC's.  See M.G.L. c. 140, § 131(a)-(b).  This is a cognizable "injury in fact" because it is

"concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  See

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (2007) (quotations omitted).  Plaintiffs plainly

have "a direct stake in the outcome" of this controversy.  Arizonans for Official English v.

Arizona, 520 U.S. 43, 64 (1997) (quotations omitted).

#### A.  Denial of an Unrestricted LTC is Injury in Fact

Defendants' argument ignores that the denial of a license is an injury in fact imparting

standing.  See, e.g., Sullivan v. City of Augusta, 511 F.3d 16, 26 (1st Cir. 2007).  For example,

the plaintiff in Heller established his standing by seeking to register a handgun with police

authorities in Washington, D.C.  See Parker v. District of Columbia, 478 F.3d 370, 376 (D.C.

Cir. 2007), aff'd sub nom. Heller, 554 U.S. 570.  The plaintiff had standing because "the formal

process of application and denial, however routine, makes the injury to Heller's alleged

constitutional interest concrete and particular."  Id.

Likewise, Kachalsky v. Cacace, 817 F. Supp. 2d 235 (S.D.N.Y. 2011) aff'd, 701 F.3d 81 (2d Cir. 2012), concerned New York's handgun licensing law, which (similar to Massachusetts) allows authorities to impose "sporting"-type restrictions.  See O'Connor v. Scarpino, 638 N.E.2d 950, 951, 83 N.Y.2d 919, 921 (1994).[1]  The defendant officials in that case denied each plaintiff's request for unrestricted handgun licenses – but three of the five plaintiffs held handgun licenses that carried target-shooting restrictions.  See Kachalsky, 817 F. Supp. 2d at 242-44. Nevertheless, the denial of each plaintiffs' request for an unrestricted license was "an actual and ongoing injury because it forestalls the exercise of their alleged constitutional rights."  Id. at 249.

## B.  Defendants Have Not Unequivocally Disavowed Enforcement of § 131

A plaintiff has standing to challenge a law when he seeks "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder. . . ."  Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).  Standing is present so long as the statute creates an "objectively reasonable" threat of prosecution that is "not imaginary or wholly speculative," and the government fails to affirmatively disavow that it will enforce the law.  See N.H. Right to Life PAC v. Gardner, 99 F.3d 8, 14 (1st Cir. 1999) (quoting Babbit, 442 U.S. at 302); see also N.H. Hemp Council, Inc. v. Marshall, 203 F.3d 1, 5 (1st Cir. 2000).  Plaintiffs easily meet this standard because § 131 provides that a restriction violation "*shall be* cause for suspension or revocation and *shall*, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000."  See M.G.L. c. 140, § 131(a)-(b) (emphases added).  And, Defendants are the "licensing officials" empowered to take these actions.  See id. § 131(f); see also Ronald

---

[1] However, unlike in Massachusetts, a person who carries a handgun in violation of his or her restrictions faces suspension or revocation of the license, but not a fine or any other "penal sanction."  See People v. Thompson, 705 N.E.2d 1200, 1201, 92 N.Y.2d 957, 959 (1998).

C. Glidden & John M. Collins, <u>Law Enforcement Guide to Firearms Laws</u> p. 197 (14th ed. 2009) (hereinafter, "<u>Glidden Guide</u>")[2] (a police chief can "charge the person under c.140, §131 where a conviction would not only result in a loss of license but a $1,000 to $10,000 fine").

Nevertheless, Defendants argue there is no standing because they "ha[ve not] even threatened" to take enforcement actions against the Plaintiffs for violating their LTC restrictions. <u>See</u> Deft. Br. p. 9.  However, to the extent that Defendants argue that Plaintiffs' compliance with the law negates their standing, the argument borders on frivolity.  As the Supreme Court has explained, a "plaintiff's own action (or inaction) in failing to violate [a] law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction . . . because the threat-eliminating behavior [is] effectively coerced." <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 129 (2007).

Defendants' contention falls far short of the "unambiguous disclaimer of coverage" that would be needed to disclaim the enforcement threat that § 131 and their restrictions create.  <u>See</u> <u>N.H. Hemp Council</u>, 203 F.3d at 12.  After all, Defendants have not asserted that they would *not* take action if they learned that the Plaintiffs were carrying guns in violation of their restrictions, and indeed, their brief contemplates that they would.  <u>See</u> Deft. Br. p. 9; <u>see also</u> Dec. of Chief Grimes (Doc. No. 33), ¶ 10.  This is nowhere near the "compelling contrary evidence" that Defendants would need to disclaim the risk of enforcement.  <u>See</u> <u>R.I. Ass'n of Realtors v. Whitehouse</u>, 199 F.3d 26, 31 (1st Cir. 1999) (quoting <u>N.H. Right to Life</u>, 99 F.3d at 15).

