UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER DAVIS; WILLIAM J. THOMPSON, JR.; WILSON LOBAO; ROBERT CAPONE; and COMMONWEALTH SECOND AMENDMENT, INC., <br><br> Plaintiffs, <br><br>  -against- <br><br> RICHARD C. GRIMES, in his Official Capacity as Chief of the Weymouth Police Department; and ROBERT L. CHAMPAGNE, in his Official Capacity as Chief of the Peabody Police Department, <br><br> Defendants, <br><br> -and- <br><br> COMMONWEALTH OF MASSACHUSETTS, <br><br> Intervenor. | CIVIL ACTION NO. <br><br> 1:13-cv-10246 |

**PLAINTIFFS' REPLY**

TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

(I) THE ISSUE HERE IS THE ABILITY TO BEAR ARMS IN *SOME* FORM ...................................... 2

    A.   A Class A LTC is Not a "Concealed Carry" License................................................ 2

    B.   The Commonwealth's Misreading of *Hightower* ...................................................... 3

    C.   Issues that are *Not* Presented Here ............................................................................ 5

        1.   *Concealed Carry* ...................................................................................................... 5

        2.   *Large Capacity Handguns* ..................................................................................... 5

        3.   *Training* .................................................................................................................. 6

(II) DEFENDANTS HAVE NOT JUSTIFIED THEIR POLICIES ........................................................ 6

    A.   **Defendants – not Plaintiffs – have the Burden of Proving that Public Safety Concerns Justify their Policies** ...................................................................... 7

    B.   **Defendants Do Not Have a "Need"-Based Policy Like Those Upheld in *Woollard* and *Kachalsky*** ..................................................................................... 7

(III) TO THE EXTENT IT IS NECESSARY TO ADDRESS THE ISSUE, THE SEVENTH CIRCUIT'S RULINGS ARE MOST PERSUASIVE ............................................................... 11

CONCLUSION ..................................................................................................................... 13

**TABLE OF AUTHORITIES**

**CASES**

Andrews v. State, 50 Tenn. 165 (1871) ................................................................................. 13

Aymette v. State, 21 Tenn. 154 (1840) .................................................................................. 13

District of Columbia v. Heller, 554 U.S. 570 (2008) ........................................................... 5-6, 13

Drake v. Filko, no. 12-1150, 2013 U.S. App. LEXIS 15635 (3d Cir. Jul. 31, 2013) .............. 11-13

English v. State, 35 Tex. 473 (1872) ..................................................................................... 13

Fife v. State, 31 Ark. 455 (1876) ........................................................................................... 13

Heller v. Doe, 509 U.S. 312 (1993) ....................................................................................... 7

Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012) ............................................................... 3-4

Kachalsky v. Westchester, 701 F.3d 81 (2d Cir. 2012) ........................................................ 7-9, 11-13

McDonald v. Chicago, 130 S. Ct. 3020 (2010) ..................................................................... 7

Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012) ................................................................. 11-13

Nguyen v. INS, 533 U.S. 53 (2001) ....................................................................................... 7

Ruggiero v. Police Commissioner of Boston, 18 Mass. App. Ct. 256,
    464 N.E.2d 104 (1984) .................................................................................................... 11

Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994) ........................................................ 7

United States v. Booker, 644 F.3d 12 (1st Cir. 2011) .......................................................... 7

United States v. Miller, 307 U.S. 174 (1939) ....................................................................... 5

Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) .......................................................... 7-9, 11

Woollard v. Sheridan, 863 F. Supp. 2d 462 (D. Md. 2012) rev'd sub nom.
    Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) .................................................... 8

**STATUTES**

Md. Code Ann., Pub. Safety § 5-302 .................................................................................... 8

Md. Code Ann., Pub. Safety § 5-306 .................................................................................... 8

Md. Code Regs. 29.03.02.04 ................................................................................................. 8

1906 Mass. Acts ch. 172 ........................................................................................................ 2

1998 Mass. Acts ch. 180 ........................................................................................................ 2