---

[2] The Supreme Judicial Court has relied on Chief Glidden's treatise as "[a] leading secondary source" to construe Massachusetts gun laws.  <u>See</u> <u>Commonwealth v. Reyes</u>, 982 N.E.2d 504, 511, 464 Mass. 245, 253-54 & n.13 (2013).

### C.  Fear of License Suspension or Revocation, and of a Monetary Fine, is Injury

Contrary to Defendants' argument that "fear alone" is insufficient for standing (p. 9), a reasonable fear of punishment *does* provide standing.  Not surprisingly, Defendants' citations do not support their arguments.

For example, City of Los Angeles v. Lyons, 461 U.S. 95 (1983), concerned an injunction that generally prevented LAPD police officers from performing "chokeholds" to effectuate arrests.  See id. at 99-100.  The plaintiff lacked standing because, while he had previously been stopped and subjected to a "chokehold," this past incident did "nothing to establish a real and immediate threat that he would again be stopped . . . by an officer or officers who would illegally choke him into unconsciousness without any provocation. . . ."  Id. at 105.  Nothing distinguished the plaintiff from the general population.  See N.H. Hemp Council, 203 F.3d at 5.  Here, in contrast, the Plaintiffs requested the licenses needed to engage in a constitutionally protected activity, the Defendants said "no," and as a result, the Plaintiffs must *currently* refrain from exercising their right to bear arms.

The decision in Houston v. Hill, 482 U.S. 451 (1987), does not support the proposition that a plaintiff "must establish he can be convicted under a statute, not whether he might be subject to arrest or prosecution" to have standing.  See Deft. Br. pp. 9-10.  To the contrary, police had arrested the plaintiff in that case four times, but each time Texas courts had dismissed the charges.  See Houston, 482 U.S. at 455-56 & n.4.  Moreover, the punishment in that case was only a $200 fine.  See id. at 455 n.3.  The Court discussed the standing issue in a footnote, where it explained that the plaintiff had "shown a genuine threat of enforcement of the ordinance against his future activities."  Id. at 459 n.7 (quotation omitted).

Both Hollingsworth v. Perry, no. 12-144, 2013 U.S. LEXIS 4919 (Jun. 26, 2013), and Diamond v. Charles, 476 U.S. 54 (1986), are easily distinguished.  The parties seeking to

establish standing in those cases had a generalized interest in *defending* laws that burdened other people, but did not intend to engage in any conduct that the statutes at issue prohibited.  See Hollingsworth, 2013 U.S. LEXIS 4919 at *20 (private citizens defending same-sex marriage ban); Diamond, 476 U.S. at 56 (pediatrician seeking to defend abortion restrictions).  If anything, these cases actually support the Plaintiffs' standing here.  The Court in Diamond observed that four physicians *challenging* the law plainly had standing "because [they] faced possible criminal prosecution."  See Diamond 476 U.S. at 65.  And, the denial of a marriage license gives rise to standing to challenge a same-sex marriage ban.  See Perry v. Brown, 671 F.3d 1052, 1068 (9th Cir. 2012) vacated sub nom., Hollingsworth, 2013 U.S. LEXIS 4919; Jackson v. Abercrombie, 884 F. Supp. 2d 1065, 1083 (D. Haw. 2012).  Finally, Lewis v. Continental Bank Corp., 494 U.S. 472 (1990), is wholly inapposite.  There, a change in federal law had mooted the plaintiff's claim, and the Court rejected its attempt to redress potential injuries to others.  See id. at 478.

Other authorities refute Defendants' claims.  For example, the Court of Appeals for the First Circuit found that a United States Attorney had standing to challenge a federal court rule relating to the service of subpoenas on lawyers on the ground that it exceeded the scope of local rulemaking authority.  See Stern v. United States, 214 F.3d 4, 11-12 (1st Cir. 2000).  The injury that the U.S. Attorney asserted was that he "stands poised to request and serve attorney subpoenas, but reasonably fears disciplinary proceedings (for himself and his staff) if he does so."  Id. at 12.  Of course, attorney disciplinary proceedings involve punishments such as the censure and disbarment of attorneys – not custodial arrest or criminal prosecution.  Nevertheless, standing was present:  "In a pre-enforcement challenge to a law carrying *significant* penalties, standing exists when the plaintiff has manifested an intention to engage in conduct arguably proscribed by the statute, and there exists a 'credible threat' of enforcement."  Id. at 11

(emphasis added); see also MedImmune, 549 U.S. at 128-29 (analogizing to constitutional cases to find that patent licensee did not need to breach a licensing agreement to have standing because the *threat* that the other party would sue for damages and an injunction was injury in fact).