M.G.L. c. 140, § 121 ............................................................................................................. 2

M.G.L. c. 140, § 131 ............................................................................................................. 2, 6, 11

M.G.L. c. 140, § 131 (1997) ................................................................................................. 2

N.J. Admin. Code § 13:54-2.4 .............................................................................................. 12

**OTHER AUTHORITIES**

Brian MacQuarrie, "Want a gun license in Massachusetts? Much depends on
    where you live," Boston Globe (Mar. 10, 2013) .................................................................. 3, 9

Executive Department Memorandum from Governor's File for
    1998 Mass. Acts ch. 180 (Jul. 22, 1998) ............................................................................... 2

Executive Office of Public Safety and Security, Large Capacity Weapons Roster 06-2011 ......... 2

Ronald C. Glidden & John M. Collins, Law Enforcement Guide to Firearms Laws
    (14th ed. 2009) ....................................................................................................................... 3

**INTRODUCTION**

Defendants seek to limit the right to bear arms to those members of their communities who they deem sufficiently deserving or privileged – police officers, military personnel, and business owners – while denying the right to others, or (at a minimum) making them wait 6 years. This is not a permissible basis for granting permission to exercise a constitutional right. While society has a legitimate interest in imposing regulations to enhance public safety, Defendants' status-oriented rationing system does not serve this goal.

It is telling that both Defendants and the Commonwealth repeatedly attempt to change and mischaracterize both the issues in this case and the facts in the record. While the Commonwealth recognizes that the "plaintiffs challenge *only* the imposition of a 'Target and Hunting' restriction on their licenses-to-carry," Com. Br. (Doc. No. 50) p. 7 (emphasis added), the Commonwealth repeatedly attempts to confuse this issue by asserting that the question here is actually whether there is a right to carry "loaded, concealed, high-capacity firearms," id. at 15; see also id. at 1, 4, 7, 10, 18. Both Defendants and the Commonwealth also try to invoke the need for training and proficiency – even though their policies do not consider these interests.

Point I responds to these attempts to confuse the issue from the one actually presented – the use of "Target & Hunting" restrictions to completely preclude the bearing of handguns for self-defense. Point II then refutes the other parties' attempt to re-characterize the Weymouth and Peabody licensing policies as systems that seek to balance the individual interest in self-defense against society's interest in public safety. Defendants' status-oriented policies do not measure individual need, notwithstanding counsel's arguments to the contrary. Finally, Point III addresses the competing approaches that the Circuit Courts have developed to review broad preclusions on the bearing of arms. Approaches that limit the right to the home are inconsistent with the precedents of the Court of Appeals for the First Circuit.

## ARGUMENT

### (I)   THE ISSUE HERE IS THE ABILITY TO BEAR ARMS IN *SOME* FORM

#### A.  A Class A LTC is Not a "Concealed Carry" License

From 1906 to 1998, Massachusetts law provided for only one type of license to carry firearms.  See 1906 Mass. Acts ch. 172;[1] see also M.G.L. c. 140, § 131 (1997).  The legislature changed this framework in 1998, when it amended § 131 to provide that "[a]ll licenses to carry firearms shall be designated Class A or Class B. . . ."  1998 Mass. Acts ch. 180, sec. 41, presently codified at M.G.L. c. 140, § 131.  The purpose of this change was (according to an Executive Department Memorandum included in the Governor's File) to "provide[] discretion to the licensing authority in deciding whether to issue a Class A or Class B License to Carry."  See Dec. of David Jensen, Esq. (submitted herewith) ex. 2, p. 5.