(II)   **DEFENDANTS' RESTRICTIONS COMPLETELY PRECLUDE THE "CORE" RIGHT OF SELF-DEFENSE OUTSIDE THE HOME**

Plaintiffs have demonstrated that:  (1) the right to bear arms is the right to carry guns; (2) Heller and McDonald did not limit this right to the home; and (3) the "core" purpose of the right is individual self-protection aided by arms.  See Pl. Br.[3] pp. 5-11.  Defendants claim that the right is homebound, and that their "Target & Hunting" restrictions impose only a minimal burden akin to a concealed-carry or sensitive-place restriction.  These claims are untenable.

**A.  The Right to Keep and Bear Arms is Not Confined to the Home**

Defendants repeatedly characterize the right to keep and bear arms as confined or limited to the home.  See Def. Br. pp. 2-4, 10, 12, 16.  Defendants contend that Heller's statement about the primacy of "'defense of hearth and home'" establishes the "scope" of the Second Amendment's protection.  See id. pp. 2, 4, 14 n.4, 16 (quoting Heller, 554 U.S. at 635).  This argument takes the Supreme Court's statement out of context.  See Pl. Br. pp. 7-11.

The Court did not *limit* the Second Amendment to the home, but instead wrote that:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. . . .  And *whatever else* [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

Heller, 554 U.S. at 634-35 (emphasis added).  Rather than *limiting* the scope of the Second Amendment to the home, the Court instead stated that further analysis was unnecessary because it was impermissible to preclude the core of an enumerated constitutional right.  "That was

---

[3] Plaintiffs' Brief in Support of Summary Judgment (Doc. No. 38).

enough to decide the case." Ezell v. Chicago, 651 F.3d 684, 701 (7th Cir. 2011). This passage

stands in marked contrast to language that the Court has used to limit its holdings in the past.

See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304,

321 (1987) ("We limit our holding to the facts presented[.]"); see also Bergemann v. R.I. Dep't

of Envt'l Mgmt., 665 F.3d 336, 341 (1st Cir. 2011).

The Supreme Court's own characterization of Heller refutes Defendants' argument:

> Two years ago, in District of Columbia v. Heller, we held that the Second
> Amendment protects the right to keep and bear arms for the purpose of
> self-defense, *and* we struck down a District of Columbia law that banned
> the possession of handguns in the home. . . .
>
> [O]ur central holding in Heller [was] that the Second Amendment
> protects a personal right to keep and bear arms for lawful purposes,
> *most notably* for self-defense within the home.

McDonald, 130 S. Ct. at 3026, 3044 (emphases added).

Defendants rely on the Supreme Judicial Court's decision in Chardin v. Police

Commissioner, 989 N.E.2d 392, 465 Mass. 314 (2013), to contend that their LTC licensing

decisions "do not burden conduct that falls within the scope of the Second Amendment." Deft.

Br. pp. 16-17 (quoting Chardin, 989 N.E.2d at 402, 465 Mass. at 327). However, Chardin

concerned a much different issue – the statutory bar against issuing LTC's to persons adjudicated

delinquent (as minors) of offenses that would be felonies if committed by adults. See Chardin,

989 N.E.2d at 393-94, 465 Mass. at 314-15.[4] While Heller described felon-in-possession bans as

"presumptively lawful," the Court did *not* state that a broad ban on bearing arms was

"presumptively lawful." See United States v. Marzzarella, 614 F.3d 85, 93 (3d Cir. 2009)

("prudence counsels caution when extending these recognized exceptions to novel regulations

---

[4] Defendants' quotation from Chardin *omits* references that identify the issue as being a
"prohibition on the possession of firearms by a particular group of individuals – those who have
committed a felony. . . ." See Chardin, 989 N.E.2d at 403, 465 Mass. at 327.

unmentioned by <u>Heller</u>").  No less significant, the First Circuit has *not* taken the view that <u>Heller</u>'s presumptively lawful restrictions fall *outside* the scope of the Second Amendment. <u>Compare</u> <u>Chardin</u>, 989 N.E.2d at 400, 465 Mass. at 324, <u>with</u> <u>United States v. Torres-Rosario</u>, 658 F.3d 110, 113 (1st Cir. 2011) (<u>Heller</u>'s identification of felon bans as "'presumptively lawful,' . . . reserves the possibility of yet to be developed qualifications"); <u>see also</u> Pl. Br. p. 8.

### B.  The Core of the Second Amendment is Armed Self-Defense – Not Target-Shooting and Hunting

Defendants attempt to minimize the burden of the "Target & Hunting" restrictions by pointing out that Plaintiffs can carry handguns at home and while target-shooting and hunting. <u>See</u> Deft. Br. pp. 2, 6, 12.  Defendants contend (p. 9) that the restrictions do not "actually affect[ Plaintiffs] in any meaningful way."  Defendants even claim that their "Target & Hunting" restrictions "*safeguard*[]" Plaintiffs' Second Amendment rights.  <u>Id.</u> at 12 (emphasis added).