Under the 1998 amendment, a Class B license is a limited version of a Class A license – and one that offers no benefit or advantage that a Class A license does not.  As Defendants concede, "Class A licenses provide the same privileges as Class B licenses, except that the holder of a Class A license may possess 'large capacity firearms' and a Class A license also allows for the possession or carrying of concealed weapons in public."  Deft. Br. (Doc. No. 31) pp. 6-7.  To provide some context, a person with a Class B LTC could not possess a Glock model 23 handgun (the firearm issued to Court Security Officers) because this handgun can accept ammunition magazines that hold more than 10 rounds of ammunition.[2]  This same person could only bear his or her handgun in open view, rather than concealed.  In contrast, a person with a

---

[1] Although the title of the 1906 act was "An act to regulate by license the carrying of concealed weapons," the terms of the act precluded one from "carry[ing] a loaded pistol or revolver" without regard to whether it was concealed. See 1906 Mass. Acts ch. 172, sec. 1, attached as ex. 1 to Dec. of David Jensen, Esq. (submitted herewith).
[2] A "large capacity weapon" is (*inter alia*) a semiautomatic handgun that is "capable of accepting" a magazine that holds more than 10 rounds of ammunition. See M.G.L. c. 140, § 121.  Hence, the Commonwealth has designated the aforesaid Glock 23 (and a host of other common handguns) as "large capacity weapons" that require Class A LTC's.  See Executive Office of Public Safety and Security, Large Capacity Weapons Roster 06-2011, available at http://www.mass.gov/eopss/docs/chsb/firearms/large-capacity-roster-06-2011.pdf (last visited Aug. 8, 2013).

Class A license could bear a handgun either in the open or concealed – unless that Class A license carried a "no concealed carry" restriction.  See Pl. Opp. Br. (Doc. No. 52) p. 12.

Because Class B LTC's confer no advantage over Class A LTC's, it is little surprise that virtually no one requests a Class B designation.  For example, Plaintiff Wilson Lobao holds an LTC of Class B, and Plaintiff Chris Davis previously held a Class B LTC – but both of these Plaintiffs had applied for Class A licenses.  It was their Police Chiefs who decided to issue them Class B licenses.  See JS (Doc. No. 34) ¶¶ 18-19; Davis Dec. (Doc. No. 39) ¶ 2.

Class B licenses are relatively uncommon.  Chief Glidden (an authority on Massachusetts gun laws that all parties rely upon) "recommend[s] that departments issue primarily Class A LTC's," rather than Class B licenses, and offers that "[i]f the department is concerned with how a person will carry a firearm, they should impose a restriction on the Class A LTC rather than issue the more confusing Class B."  See Ronald C. Glidden & John M. Collins, Law Enforcement Guide to Firearms Laws p. 74 (14th ed. 2009);[3] see also Pl. Opp. Br. pp. 11-12.  And indeed, across Massachusetts, Police Chiefs have designated only about 1.3% of LTC's to be of Class B.  See Brian MacQuarrie, "Want a gun license in Massachusetts? Much depends on where you live," Boston Globe (Mar. 10, 2013).[4]

### B.  The Commonwealth's Misreading of Hightower

Seemingly blind to the fact that it is Police Chiefs who choose whether to designate LTC's as Class A or Class B, the Commonwealth argues that the only issue in this case is the advantage that an unrestricted Class A LTC would offer over an unrestricted Class B LTC.  See Com. Br. p. 7 (quoting Hightower v. Boston, 693 F.3d 61, 70 (1st Cir. 2012)).  This argument is misplaced because the restrictions that Defendants have imposed do not allow the Plaintiffs to

---

[3] Pertinent portions of the Glidden Guide are exhibit 3 to the Dec. of David Jensen, Esq. (submitted herewith).
[4] Available at http://www.boston.com/news/local/massachusetts/2013/03/10/want-gun-license-massachusetts-much-depends-where-you-live/04SFWtTEpGdtEHm5mTQuSO/story.html (last visited Aug. 8, 2013).

bear non-large capacity handguns in a non-concealed manner.  Rather, the "Target & Hunting" restrictions flatly prohibit the bearing of *any* type of handgun in *any* manner.  The Commonwealth's argument might have merit if (for example) the Defendants had issued the Plaintiffs unrestricted Class B LTC's, and the Plaintiffs now sought to have those Class B LTC's changed to Class A.  But this is not the case presented.