However, the core of the Second Amendment is *not* target-shooting and hunting.  Rather, "individual self-defense is 'the *central component*' of the Second Amendment right." <u>McDonald</u>, 130 S. Ct. at 3036 (quoting <u>Heller</u>, 554 U.S. at 599) (emphasis in source); <u>accord</u> <u>United States v. Rene E.</u>, 583 F.3d 8, 11 (1st Cir. 2009); Pl. Br. pp. 5-7.  Indeed, from a constitutional perspective, target shooting's value is as "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense."  <u>Ezell</u>, 651 F.3d at 708.

For each of the Plaintiffs, the "Target & Hunting" restrictions that Defendants have imposed virtually preclude bearing arms outside the home for the "core lawful purpose" of the Second Amendment:  self-defense.  The exceptions that Defendants have provided for target-shooting and hunting do not transform this burden into a modest restriction of place or manner. For example, Illinois law allowed people to carry guns for both hunting and target-shooting, and while the Court of Appeals for the Seventh Circuit acknowledged this fact, it still characterized

the state's general preclusion on bearing arms outside of these exceptions as a "broad" and "flat"

"ban."  See Moore v. Madigan, 702 F.3d 933, 934, 939-40 (7th Cir. 2012).

### C.   The Burden is Much Broader than a Concealed-Carry and Sensitive-Place Restriction

Defendants' claim that Plaintiffs seek the right to carry guns "wherever they want,

whenever they want," and they invoke Heller's caution that the right to keep and bear arms is not

the right to "'keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose.'"  See Deft. Br. pp. 2, 5-6 (quoting Heller, 554 U.S. at 626).  Defendants contend that

Plaintiffs have no right to unrestricted LTC's because those LTC's might authorize carry in

"sensitive places" where carrying could permissibly be banned, and they cite shopping malls and

stadiums as examples.  See id. p. 13 n.13.

Contrary to Defendants' claim, Plaintiffs do not seek an order giving them the right to

carry guns "wherever they want, whenever they want."  Numerous other laws already prohibit

guns from specific places and at specific times, regardless of whether one is licensed.  For

example, laws that are not at issue in this case already preclude people from carrying guns:  on

school or university grounds, see M.G.L. c. 269, § 10(j); in airports, see 740 CMR 30.04(1); in

state courts, see Massachusetts Court System Weapons Policy ¶ II(B);[5] in nature preserves, see

321 CMR 11.07(15); and, while intoxicated, see M.G.L. c. 269, § 10H; to name a few.  Plaintiffs

do not seek to bear arms at all places and times, but rather, in conformity with the

Commonwealth's existing regulations.

Defendants also mis-characterize the Plaintiffs' claim as being one for the issuance of a

concealed handgun license.  See Deft. Br. pp. 2, 6-7, 10, 20.  However, the Massachusetts gun-

licensing scheme is apples and oranges with the *concealment* laws that Heller and Peterson v.

---

[5] Available at http://www.mass.gov/courts/weapons-policy.pdf (last visited Jul. 29, 2013).

Martinez, 707 F.3d 1197 (10th Cir. 2013), addressed.  Massachusetts is one of only three states

requiring licenses to possess or use handguns in any manner.  See M.G.L. c. 140, §§ 129B(6),

129C; M.G.L. c. 269, § 10(a); Pl. Br. pp. 1-2 n.1; see also 430 Ill. Comp. Stat. 65/2(a)(1); N.Y.

Penal L. §§ 265.01(1), 265.20(a)(3).  The LTC's that Plaintiffs sought from Defendants are not

"concealed carry" licenses – rather, they are the licenses needed to lawfully possess or carry

handguns in any form.  See Glidden Guide, supra, p. 295 ("Massachusetts has no special license

for concealed firearms.").  In contrast, the concealed-carry laws that Heller and Peterson

discussed still left people free to bear arms in open view.  See Heller, 554 U.S. at 626; Peterson,

707 F.3d at 1209; Pl. Br. p. 9.  Plaintiffs have detailed other historical authorities that support

this rationale.  See Pl. Br. pp. 15-16.

Significantly, while Peterson upheld Colorado's general refusal to issue concealed-carry

licenses to nonresidents, the court also suggested that a complete preclusion would violate the

right to bear arms.  See Peterson, 707 F.3d at 1209 ("By contrast, had Peterson challenged the

Denver ordinance [that prohibits open carry], he may have obtained a ruling that allows him to

carry a firearm openly while maintaining the state's restrictions on concealed carry.").  Indeed, a

Tenth Circuit district court recently ruled that a complete preclusion – the issue here – was *not*

constitutional.  See Bonidy v. United States Postal Serv., no. 10-cv-02408, 2013 U.S. Dist.