The Commonwealth grounds its argument in a quote pulled from Hightower and taken out of context.  Context, however, matters.  The plaintiff in Hightower had previously held an unrestricted Class A LTC, which the Boston Police Department had revoked.  See Hightower, 693 F.3d at 65.  The plaintiff had not applied for another license, but the Department stated that, if she did, they would issue her either an unrestricted Class B license or a restricted Class A license (apparently prohibiting concealed carry[5]).  See id. at 69-70 & n.6.  Hence, the injury that flowed from the revocation was the difference between the license that had been revoked and could not be obtained again (an unrestricted Class A) and the license that would issue on a new application (an unrestricted Class B, or a restricted Class A).  Ergo the court's statement that "Hightower's as-applied claim extends only to the characteristics of the license that was revoked – a Class A unrestricted license that allows for carrying of concealed, large capacity weapons outside the home."  Id. at 70.  It is telling that in order to make its standing argument, the Commonwealth quotes this language from the decision, and then simply substitutes the word "sought" for the word "revoked."  See Com. Br. p. 7.  This misreading of Hightower would have the effect of immunizing Police Chiefs from constitutional review merely because they elect to designate LTC's as Class A, rather than Class B.  Moreover, one of the Plaintiffs was issued a Class B license with a "Target & Hunting" restriction – a fact the Commonwealth seems to miss.

---

[5] The decision does not indicate how the Police Department would have "restricted" the license, but the only restriction it notes is one "preventing the carrying of concealed weapons in public."  See Hightower, 693 F.3d at 66.

-4-

### C. Issues that are *Not* Presented Here

#### 1. *Concealed Carry*

The Commonwealth repeatedly asserts that the issue here is whether there is a "constitutional right to carry a concealed weapon." See Com. Br. p. 11; see also id. at 1, 4, 7, 9-15, 17-21; Deft. Opp. Br. pp. 7-8. However, the "Target & Hunting" restrictions preclude the bearing of handguns in *any* manner – not just in a concealed manner. As Plaintiffs have already shown, Police Chiefs who wish to mandate open carry over concealed carry have the option of issuing Class B LTC's, or alternatively, of issuing Class A LTC's with "no concealed carry" restrictions. See Pl. Opp. Br. pp. 11-12. The "Target & Hunting" restrictions do not leave Plaintiffs free to carry handguns in open view.

#### 2. *Large Capacity Handguns*

The Commonwealth attempts to change the issue to "large capacity" handguns by invoking the statement in District of Columbia v. Heller, 554 U.S. 570 (2008), that the Second Amendment protects only "the sorts of weapons . . . 'in common use at the time,'" as opposed to "M-16 rifles and the like." See id. at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)); Com. Br. pp. 4, 7, 10-11.[6] The argument is also a non-sequitur, as the "Target & Hunting" restrictions do not have any particular impact on "large capacity" handguns. The three Plaintiffs who were issued Class A LTC's are free to possess and use "large capacity" handguns for target and hunting purposes. And again, the relief that Plaintiffs seek is not an order directing the issuance of new Class A LTC's, but rather, an order directing the removal of the "Target & Hunting" restrictions from the Class A and Class B LTC's that Defendants have already issued.

---

[6] It is doubtful that this line of reasoning has any bearing here at all, as this discussion in Heller was directed at machineguns ("M-16 rifles") and sawed-off shotguns (which Miller addressed), rather than common handguns such as the Glock pistols that Court Security Officers carry.

### 3. *Training*

Defendants also try to change the issue to training and qualification, contending that their "Target & Hunting" restrictions serve "to ensure that only qualified individuals can legally carry a loaded gun" and advance the interest of "firearms proficiency." Deft. Opp. Br. pp. 10-11. Defendants submit affidavit evidence suggesting that the firearms safety training that § 131 otherwise mandates may not be adequate to ensure that individuals are competent. See id. at 12 n.12; Glidden Dec. (Doc. No. 47). Again, the argument is misplaced.