LEXIS 95435, *18 (D. Colo. Jul. 9, 2013).  While the court in Bonidy upheld a ban on carrying

guns in postal office buildings as a ban on carry in "sensitive places," see id. at *8, it found that

the general ban on having arms in postal office parking lots "sweeps too far," id. at *17.

The "Target & Hunting" restrictions that Defendants placed on Plaintiffs' LTC's do not

address concealment at all.  Police Chiefs who wish to restrict the *concealed* carry of firearms,

alone, have different options available.  First, Police Chiefs can designate LTC's to be of Class

B, which do not authorize concealed carry, but do allow people to carry guns in open view.  See M.G.L. c. 140, § 131(b); see also Glidden Guide, supra, pp. 198 & 288.  Indeed, this was the approach taken with Plaintiffs Wilson Lobao and Chris Davis, who both applied for Class A LTC's, but were instead issued Class B LTC's.  See JS ¶¶ 18-19; Dec. of Chris Davis (Doc. No. 39) ¶ 2.  Second, they can impose a license restriction of "No Concealed Carry."  See Glidden Guide, supra, p. 198; see also Dec. David Botticelli ¶ 4 & ex. 1; Dec. of Evelyn Freeman ¶ 4 & ex. 1 (both submitted herewith) (examples of "no concealed carry" restrictions).

## (III)   DEFENDANTS HAVE NOT JUSTIFIED THEIR POLICIES

Defendants' claimed interest in public safety (pp. 11-12) does not justify their policies.

### A. Defendants Must Show that Public Safety Concerns Justify their Policies

Defendants contend that intermediate scrutiny applies and that, *ipso facto*, their restriction policies pass muster.  However, Plaintiffs have already shown that the First Circuit has carefully avoided adopting categorical standards of scrutiny to review laws that burden the right to keep and bear arms.  See Pl. Br. pp. 11-13.  Notwithstanding Defendants' citation (p. 10), the First Circuit did not adopt intermediate scrutiny in Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012), and indeed, the decision mentions "intermediate scrutiny" only once, in a footnote discussing another case.  See id. at 71 n.7.  Likewise, the court in Fletcher v. Haas, 851 F. Supp. 2d 287 (D. Mass. 2013), ruled that the Massachusetts law prohibiting non-citizens from possessing guns did "not pass constitutional muster *regardless* of whether intermediate scrutiny or strict scrutiny applies."  See id. at 302-03 (emphasis added).  Heller itself belies Defendants' appeal to intermediate scrutiny as a "one size fits all" approach.  Although the Court did not announce a standard of scrutiny *per se*, it disclaimed use of the rational basis standard, and approvingly cited footnote 4 of United States v. Carolene Products Co., 304 U.S. 144 (1938). See Heller, 554 U.S. at 628-29 n.27.  Of course, this footnote was the genesis of the current

"tiered"-scrutiny approach under which the level and rigor of scrutiny depends on the nature and severity of the burden.  See Ezell, 651 F.3d at 706; Stacey L. Sobel, The Tsunami of Legal Uncertainty:  What's a Court to do Post-*McDonald*?, 21 Cornell J. L. & Pub. Pol'y 489, 504-05 (2012); Robert A. Levy, Second Amendment Redux:  Scrutiny, Incorporation, and the *Heller* Paradox, 33 Harv. J.L. & Pub. Pol'y 203, 206 (2010).

Nomenclature aside, because some form of heightened scrutiny must apply, "the burden of justification is *demanding* and it rests *entirely* on" Defendants.  Nguyen v. INS, 533 U.S. 53, 75 (2001) (quotation omitted) (emphases added).  Even under the more relaxed standard of intermediate scrutiny, where Defendants do not need to show that the degree of "fit" is perfect, Defendants still must show that their burdens are "in proportion to the interest served."  See Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989) (quoting In re R.M.J., 455 U.S. 191, 203 (1982)).  This "narrow tailoring" requirement compels Defendants to show that their policies "do[] not 'burden substantially more [conduct] than is necessary to further the government's legitimate interests.'"  Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664-65 (1994) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)).  As the level of scrutiny increases, the policies must be "the 'least restrictive means among available, effective alternatives.'"  United States v. Alvarez, 132 S. Ct. 2537, 2551 (2012) (quoting Ashcroft v. ACLU, 542 U.S. 656, 666 (2004)).