While proficiency is surely an important governmental interest, this is not a situation where Defendants choose to impose or remove restrictions on the basis of demonstrated qualification.[7] Quite to the contrary, Plaintiff Robert Capone specifically asked whether Chief Champagne would remove his restriction if he took additional training, and the answer was "no." See Capone Dec. (Doc. No. 42) ¶ 8. Likewise, Chief Grimes's designee explicitly told Joseph Fee (a well qualified firearms instructor) that training and qualification would not justify removal of his "Target & Hunting" restriction. See Dec. of Joseph Fee (submitted herewith) ¶ 9.

**(II)   DEFENDANTS HAVE NOT JUSTIFIED THEIR POLICIES**

Plaintiffs have shown that the First Circuit has eschewed the adoption of categorical standards of scrutiny, and has instead analyzed gun restrictions by comparing them to Heller's "presumptively lawful" restrictions, placing them in historical and contemporary context, and then considering whether the government has adequately justified the burdens at issue. See Pl. Br. (Doc. No. 38) pp. 11-13. Defendants' complete preclusion on bearing arms in public is far broader than the presumptively lawful restrictions on concealment and sensitive places, and it is also far more restrictive than those restrictions upheld historically or presently on the books in other states. See id. at 14-17.

---

[7] Plaintiffs would likely have no objection to such a policy, so long as implemented reasonably.

### A. Defendants – not Plaintiffs – have the Burden of Proving that Public Safety Concerns Justify their Policies

The Commonwealth's attempt to argue that Defendants' policies are "presumed constitutional" is incorrect. See Com. Br. p. 7 (quoting Heller v. Doe, 509 U.S. 312, 320-21 (1993)). Rather, as Heller v. Doe observes, there is *no* "presumption of validity" accorded to "a classification . . . involving fundamental rights." Heller v. Doe, 509 U.S. at 319. The presumption of validity applies only when the rational basis standard applies. See Nguyen v. INS, 533 U.S. 53, 75 (2001). And Heller plainly disclaimed the rational basis standard. See United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011); Pl. Br. p. 20. To the contrary, "[u]nder heightened scrutiny, the burden of justification is demanding and it rests entirely on" the Defendant state actors. Nguyen, 533 U.S. at 75 (quotation omitted); see also Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664-65 (1994); Pl. Opp. Br. p. 13.

In addition, the Commonwealth's claim that only "[a] four-member plurality" of the Court ruled the right to be fundamental in McDonald v. Chicago, 130 S. Ct. 3020 (2010), is also wrong. See Com. Br. p. 8. Plaintiffs have already shown that the five Justices in the majority all agreed that the right to keep and bear arms is "among those fundamental rights necessary to our system of ordered liberty." McDonald, 130 S. Ct. at 3042; see also Pl. Opp. Br. pp. 13-14.

### B. Defendants Do Not Have a "Need"-Based Policy Like Those Upheld in Woollard and Kachalsky

Defendants and the Commonwealth rely primarily on analogy to two decisions – Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013), and Kachalsky v. Westchester, 701 F.3d 81 (2d Cir. 2012) – that they consider to be consistent with their desired end result. See Deft. Opp. Br. pp.8-9, Com. Br. pp. 13-15, 19-20. While Plaintiffs doubt that the rationale of these two decisions will ultimately prevail, the fact is that this rationale would not uphold Defendants' status-oriented policies. Defendants have not implemented policies that tie the right to bear arms

-7-

to an individuals' documented "need" for self-defense.  Review of the Woollard and Kachalsky decisions makes the distinction clear.