Finally, Defendants' claim (p. 10) that "the Supreme Court did not explicitly hold that the Second Amendment right is a fundamental right," and that the level of scrutiny should accordingly be lower, is wrong.  In McDonald, the five Justices making up the majority all agreed in Part III-B that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those *fundamental* rights necessary to our system of ordered

liberty." McDonald, 130 S. Ct. at 3042 (emphasis added).  Even in his concurring opinion,

Justice Thomas reiterated his agreement that the right to keep and bear arms is "fundamental to

the American scheme of ordered liberty."  Id. at 3059 (Thomas, J., concurring) (quotations

omitted).  The statement in Heller v. District of Columbia, 698 F. Supp. 2d 179 (D.D.C. 2010),

aff'd in part & rev'd in part 670 F.3d 1244 (D.C. Cir. 2011), that the Supreme Court did not

"explicitly" recognize the Second Amendment as a fundamental right *predated* McDonald, and

indeed, the Court of Appeals for the District of Columbia Circuit repeatedly characterized the

right as "fundamental" on appeal.  See Heller v. District of Columbia, 670 F.3d 1244, 1256 (D.C.

Cir. 2011).  The other case Defendants cite for this point also preceded the Supreme Court's

decision in McDonald.  See United States v. Miller, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009).

### B. Defendants Have Not Justified Their Policies for Withholding the Right to Bear Arms

#### 1. *6-Year Waiting Period*

Defendants claim that they need a 6-year waiting period to evaluate LTC holders.  See

Deft. Br. p. 18.  However, as previously explained, only Chief Champagne has a policy of

removing restrictions after 6 years.  If Chief Grimes had this policy, then both Plaintiff Chris

Davis and non-party Jack Darling would have unrestricted LTC's.

In any event, contrary to Defendants' claim, a 6-year waiting period is not "what the

Tenth Circuit described as the ability 'to monitor continued qualification. . . .'"  Id. pp. 18-19

(quoting Peterson, 707 F.3d at 1221 (Lucero, J., concurring)).  Peterson addressed a requirement

that a person be a "resident" to obtain a concealed-carry license, and did not concern a

requirement that an applicant hold a license for a probationary period, or even reside in the state

for some preliminary period.  See Colo. Rev. Stat. § 18-12-203(a); see also Peterson, 707 F.3d at

1201.  This is not the issue here, as all Plaintiffs are Massachusetts residents, and in any event,

Massachusetts law allows non-residents to obtain LTC's.  <u>See</u> M.G.L. c. 140, § 131F.[6]

Likewise, both <u>Bach v. Pataki</u>, 408 F.3d 75 (2d Cir. 2005), and the district court's decision in

<u>Osterweil v. Bartlett</u>, 819 F. Supp. 2d 72 (S.D.N.Y. 2011) <u>question certified</u>, 706 F.3d 139 (2d

Cir. 2012), concerned a residency requirement – not a probationary licensing period, nor any

other type of waiting period.  <u>See</u> <u>Bach</u>, 408 F.3d at 76; <u>Osterweil</u>, 819 F. Supp. 2d at 76; <u>see</u>

<u>also</u> N.Y. Penal L. § 400.00(3)(a).  Moreover, the Second Circuit decided <u>Bach v. Pataki</u> prior to

both <u>Heller</u> and <u>McDonald</u>, relying on the discredited view that the right to keep and bear arms

does not apply against the states.  <u>See</u> <u>Bach</u>, 408 F.3d at 84-86.  And on appeal from the District

Court's decision in <u>Osterweil</u>, the Second Circuit reasoned that the residency requirement raised

"a serious constitutional question," and certified a question to the New York Court of Appeals

(which has yet to be answered).  <u>See</u> <u>Osterweil v. Bartlett</u>, 706 F.3d 139, 144-45 (2d Cir. 2012).[7]

Defendants' appeal to a waiting period of 6 years is simply without precedent.  Quite to

the contrary, when it comes to the exercise of constitutional rights, the Supreme Court has

upheld durational requirements of only a very limited period – to the extent it has upheld them at

all.  For example, the maximum durational residency requirement that can be imposed on voting

is 50 days.  <u>See</u> <u>Burns v. Fortson</u>, 410 U.S. 686, 686-87 (1973); <u>Dunn v. Blumstein</u>, 405 U.S.

330, 348 (1972).  The Supreme Court has upheld longer periods for "readily portable benefits"

such as welfare benefits, for which there is no *per se* constitutional right.  <u>See</u> <u>Saenz v. Roe</u>, 526

U.S. 489, 505 (1999).  But even so, the limits upheld fall far short of Defendants' 6 years.  <u>See</u>

<u>Vlandis v. Kline</u>, 412 U.S. 441, 453-54 (1973) (irrebuttable requirement of one year of

residency, prior to application, in order to obtain in-state tuition was unconstitutional).

---

[6] The non-resident LTC application is available at <u>http://www.mass.gov/eopss/docs/chsb/firearms/non-resident-application-2013.pdf</u> (last visited Jul. 29, 2013).
[7] The question was whether a part-time resident is "eligible for a New York handgun license in the city or county where his part-time residence is located?"  <u>Osterweil</u>, 706 F.3d at 145.