The decision in Woollard concerned a permitting system that used statewide regulations to delineate what constituted "a good and substantial reason" to be armed.  See Md. Code Regs. 29.03.02.04(G), (L), (O); Woollard, 712 F.3d at 869-70 (and sources therein).[8]  Those regulations authorized the issuance of a permit when "necessary as a reasonable precaution for the applicant against apprehended danger."  Md. Code Regs. 29.03.02.04(O); Woollard, 712 F.3d at 869-70.  The regulations looked to the "'nearness' or likelihood" of a threat, whether the threat could be avoided, whether the threat was particular to the applicant, whether facts supported the presumption of a threat, and the length of time that has passed since the initial threat.  See Woollard, 712 F.3d at 870 (and sources therein).  The District Court had found the system unconstitutional because it did not advance public safety by seeking to keep guns away from "those adjudged most likely to misuse them," or by prohibiting their carry in sensitive locations, or by seeking to reduce accidents through training.  See Woollard v. Sheridan, 863 F. Supp. 2d 462, 474 (D. Md. 2012) rev'd sub nom. Woollard, 712 F.3d 865.  Instead, the scheme served as "a rationing system.  It aims . . . simply to reduce the total number of firearms carried outside of the home. . . ."  Id.  When it reversed, the Court of Appeals for the Fourth Circuit rejected the notion that the restriction was a mere "rationing system," and instead reasoned that it "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland."  See Woollard, 712 F.3d at 881.

---

[8] Moreover, a single government agency (the Handgun Permit Unit of the Maryland State Police) made licensing decisions, which were subject to review by another statewide government agency (the Handgun Permit Review Board).  See Md. Code Ann., Pub. Safety §§ 5-302, 5-306(a); Woollard, 712 F.3d at 869-70.

-8-

Similarly, the New York law at issue in Kachalsky required "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." Kachalsky, 701 F.3d at 86 (quotation omitted). People who could not meet this standard were instead issued handgun licenses with restrictions. See id. The Court of Appeals for the Second Circuit concluded that "[r]estricting handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related to New York's interests in public safety and crime prevention" and "is not . . . an arbitrary licensing regime no different from limiting handgun possession to every tenth citizen." Id. at 98.

Unlike the policies at issue in Woollard and Kachalsky, Defendants' policies do not seek to strike a balance between an individual's need for self-defense and society's interest in public safety.[9] Under Defendants' implementation, people with a certain status in society – police officers, members of the military, and business owners (with a sufficient amount of cash) – are allowed to bear arms, while others are not.

Defendants and the Commonwealth make a telling concession when they attempt to *change* the parameters of Defendants' policies to be analogous to those upheld in Woollard and Kachalsky. For example, per his discovery responses and the parties' Joint Statement of Facts, Chief Champagne's policy is to place a "Target & Hunting" restriction on all applicants for first-time LTC's, unless an applicant "requires such a license to carry for employment or business purposes and supporting documentation is provided, or if a first-time applicant has a history of being licensed unrestricted in his home state or the military." JS ¶ 10. By its terms, this policy does not consider an individual's need for self-defense as being pertinent. Similarly, Chief Grimes places "Target & Hunting" restrictions on LTC's, except for "law enforcement, military,

---

[9] And, in Massachusetts "[n]early everyone interested in the licensing process – gun-control activists, gun-rights groups, and police – agree that the state lacks a consistent standard for issuing licenses to carry." Brian MacQuarrie, "Want a gun license in Massachusetts? Much depends on where you live," Boston Globe (Mar. 10, 2013).

-9-

and business owners who substantiate they handle large amounts of cash." JS ¶ 9. Again, personal self-defense is not on the radar screen.

However, in their briefing Defendants now attempt to morph these policies into ones that look to whether private citizen applicants "have demonstrated a genuine security concern based on the fact they carry large amounts of cash or valuables." See Deft. Opp. Br. p. 11. The Commonwealth likewise seeks to re-characterize the issue as "demonstrated and proper need," or "a special need to be armed in public or that they faced any particular or immediate threat to their safety," or "a specific showing of need," or "a special need for self-protection outside the home." See Com. Br. pp. 1, 5, 20-21. Never mind that these alleged policies are nowhere in the record, and indeed, are contravened by Defendants' owner assertions in the record.