Common sense and comparative analysis bely Defendants' claim to need a 6-year evaluation period – and Defendants present no academic, governmental, or other studies that would support it. If this is *really* needed to protect public safety, then how can other Massachusetts localities not impose it? For that matter, how can other states with restrictive gun laws – like California and New York – get by with only a requirement of residency? See Cal. Penal Code § 26150(a)(3); N.Y. Penal L. § 400.00(3)(a). And finally, if a 6-year waiting period is necessary, then how can Defendants issue unrestricted LTC's from the outset to "privileged" members of the community, such as business owners?

### 2. *"Privileged" Members of Society*

Both Defendants allow certain "privileged" members of their communities to exercise their right to bear arms: business owners and individuals with military experience. JS ¶¶ 9-10. This aspect of Defendants' policies particularly raises equal protection concerns because it "has a special impact on less than all the persons subject to [Defendants'] jurisdiction." N.Y. City Transit Auth. v. Beazer, 440 U.S. 568, 587-88 (1979).[8] Incredibly, Defendants make *no* attempt to justify these policies. Perhaps this shouldn't be surprising: How could permission to exercise a *constitutional right* be limited to the segments of society deemed sufficiently "important" by local government officials? Cf. Heller, 554 U.S. at 634 ("The very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really* worth insisting upon.").

---

[8] While Defendants' policies contravene the Second Amendment on their own, equal protection analysis "retains independent worth" because it "serves to illumine the state's interest in burdening those of the plaintiff's class and the necessity of doing so in order to advance that interest." Morial v. Judiciary Comm'n of Louisiana, 565 F.2d 295, 304 (5th Cir. 1977) (en banc). How can one's status as a business owner be a permissible basis for doling out permission to exercise an inherently personal constitutional right?

3. *Naked Discretion*

Defendants also attempt to justify their policies by citing (p. 15) the basic concept of "delegat[ing] to local police chiefs the discretion and authority to issue an LTC with restrictions as they deem appropriate," and pointing to the possibility that someone might not be responsible, even though they are not statutorily disqualified (p. 18). This argument is misplaced because Defendants are not using their discretion to impose LTC restrictions merely to restrict individuals who they find are not "law-abiding" or "responsible."[9]  Moreover, this is not the aim of the statute, which (unlike laws in other states) provides a broad grant of discretion that is not limited to weeding out irresponsible individuals who would otherwise slip through the cracks. See, e.g., 25 Me. Rev. Stat. Ann. § 2003(4) (officials can deny licenses based on "reckless or negligent conduct" or a history of misdemeanor offenses); 18 Pa. Cons. Stat. Ann. § 6109(e)(i) (sheriff can deny license to a person "whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety"); Va. Code Ann. § 18.2-308.09(13) (discretion to deny license based on "specific acts by the applicant, [showing he or she] is likely to use a weapon unlawfully or negligently to endanger others").

To the extent Defendants seek to justify naked discretion for its own sake, the claim must fail. It is telling that Defendants rely (pp. 17-18) on Marchesi v. Selectmen of Winchester, 42 N.E.2d 817, 312 Mass. 28 (1942), which concerned a state law that delegated local officials broad discretion ("pleasure") to grant or deny licenses to operate bowling alleys. See id. at 819, 312 Mass. at 30. Of course, there is no constitutional right to operate a bowling alley. Licensing schemes that impact the ability to exercise *constitutional rights*, in contrast, must not place

---

[9] Individuals who are not responsible and law-abiding do not qualify for licenses in the first place. See M.G.L. c. 140, § 131(d) (applicants cannot have convictions for felonies, a violent crimes, or certain misdemeanors, cannot be subject to restraining orders or arrest warrants, and must otherwise be "suitable").

"unbridled discretion in the hands of a government official or agency" and must not allow "a permit or license [to] be granted or withheld in the discretion of such official."  See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225-26 (1990) (quotations omitted).  The Supreme Court has applied this principle to an array of constitutional rights, including the rights to vote, picket and protest, distribute literature, and solicit support for a religion.  See, e.g., Louisiana v. United States, 380 U.S. 145, 153 (1965) (interpretation test required to vote "leave[s] the voting fate of a citizen to the passing whim or impulse of an individual registrar"); Cox v. Louisiana, 379 U.S. 536, 556 (1965); Largent v. Texas, 318 U.S. 418, 422 (1943); Cantwell v. Connecticut, 310 U.S. 296, 306-07 (1940); see also Isaacson v. Horne, no. 12-16670, 2013 U.S. App. LEXIS 10187, *6 (9th Cir. May 21, 2013) (right to obtain abortion could not be made contingent on physician's finding of medical necessity because this "is not the same as allowing a *woman* to decide whether to carry her own pregnancy to term").  The Supreme Court "ha[s] consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." Shuttlesworth v. Birmingham, 394 U.S. 147, 153 (1969) (quoting Kunz v. New York, 340 U.S. 290, 294 (1951)); see also Pl. Br. p. 20.  Defendants cannot defend their restrictive policies by asserting an interest in exercising unfettered discretion any more than they could point to an alleged interest in suppressing the exercise of constitutional rights.  Cf. Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd., 502 U.S. 105, 118 (1991) (government cannot "take[] the effect of the statute and posit[] that effect as the State's interest").