The Commonwealth's attempt to resuscitate these policies is especially revealing. As previously shown, the Weymouth Police Department has both articulated and disclaimed several different policies for issuing unrestricted LTC's over the past 18 months. See Pl. Br. p. 3. First, when Plaintiff Chris Davis asked the Department to remove the restriction from his LTC when he renewed it in March 2012, an officer told him that the Police Department did *not* issue unrestricted LTC's on the basis of "good reason to fear injury" – even though this was the policy posted on the Department's website. See Davis Dec. ¶¶ 4-8 & ex. 1 at ¶ 5. The officer said that, instead, individuals needed to be "victims of violent crime or [to have] had threats against them." See id. ¶ 7. A year later, the policy on the website said the Department did not issue unrestricted LTC's at all. See Pl. Br. p. 3. And as previously explained, the policy identified in this litigation looks only to whether a person owns a business (with cash), is a police officer, or has been in the military. So now, the Commonwealth attempts transform the ever-changing Weymouth policy into a "need"-based standard by citing *one* of the standards previously relayed to Mr. Davis

about "violent crime" and "threats."  See Com. Br. p. 6 (quoting Davis Dec. ¶ 7).  As though that settles the matter.

The Commonwealth also tries to rely on a selective reading § 131 to suggest that the statute itself ties restrictions to one's "need" for self-defense.  The Commonwealth quotes subpart (d)'s requirement that an applicant be "a suitable person . . . and [have a] good reason to fear injury to his person or property," and then tries to link this requirement to the statutory power in subparts (a) and (b) to impose "restrictions relative to the possession, use or carrying of [handguns] as the licensing authority deems proper."  See Com. Br. pp. 3, 20-21.  Of course, by this reading, all of the Massachusetts Police Chiefs who issue unrestricted LTC's to otherwise qualified applicants (such as Worcester and Halifax) are acting in open violation of the law – an issue that the Commonwealth never addresses.  While a state appellate court upheld a "need"-based restriction policy in Ruggiero v. Police Commissioner of Boston, 18 Mass. App. Ct. 256, 464 N.E.2d 104 (1984), the record here does not reflect any similar standard.

**(III)   TO THE EXTENT IT IS NECESSARY TO ADDRESS THE ISSUE, THE SEVENTH CIRCUIT'S RULINGS ARE MOST PERSUASIVE**

To date, the Circuit Courts have developed three distinct approaches to evaluate preclusions on bearing arms in public.  See Pl. Opp. Br. pp. 19-20 (detailing Moore versus Woollard and Kachalsky); see also Drake v. Filko, no. 12-1150, 2013 U.S. App. LEXIS 15635 (3d Cir. Jul. 31, 2013) (the third approach).  Plaintiffs have explained that – to the extent it is necessary for this Court to decide between these approaches – the decisions of the Court of Appeals for the Seventh Circuit are most appropriate because:  (a) the First and Seventh Circuits have similarly treated the "presumptively lawful" restrictions; (b) both Circuits have similarly declined to employ categorical standards of scrutiny; and (c) the First Circuit has relied substantially on Seventh Circuit authorities to articulate standards of Second Amendment

scrutiny in the past. See Pl. Br. pp. 8, 10-12, 17-19. Defendants and the Commonwealth respond by invoking Second and Fourth Circuit authorities, but not explaining why they should control over other authorities – and most notably, over Seventh Circuit authorities.

The line of authority that Defendants and the Commonwealth rely upon is premised on the view that the presumptively lawful restrictions do *not* serve to delineate the scope of the Second Amendment, but instead show merely that gun laws are permissible. See Kachalsky, 701 F.3d at 90 n.11 ("While we find [the discussion of presumptively lawful restrictions] informative, it simply makes clear that the Second Amendment right is not unlimited."); see also Pl. Br. pp. 9-10. This is perhaps best illustrated in Drake, where the Court of Appeals for the Third Circuit found that a preclusion on carrying guns in any form was *itself* a presumptively lawful, longstanding restriction that (per Third Circuit precedent) fell outside the scope of the Second Amendment. See Drake, 2013 U.S. App. LEXIS 15635 at *7. But see id. at *74 (Hardiman, J., dissenting) ("The greatest flaw I perceive in the majority's opinion, however, is that the longstandingness analysis is conducted at too high a level of generality.").[10] But under First Circuit precedent, the presumptively lawful restrictions fall *within* the scope of the Second Amendment – making the approaches of the Second, Third, and Fourth Circuits untenable.