### C.  Courts Have Not "Consistently Rejected" Claims Comparable to Plaintiffs'

While Defendants contend that "federal courts around the country have consistently rejected arguments comparable to those posited by Plaintiffs here," the cases Defendants cite are readily and properly distinguished.  See Deft. Br. p. 14.  The only issue in Hightower v. Boston,

693 F.3d 61 (1st Cir. 2012), was the revocation of the plaintiff's LTC – not the placement of restrictions on valid LTC's.  See id. at 70.  While the court stated that under Heller, "the government may regulate the carrying of concealed weapons outside the home," id. at 73; see also Deft. Br. p. 14, this is neither here nor there.  And, when this Court decided Pineiro v. Gemme, no. 10-40262, 2013 U.S. Dist. LEXIS 42626 (D. Mass. Mar. 26, 2013), it was careful to qualify that it did not "attempt to answer the difficult constitutional question presented here."  Id. at *18.  This Court expressly noted that "[w]hether a written policy that in fact prohibited the carrying of a firearm outside the home for personal protection under all circumstances (for example, by limiting all such uses to hunting, sporting, or target uses) would be constitutional is an issue that this Court does not reach."  Id. at *28 n.7.

Of the cases Defendants cite, only three addressed the constitutionality of complete preclusions on carrying guns in any manner:  Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013); Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012); and, Kachalsky v. Westchester, 701 F.3d 81 (2d Cir. 2012).  While there are some significant differences among these decisions, none of them would support the policies that Defendants have implemented here.  The decisions in both Woollard and Kachalsky upheld restrictive policies for issuing licenses to carry handguns because the courts there found that the policies sought to strike a balance between the individual interest in self-defense and society's interest in public safety.  See Woollard, 712 F.3d at 881 (rejecting the notion that the permitting system was a mere "rationing system," and instead finding that it "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland"); Kachalsky, 701 F.3d at 98 ("[r]estricting handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related to

New York's interests in public safety and crime prevention" and "is not . . . an arbitrary licensing regime no different from limiting handgun possession to every tenth citizen").  And there is no dispute that the Court of Appeals for the Seventh Circuit's decision in Moore v. Madigan undercuts Defendants' position.  See Deft. Br. p. 14 (using the "but see" signal to introduce Moore).  That case concerned Illinois's general ban (since repealed) on private citizens carrying guns in public.  See Moore, 702 F.3d at 934.  Judge Posner ruled the ban unconstitutional because "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in Heller and McDonald."  Id. at 937.

To be sure, there are significant differences between Moore, on the one hand, and Kachalsky and Woollard, on the other – most notably, related to the strength of a person's right to self-defense when outside the home.  Compare Woollard, 712 F.3d at 882, and Kachalsky, 701 F.3d at 94, with Moore, 702 F.3d at 941 ("the interest in self-protection is as great outside as inside the home").  But those differences are not dispositive here.  All of these courts agreed (at a minimum) that a carry-licensing system needed to balance an individual's need for self-defense against society's interest in public safety – rather than functioning as mere rationing system that sought to limit the number of licenses.

## CONCLUSION

Defendants' policies do not strike a balance between the Plaintiffs' constitutional right of armed self-defense and society's interest in public safety.  To the contrary, Defendants' policies serve only to limit the ability of law-abiding citizens to bear arms for their protection.  Defendants' bare desire to curtail the Plaintiffs' constitutional right of armed self-protection cannot pass muster, and Defendants' showing of justification falls woefully short.

Dated: July 31, 2013

Respectfully submitted,

THE PLAINTIFFS,

By their attorneys,

_____

David D. Jensen, Esq.
Admitted *Pro Hac Vice*
DAVID JENSEN PLLC
111 John Street, Suite 230
New York, New York 10038
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

Patrick M. Groulx, Esq.
BBO No. 673394
POLIS LEGAL
P.O. Box 76056
Melrose, Massachusetts 02176
Tel:  978.549.3124
Fax:  617.500.9955
pgroulx@polislegal.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on 31 July 2013.

/s/ David D. Jensen_____
David D. Jensen, Esq.