A final consideration undermining Kachalsky's rationale is its conclusion (relied upon by Drake) that some state courts construing the right to bear arms in the nineteenth century found complete preclusions on the ability to carry handguns to be constitutional. See id. at *12; Kachalsky, 701 F.3d at 90-91. While the Seventh Circuit was correct to "regard the historical

---

[10] Drake alternatively upheld the "need" requirement on the same rationale as the Second and Fourth Circuits – as "a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun." Drake, 2013 U.S. App. LEXIS 15635 at *36 (quotation omitted). Unlike Massachusetts, New Jersey has published regulations that delineate circumstances that constitute "need" for a permit to carry a handgun. See id. at *3; see also N.J. Admin. Code § 13:54-2.4(d).

-12-

issues as settled by Heller," Moore v. Madigan, 702 F.3d 933, 941 (7th Cir. 2012), the decisions that Kachalsky cited simply do not support its conclusion.

First, the court in Fife v. State, 31 Ark. 455 (1876), upheld a restriction on carrying "pocket" pistols, but noted that such a ban could not be extended to cover all revolvers. See id. at 460-61. English v. State, 35 Tex. 473 (1872), upheld a ban on carrying handguns – but it did so on the rationale (rejected by Heller) that pistols are not "arms" within the meaning of the Second Amendment. See id. at 474, 476. Aymette v. State, 21 Tenn. 154 (1840), upheld a ban on concealed carry, but – as Heller observes – the Tennessee court adopted a position "whereby citizens were permitted to carry arms openly." Heller, 554 U.S. at 613; see Aymette, 21 Tenn. at 160. And indeed, in Andrews v. State, 50 Tenn. 165 (1871), the Tennessee high court later overturned a law that prohibited the carry of handguns in any manner as "too broad to be sustained." Id. at 187-88. As Judge Hardiman observed in his dissent in Drake, "the laws that the majority cites which purportedly banned both open and concealed carry altogether actually provide little support." Drake, 2013 U.S. App. LEXIS 15635 at *72-73 (Hardiman, J., dissenting). Plaintiffs have already shown – and Heller itself found – that the great weight of historical authorities support the conclusion that the right to bear arms is the right to carry guns, in some manner or another. See Pl. Br. pp. 15-17; see also Heller, 554 U.S. at 613-14, 626, 629.

## CONCLUSION

The conclusion that the right to bear arms is the right to carry guns – and to do so for the *core purpose* of self-defense – is unavoidable. And once this conclusion is reached, it is plain that Defendants have not justified their policies of presumptively denying this right to the citizens of their communities. The attempts of the Defendants and the Commonwealth to change the issues and the facts may reflect a tacit concession that the policies do not pass constitutional scrutiny, but they do not overcome Defendants' failure to justify them.

Dated: August 13, 2013

        Respectfully submitted,

        THE PLAINTIFFS,

        By their attorneys,

        David D. Jensen, Esq.
        Admitted *Pro Hac Vice*
        DAVID JENSEN PLLC
        111 John Street, Suite 230
        New York, New York 10038
        Tel: 212.380.6615
        Fax: 917.591.1318
        david@djensenpllc.com

        Patrick M. Groulx, Esq.
        BBO No. 673394
        POLIS LEGAL
        P.O. Box 76056
        Melrose, Massachusetts 02176
        Tel: 978.549.3124
        Fax: 617.500.9955
        pgroulx@polislegal.com

        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on 13 August 2013.

        /s/ David D. Jensen
        David D. Jensen, Esq.