UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
CHRISTOPHER DAVIS, WILLIAM P.           )
THOMPSON, WILSON LOBAO,                 )
ROBERT CAPONE, and                      )
COMMONWEALTH SECOND                     )        Civil No.
AMENDMENT, INC.,                        )        13-10246-FDS
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )
                                        )
RICHARD C. GRIMES, in his official      )
capacity as Chief of the Weymouth Police )
Department, and ROBERT L.               )
CHAMPAGNE, in his official capacity as  )
Chief of the Peabody Police Department, )
                                        )
          Defendants.                   )
                                        )
_____)

MEMORANDUM AND ORDER ON
MOTIONS FOR SUMMARY JUDGMENT

SAYLOR, J.

       This is a federal constitutional challenge to the policies of two Massachusetts towns

concerning firearms licenses.  Plaintiffs Christopher Davis, William Thompson, Wilson Lobao,

Ropert Capone, and Commonwealth Second Amendment, Inc., have brought suit under 42

U.S.C. § 1983, contending that certain policies of the Weymouth and Peabody Police

Departments that restrict their ability to obtain gun licenses violate the Second and Fourteenth

Amendments.  In particular, plaintiffs contend that defendants unconstitutionally restrict the

firearm licenses of first-time applicants to target and hunting purposes and exercise their

licensing authority according to arbitrary considerations.  The named defendants are Richard C.

Grimes and Robert L. Champagne, the police chiefs of the Weymouth and Peabody Police Departments, respectively.

Both sets of parties have cross-moved for summary judgment.  Plaintiffs do not challenge the constitutionality of the Massachusetts statutory framework regulating firearms, but rather the Weymouth and Peabody police department policies adopted under that framework.  In substance, plaintiffs contend that (1) under *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 130 S. Ct. 3020 (2010), individual self-defense is the central component of the Second Amendment right to bear arms; (2) defendants here placed "target & hunting" restrictions on their firearms licenses that "virtually preclude" them from bearing arms outside the home for self-defense; and (3) those restrictions violate their constitutional rights under the Second Amendment.  Defendants, in turn, defend their policies as constitutionally permissible, and argue that plaintiffs are seeking nothing less than the right "to carry a loaded, concealed gun wherever they want, whenever they want."  (Def. Mem. in Supp. at 2.).

Both sides devote substantial attention to broad constitutional issues, offering competing visions of the scope and impact of the Second Amendment on the licensing issues in this case. In doing so, both sides have ignored a more pedestrian, yet potentially critical, question: whether the police department policies at issue violate the Massachusetts statute, Mass. Gen. Laws ch. 140, § 131(d), under which those policies were promulgated.

Specifically, Massachusetts law provides, in substance, that an applicant for a firearms license must show both that he is a "suitable person" and that he has a "reason" for carrying a firearm.  The relevant statute, chapter 140, § 131(d), provides that one such "reason" that an applicant may establish is that "the applicant has good reason to fear injury to his person or

property."  Here, however, the police chiefs of Weymouth and Peabody have adopted policies

that effectively prohibit (with certain exceptions not relevant here) *all* first-time applicants from

*ever* making such a showing, either at the outset or (if a restricted license was granted) for the

next six years.  The plaintiffs here were apparently rejected for unrestricted licenses solely

because they were first-time applicants, not because they failed to show the requisite degree of

fear of injury; put simply, it did not matter whether they made such a showing or not.

The policies at issue, at least at first blush, appear to violate Massachusetts law.  It

therefore may not be necessary to reach the Second Amendment issues; under principles of

constitutional avoidance and judicial restraint, this Court should avoid reaching federal

constitutional grounds where cases can be disposed of on statutory grounds.  *See, e.g., Sony*

*BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 511 (1st Cir. 2011).  Furthermore, because

Massachusetts law may not be clear, the case may be appropriate for *Pullman* abstention or

certification of a question of law to the Massachusetts Supreme Judicial Court.  *See Railroad*

*Comm'n v. Pullman Co.*, 312 U.S. 496 (1941); Massachusetts SJC Rule 1:03.   However,

because the parties have not briefed those questions, and because some additional fact-finding

may be required, the Court will deny the cross-motions for summary judgment without prejudice

and direct the parties to file supplemental pleadings addressing the issues raised in this

memorandum.

## I.       Background

The facts set forth below are undisputed, except as noted.

### A.       Massachusetts Regulatory Framework

In Massachusetts, it is a felony to carry a firearm in public without a valid license.  Mass.

Gen. Laws ch. 269, § 10.[1]  Licenses to carry firearms may be requested by application pursuant

to Mass. Gen. Laws ch. 140, § 131(d).[2]  Applications are made to a "licensing authority," which

is defined as either the applicant's local police chief or the State Police colonel.  *Id.* §§ 121,

131(d).  The statute specifies the circumstances under which the licensing authority may grant

licenses, when licenses may be revoked, and what restrictions licenses may contain.  *Id.* §§

131(a)-(b).  Licensing decisions are subject to judicial review in the state District Court having

jurisdiction in the locality wherein the person applied for the license.  *Id.* § 131(f).

Two types of licenses are available under the statute:  Class A and Class B.  *Id.* §§

131(a)-(b).   Class A licenses allow an individual to possess a large-capacity firearm and carry a

concealed firearm in public.  *Id.* § 131(a).[3]  Class B licenses prohibit the concealed carrying of a

firearm and the carrying of a large-capacity firearm.  *Id.* § 131(b).  Licenses expire after six years

and can be renewed at expiration.  *Id.* § 131(I).

In processing a license application, the licensing authority is required to conduct a

two-step inquiry to determine the applicant's eligibility.  *See Ruggiero v. Police Comm'r of

Boston*, 18 Mass. App. Ct. 256, 259 (1984).  At the first step of the inquiry, the licensing

authority examines whether the applicant is a "suitable person to be issued such a license."

---

[1] For purposes of the statute, "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured."  Mass. Gen. Laws ch. 140, § 121.

[2] Massachusetts adopted its licensing requirement "as a first-line measure in the regulatory scheme" as a result of the "realization that prevention of harm is often preferable to meting out punishment after an unfortunate event."  *Ruggiero*, 18 Mass. App. Ct. at 258-59.  The requirement "was intended 'to have local licensing authorities employ every conceivable means of preventing deadly weapons in the form of firearms [from] coming into the hands of evildoers.'"  *Id.* at 59 (quoting Rep. A.G., Pub. Doc. No. 12, at 233-34 (1964)).

[3] A large-capacity firearm is defined as one that can hold more than ten rounds of ammunition or more than five shotgun shells.  Mass. Gen. Laws ch. 140, § 121.

Mass. Gen. Laws ch. 140, § 131(d).  Several specific groups of applicants (for example, minors and the mentally ill) are categorically barred from firearm possession.  Mass. Gen. Laws ch. 140, § 131(d)(I)-(vii).[4]

At the second step of the application inquiry, the licensing authority is required to consider whether the applicant has a "reason" for carrying a firearm.  Mass. Gen. Laws ch. 140, § 131(d); *see Ruggiero*, 18 Mass. App. Ct. at 259.  The statute does not give an exhaustive list of reasons.  Instead, it merely provides that the licensing authority "may issue" the license if "it appears . . . that the applicant has good reason to fear injury to his person or property, or . . . any other reason, including the carrying of firearms for use in sport or target practice only."  Mass. Gen. Laws ch. 140, § 131(d).[5]

When an applicant seeks a license solely for self-protection, the licensing authority may require that the applicant distinguish his or her own needs from those of the general public. *Ruggiero*, 18 Mass App. Ct. at 261 (finding, under earlier version of the statute, that applicant's stated purposes to avoid "spend[ing] his entire life behind locked doors [and to prevent becoming] a potential victim of crimes" did not require issuance of a license for self-defense in public).

Even when an applicant otherwise meets the requirements for license approval, the licensing authority may issue the license "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper."  Mass. Gen. Laws ch. 140,

---

[4] Plaintiffs here do not challenge the "suitable person" requirement of the statute.  (Am. Compl. ¶ 25).

[5] The court in *Ruggiero* summarized an earlier version of the statute as follows:  "Without excluding other valid reasons for being licensed, the statute identifies two purposes which will furnish adequate cause to issue a license – 'good reason to fear injury to person or property' and an intent to carry a firearm for use in target practice."  18 Mass. App. Ct. at 259.

§ 131(a).  Pursuant to that provision, the licensing authority may restrict a license to those uses for which the authority determines there to be an appropriate reason, even if it is not the reason proposed by the applicant.  *See Ruggiero*, 18 Mass. App. Ct. at 257, 260 (upholding issuance of license for target and sport use where applicant requested license for self-defense purposes).

Upon judicial review, the licensing authority's determination as to whether the applicant is a "suitable person" or has an appropriate "reason" may be reversed only if the authority had "no reasonable ground for denying . . . such license" and the applicant was not prohibited by law from holding a license.  Mass. Gen. Laws ch. 140, § 131(f).  Such a finding is warranted only upon a showing that the refusal to grant a license was "arbitrary, capricious, or an abuse of discretion."  *Chief of Police of Shelburne v. Moyer*, 16 Mass. App. Ct. 543, 546 (1983); *Ruggiero*, 18 Mass. App. Ct. at 259 (citing *Moyer*, 16 Mass. App. Ct. at 546); *Godfrey v. Chief of Police of Wellesley*, 35 Mass. App. Ct. 42, 46 (1993).

## B.      Target and Hunting Restrictions on Firearms Licenses

In Massachusetts, firearms licenses are recorded in the Massachusetts Instant Record Check System ("MIRCS").  (Joint SMF, ¶ 7).  Any restrictions imposed on a license are also recorded in the MIRCS.  (*Id.*).  The actual firearms license is printed from the MIRCS by the Massachusetts Firearms Records Bureau.  (*Id.*).  It is then mailed to the local licensing authority, who issues it to the applicant.  (*Id.*).

The MIRCS provides standard definitions for restrictions that can be placed on firearms licenses, including a "target & hunting" restriction.  (*Id.*).  Under the MIRCS definition, a "target & hunting" restriction "[r]estricts possession [of a firearm] to the purpose of lawful recreational shooting or competition; for use in the lawful pursuit of game[] animals and birds; for personal

6

protection in the home; and for the purpose of collecting (other than machine guns)."  (*Id.* ¶ 8).

The restriction also allows "travel to-and-from the activity location."  (*Id.*).

### C.       Firearms Licensing Policy of Weymouth

Richard Grimes is the chief of the Weymouth Police Department.  (Joint SMF ¶ 5).  As

police chief, he is responsible for issuing firearms licenses in Weymouth under Mass. Gen. Laws

ch. 140, § 131.  (*Id.*).  With three exceptions, Chief Grimes "ordinarily" imposes a "target &

hunting" restriction on Class A licenses for first-time applicants.  (*Id.* ¶ 9).  The three exceptions

are that Chief Grimes will "usually" give unrestricted licenses to first-time applicants who are

(1) members of law enforcement, (2) members of the military, or (3) "business owners who

substantiate they handle large amounts of cash."  (*Id.*).[6]

Individuals who already have a restricted Class A license may petition to have the

restriction lifted within the initial six-year period.  (*Id.*).  Chief Grimes will "consider" lifting the

restriction "where the applicant shows a change of circumstance which, in his view, warrants

such a result."  (*Id.*).  It appears, however, that absent a change in circumstances, Grimes will not

remove the restriction during the initial six-year period.

As of April 17, 2013, Chief Grimes had issued 1,078 firearms licenses.  (*Id.* ¶ 25).  Of

those licenses, 485 contained some restriction, the majority of which were "target & hunting"

restrictions.  (*Id.*).

### D.       Firearms Licensing Policy of Peabody

Robert Champagne is the chief of the Peabody Police Department, and the individual

responsible for issuing firearms licenses in Peabody.  (*Id.* ¶ 6).  With three exceptions, he

---

[6] Chief Grimes will grant a license with an "employment" restriction to "people who are required to carry a firearm by their employer and submit documentation from their employer."  (*Id.*).

"ordinarily" imposes a "target & hunting" restriction on Class A licenses for first-time license applicants. (*Id.* ¶ 10). The three exceptions are that he will "consider" issuing an unrestricted Class A license to a first-time applicant who (1) "requires such a license to carry for employment or business purposes and supporting documentation is provided," (2) "has a history of being licensed unrestricted in his home state," (3) or had such a license "in the military." (*Id.*). Chief Champagne "ordinarily" issues renewal licenses without restrictions, unless a suitability condition exists. (*Id.*).

As of May 22, 2013, Chief Champagne had issued 1,633 firearms licenses. (*Id.* ¶ 26). Of those licenses, 475 contained a "target & hunting" restriction. (*Id.*).

### E.   Plaintiffs' Applications for Firearms Licenses

#### 1.   Christopher Davis

Christopher Davis received an unrestricted Class B firearms license from the Police Chief of Foxborough, Massachusetts, in November 2006. (Davis Aff., ¶ 2). He then moved to Weymouth. (*Id.* ¶ 3).

Davis submitted an application to the Weymouth Police Department on March 22, 2012, requesting a Class A license with no restrictions. (Joint SMF ¶ 11). In his application for a license, Davis wrote:

> I was a victim of identity theft as well as criminal [harassment] by an individual who was deemed "unfit to stand trial" for failing a psychological reasons. This person was shipping Items to my house and I fear for my safety as well as the safety of my family. Reference Quincy district court docket # 1056CR004751.

(Joint Ex. M). In a separate letter, Davis wrote:

> I was recently a victim of two crimes, identity theft and criminal harassment. The individual was shipping items to my address . . . . The individual changed my utilities from my name to his as well as the address to his, multiple times, in order

> to have proof of residency.  He went so far as to partially pay my electric bill
> twice, resulting in NStar showing up to shut off my service, because once
> changed, my direct withdrawal was stopped.  Charges were filed in Quincy
> District Court (Docket #1056CR004751) but the individual was found[] unfit to
> stand trial due to [the] failing of a psychological exam, and trial was postponed
> until he passes such an exam.  I am fear[ful] for my safety and the safety of my
> family from retaliation of this individual.  This individual has no respect for the
> law, and is very bold in his actions of breaking the law.  This individual knows
> full well my address.  I do not feel safe with this individual free on the streets.

(Joint Ex. O).  Davis added:

> Another reason I wish to posses[s] a Class A LTC with no restrictions is I enjoy
> back country hiking and camping with my family.  Many times we find ourselves
> in areas free from cell phone signals and no way to call for help.  I wish to have
> the ability to protect my family when in these situations.  Finally I wish to apply
> for a LTC in other states which we hike and camp as a family.  Having a license
> in my home state with restrictions on it will cause undue problems in my
> attainment of a nonresident LTC in other states.  We spend time year round in
> Maine and have had encounters with black bears and coyotes in the past.

(*Id.*).

When Davis applied for an unrestricted license, the instructions posted on the Weymouth

Police Department's website stated:  "New & Renewals for a Class A LTC for Protection of Life

or All Lawful Purposes must . . . be able to document that you have 'good reason to fear injury'

as required by [Mass. Gen. Laws. Ch. 140, § 131].  Other permits will be for hunting and target."

(Joint Ex. X, ¶ 5).  Brian King, the police officer who accepted Davis's application, told him that

"generally speaking," Weymouth's policy for first-time applicants was to issue unrestricted

licenses "only to law enforcement, military personnel, and business owners."  (Joint SMF ¶ 11).

According to a letter of complaint later submitted by Davis, he told Officer King that he

had a genuine concern for his safety because he had been a victim of criminal harassment and

identity theft.  (Joint Ex. P).  According to Davis,

> I was told by Officer King that I would not be awarded a class A with no

restrictions because I was not personally threatened by this individual and that my license would be restricted to target and hunting purposes only.  I showed Officer King the town's policy regarding the issuance of unrestricted licenses that I had printed off the town's website.  I read it word for word to him and told him that I felt I qualified.  He told me that what I had was the old policy and that it had not been updated yet on line.  He told me that the new town policy was that only small business owners, law enforcement and lawyers were issued this license along with people who were victims of violent crimes or those that had threats of violence against them.  I asked for a copy, in writing, of the new town policy and was refused by Officer King.

(*Id.*).

On July 3, 2012, Davis received a Class A license with a "target & hunting" restriction.

(Joint SMF ¶ 12).  Later that month, Davis requested, in writing, that the restriction be removed.

(*Id.* ¶ 13).  Chief Grimes did not remove the restriction, stating through a representative that the

"denial was based on the same policies and guidelines that have been in place for many years."

(Joint Ex. F).

## 2.    **William Thompson**

On May 5, 2008, William Thompson applied for a Class A firearms license from the

Weymouth Police Department.  (Joint SMF ¶ 14).[7]  He requested that the license contain no

restrictions because he wanted it "to protect himself and his family."  (*Id.*).  On April 2, 2008, he

was issued a Class A license with a "target & hunting" restriction.  (*Id.*).  Thompson later asked

the Weymouth Police Department to remove the restriction; that request was denied.  (*Id.* ¶ 15).

In 2009, Thompson and his wife moved to Halifax, Massachusetts.  (Thompson Aff., ¶

10).  Thompson's wife applied for, and received, an unrestricted Class A firearms license from

the Halifax Police Department.  (Joint SMF ¶ 16).  Thompson himself also applied for an

---

[7] One of Grimes's predecessors, James Thomas, was chief of the police department at the time.  (Joint SMF ¶ 14).

unrestricted license.  (*Id.* ¶ 17).  The Halifax Police Department granted his application, but was unable to issue him a new license until his previous license from Weymouth expired.  (*Id.*).[8] Chief Grimes refused to terminate his license before its normal expiration date.  (*Id.*).

### 3.   Wilson Lobao

On November 20, 2008, Wilson Lobao applied for a Class A firearms license from the Peabody Police Department.  (*Id.* ¶ 18).  On the application, he stated that the reasons he requested a license were "carry to and from home to club range and boat – self protection." (Joint Ex. S).

In a separate letter to Chief Champagne, he stated:

> I would also like the option of being able to carry a pistol to and on my boat
> without anyone knowing there is one on board. There are something's [sic] best
> not advertised.  There are occasions when we sail to remote areas, with expensive
> equipment on board.  Not that having a weapon on board is the total answer, it
> does provide another option for self-defense.

(Joint Ex. T).

When he submitted his application, "[police] personnel told him" that Chief Champagne "doesn't like to issue" unrestricted Class A licenses to first-time applicants.  (Joint SMF ¶ 18). On December 5, 2008, he was issued a Class B firearms license with a "target & hunting" restriction.  (*Id.* ¶ 19).  He subsequently spoke to a detective at the Peabody Police Department about removing the restriction.  (*Id.* ¶ 20).  The detective told him that he could wait and re-apply, but that Chief Champagne generally "did not like to issue" unrestricted licenses to first-time applicants.  (*Id.*).

---

[8] In his affidavit dated June 25, 2013, Thompson stated that his license would expire on October 3, 2013, at which point he would be issued an unrestricted license.  (Thompson Aff. ¶ 14).

4.     **Robert Capone**

On May 14, 2012, Robert Capone applied for an unrestricted Class A firearms license from the Peabody Police Department.  (Joint SMF ¶ 21).  On his application, he stated that the reasons he requested the license were "[f]or personal protection in and out of the house and sport and target (Business capacity)."  (Joint Ex. I).  In a separate letter to Chief Champagne, he stated:

> I am the owner of C&C Landscaping Inc in Peabody, which was established in 2004.  I started out working in my neighborhood at the age of twelve and now my business grosses over a quarter million dollars a year.  I frequently make large deposits and purchase used equipment via craigslist typically using cash transactions that can range from a few hundred dollars to a few thousand.  My company also provides snow and ice management at several commercial properties throughout Essex county.  During the winter my truck is equipped with expensive computers, GPS, and radio communications equipment which could potentially makes me a target for crime.
>
> . . .
>
> I recently got married and I am a devoted family man to my wife and plan on starting a family soon.  I feel it is my duty and obligation as a husband be able to protect her.
>
> My wife and I are avid hikers and enjoy the pleasures of the outdoors.  We take our 3 dogs almost every week to Harold Parker in Andover and Bradley Palmer in Topsfield.  A firearm would be added protection against any animal or human threats that can be encountered in a remote area especially when travelling off trail.

 (Joint Ex. J).

On June 25, 2012, Capone was issued a Class A license with a "target & hunting" restriction.  (Joint SMF ¶ 21).  In December 2012, Capone e-mailed the Peabody Police Department to request that the restriction be removed.  (Joint Ex. K).  He offered to complete further training to qualify for removal of the restriction.  (*Id.*).  The department refused the

request.  A detective advised Capone by e-mail that "[f]or a first-time applicant (per policy) if it['s] required for employment or if you are a documented business owner with a demonstrated need, such as making morning and evening deposits the restriction may not apply."  (*Id.*).  According an affidavit submitted by Michael Crane, a Peabody Police Department detective, Crane called Capone on December 6, 2012, and told him that an unrestricted Class A license may be issued to first-time applicants if they are engaged in a primarily cash business.  (Crane Aff., ¶ 2).  The detective further explained that because Capone owned a landscaping business, and because landscaping businesses are not normally paid in cash, he could not receive an unrestricted license unless he submitted documentation that he did in fact receive large amounts of cash payments.  (*Id.*).

F.     **Procedural Background**

On February 7, 2013, plaintiffs Davis, Thompson, Lobao, Capone, and Commonwealth Second Amendment, Inc., brought this lawsuit.[9]  The complaint asserts two counts under 42 U.S.C. § 1983 for violations of the Second and Fourteenth Amendments.[10]  They contend that the restrictions on their firearms licenses violate the Second Amendment by prohibiting them from carrying and using handguns for the purpose of armed self-defense in public.  All parties have

---

[9] Plaintiff Commonwealth Second Amendment, Inc. is a non-profit corporation organized for the purposes of education, research, and legal action focusing on what it contends is the Second Amendment right to possess and carry firearms.  (Joint SMF ¶ 4).  Because its standing relies on the standing of its members, *see United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992), and because its claims appear to be essentially derivative of the claims of its members, the organization's claims can be decided on the same grounds as those of the individual plaintiffs at this stage without separate analysis.

[10] The complaint also asserts claims arising under the Equal Protection and Due Process clauses of the Fourteenth Amendment.  However, plaintiffs have not briefed either issue, and those claims therefore appear to have been waived.  *See San Geronimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d 465, 490-91 (1st Cir. 2012) (*en banc*).  Even if the Due Process claim were not waived, the First Circuit has "held, with a regularity bordering on the monotonous, that the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong."  *Pagan v. Calderon*, 448 F.3d 16, 33 (1st Cir. 2006).

cross-moved for summary judgment.

## II.   Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the non-moving party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

### A.   Standing

Standing is a threshold question in every case; "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." *AVX Corp.*, 962 F.3d at 113. To satisfy the case-or-controversy requirement of Article III of the United States Constitution, plaintiffs bear the burden of establishing that they (1) have suffered

an "injury-in-fact," (2) that the injury is "'fairly traceable' to the actions of the defendant," and (3) that the injury will likely be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).[11]  These elements must be proved "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

An "injury-in-fact" "is defined as 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'"  *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (quoting *Lujan*, 504 U.S. at 560).  Defendants contend that because plaintiffs were granted firearms licenses, they have not suffered an injury in fact, and therefore lack standing.

It is well-settled that the denial of a firearms license constitutes an injury that satisfies the minimum requirements of Article III standing. *Hightower v. City of Boston*, 693 F.3d 61, 70 (1st Cir. 2012).  Furthermore, a party whose cognizable interest has been injured by a firearms license restriction has standing to challenge that restriction.  *See Casey v. City of Newport, R.I.*, 308 F.3d 106, 118-19 (1st Cir. 2002) (upholding standing to challenge a license restriction).

The individual plaintiffs in this case applied for unrestricted Class A firearms licenses.  They all received either Class A or Class B licenses with a "target & hunting" restriction.  That restriction prevents them from carrying a firearm outside the home unless they are traveling to or from, or engaging in, recreational target-shooting or hunting.  Therefore, they are unable to carry a firearm legally in public for the cognizable interest of personal self-defense that they contend is protected by the Second Amendment.  That constitutes a "concrete and particularized" injury

---

[11] Standing also has prudential dimensions, which are not implicated here.  *See Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012).

sufficient to give them standing. *See Casey*, 308 F.3d at 119 (musician had standing to challenge license restriction because it affected her cognizable interest in freedom of expression under the First Amendment).

Defendants also contend that each plaintiff's alleged injury is not an injury-in-fact because it is not actual or imminent. "In a pre-enforcement challenge to a statute carrying criminal penalties, standing exists when 'the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the statute, and there exists a credible threat of prosecution.'" *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Under the statutory firearms-licensing regime, a violation of a license restriction "shall be cause for suspension or revocation and shall . . . be punished by a fine of not less than $1,000 nor more than $10,000." Mass. Gen. Laws ch. 140, § 131(a), (b).

Defendants contend that there is no evidence they have threatened to penalize plaintiffs for violations of their licensing restrictions. However, "'[a] realistic risk of future exposure to a challenged policy is sufficient to satisfy' . . . constitutional standing concerns." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003) (quoting *Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997)) (internal alterations omitted). While defendants have not threatened to penalize plaintiffs, they also have not unequivocally stated that they will not enforce the licensing restrictions.

In these circumstances, plaintiffs need not "first expose [themselves] to actual arrest or prosecution to be entitled to challenge [the] statute that [they] claim deters the exercise of [their] constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) ("The plaintiff's own action (or inaction) in failing

to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction."); *New Hampshire Right to Life*, 99 F.3d at 15 (in the First Amendment context, courts "will assume a credible threat of prosecution in the absence of compelling contrary evidence").  Plaintiffs choose not to carry a firearm for self-protection because of a credible threat of penalty, and therefore have established an actual injury-in-fact.  Accordingly, the individual plaintiffs have standing to assert their Second Amendment claims.[12]

### B.    The Second Amendment

#### 1.    Generally

The Second Amendment to the United States Constitution provides as follows:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In 2008, the Supreme Court struck down a District of Columbia ordinance that prohibited the possession of handguns in the home, declaring that the amendment guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  In 2010, the Court affirmed that the "right to possess a handgun in the home for the purposes of self-defense" is incorporated into the protections against infringement by the states provided by the Fourteenth Amendment.  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010).  In *Heller*, however, the Supreme Court qualified its holding, stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms

---

[12] Plaintiff Thompson may no longer have standing, as he was granted an unrestricted Class A license on October 3, 2013.  However, because the other individual plaintiffs have standing, Thompson's lack of standing is not an issue.  *See Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, 976 (1st Cir. 1989) ("Where co[-]plaintiffs have a shared stake in the litigation—close identity of interests and a joint objective—the finding that one has standing to sue renders it superfluous to adjudicate the other plaintiffs' standing.").  The Court also need not decide whether plaintiff Commonwealth Second Amendment, Inc., has standing.  *See AVX Corp.*, 962 F.2d at 116 (describing requirements for associational standing).

by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such

as schools and government buildings, or laws imposing conditions and qualifications on the

commercial sale of arms." *Heller*, 554 U.S. at 626-27.

### 2.    Framework for Analysis

When analyzing a constitutional challenge under the Second Amendment, a majority of

the courts of appeals have adopted a two-step approach, first set forth by the Third Circuit:

> First, we ask whether the challenged law imposes a burden on conduct falling
> within the scope of the Second Amendment's guarantee. . . . If it does not, our
> inquiry is complete.  If it does, we evaluate the law under some form of means-
> ends scrutiny.  If the law passes muster under that standard, it is constitutional.  If
> it fails, it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  The Fourth, Fifth, Sixth, Seventh,

Ninth, Tenth, Eleventh, and D.C. Circuits have explicitly adopted this approach. *United States v.*

*Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *National Rifle Ass'n of Am., Inc. v. Bureau of*

*Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 194-95 (5th Cir. 2012); *United*

*States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 703-

04 (7th Cir. 2011); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *United States*

*v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010) *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d

1244, 1260 n.34 (11th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C.

2011) (*Heller II*).[13]

The First Circuit has not expressly adopted this approach.  However, the cases in which it

has directly analyzed Second Amendment issues appear to fall under either the first or second

---

[13] The Eighth Circuit has not yet decided a case where it found that a law burdened conduct regulated by the Second Amendment.  The Second Circuit has not explicitly adopted the *Marzzarella* framework, but its approach is very similar.  *See, e.g.*, *United States v. Decastro*, 682 F.3d 160, 167 (2d Cir. 2012) (finding it appropriate to apply higher levels of means-ends scrutiny as the regulation at issue imposes a greater burden on Second Amendment conduct).

step of the analysis performed by the other circuits.  For example, in *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), the court concluded that the federal statute criminalizing firearm possession by juveniles did not violate the Second Amendment because it was one of the "longstanding prohibitions" that *Heller* did not call into question.  583 F.3d at 16.  While *Rene E.* did not specifically hold that the statute only burdened conduct outside the scope of Second Amendment protection, the analysis it followed was almost identical to those of other circuits when conducting the first step in their Second Amendment analysis.  *Compare Rene E.*, 583 F.3d at 13-16 (surveying nineteenth-century state laws and the founders' attitudes on juvenile handgun possession) *with National Rifle Ass'n of Am.*, 700 F.3d at 200-204 (surveying founding-era attitudes and nineteenth-century opinion on juvenile firearm possession).

In *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011), and *United States v. Armstrong*, 706 F.3d 1 (1st Cir. 2013), the First Circuit upheld the federal statute criminalizing firearm possession by persons convicted of a misdemeanor crime of domestic violence.  In doing so, it found that the statute, although falling within one of the "presumptively lawful" categories of firearm regulation in *Heller*, required some form of means-ends scrutiny because it was a new categorical limit on the Second Amendment right.  *Booker*, 644 F.3d at 25; *Armstrong*, 706 F.3d at 8.  In *Hightower*, the court concluded that under any standard of heightened scrutiny, revoking an individual's license to carry a concealed weapon did not violate the Second Amendment when based on an inaccurate firearms-license application.  693 F.3d at 74.  Thus, the analysis in *Booker*, *Armstrong*, and *Hightower* was similar to the analysis performed by other circuits in the second step of their Second Amendment framework.  *Compare Hightower*, 693 F.3d at 73-76 (regulation upheld under any standard of heightened means-ends scrutiny) *with Woollard v. Gallagher*, 712 F.3d 865, 880-81 (4th Cir. 2013) (regulation upheld under intermediate scrutiny).

### 3.    Scope of the Second Amendment Guarantee

Plaintiffs contend that the Second Amendment grants them the constitutional right to carry a firearm outside the home for the "core purpose" of self-defense.  They contend that the "target & hunting" restrictions on their licenses violate that right.  Defendants contend the Second Amendment right to armed self-protection does not extend beyond the home.

The *Heller* and *McDonald* decisions established "that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." *Hightower*, 693 F.3d at 72.   However, neither *Heller* nor *McDonald* addressed the full extent of the Second Amendment right.  *See Heller*, 554 U.S. at 635 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field.").  Although *Heller* concluded that "the Second Amendment conferred an individual right to keep and bear arms," the Supreme Court also stated that the Second Amendment did not "protect the right of citizens to carry arms for *any sort* of confrontation."  *Id.* at 595 (emphasis in original).

As a result, the lower federal courts have wrestled with the question of if, and to what extent, the right protected by the Second Amendment extends beyond the home.  *See Hightower*, 693 F.3d at 74 (describing the issue as a "vast *terra incognita*") (quoting *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011)).  In *Hightower*, the First Circuit specifically noted that it did "not reach the issue of the scope of the Second Amendment as to carrying firearms outside the vicinity of the home without any reference to protection of the home."  693 F.3d at 72 n.8.

Decisions from the other courts of appeals offer mixed guidance.  The Second, Third, and Fourth Circuits have assumed the Second Amendment has some application outside the home,

without deciding the issue.  *See Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012); *Woollard*, 712 F.3d at 876.  Those courts concluded, however, that because *Heller* described the "core" of the right to bear arms as the "right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635, any right of armed self-defense outside the home would be outside the "core" of the Second Amendment.  *Drake*, 724 F.3d at 430-31; *Kachalsky*, 701 F.3d at 93-94; *Woollard*, 712 F.3d at 876.[14]

The Seventh and Ninth Circuits have disagreed with that analysis.  After reviewing the historical record, those courts found that the "core" of the Second Amendment right extends to armed self-defense outside the home.  *Peruta v. County of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014); *Moore v. Madigan*, 702 F.3d 933, 936-37 (7th Cir. 2012).  Accordingly, both courts concluded that the firearms regulations at issue were unconstitutional without reference to a level of scrutiny.  *Peruta*, 742 F.3d at 1175-76; *Moore*, 702 F.3d at 941.  In *Peruta*, the Ninth Circuit explicitly found that because "self-defense outside the home is part of the core right to 'bear arms' . . . no amount of interest-balancing under a heightened form of means-ends scrutiny can justify" policies destroying that right.  *Peruta*, 742 F.3d at 1167.[15]  In *Moore*, the Seventh Circuit struck down a "blanket prohibition on carrying [a] gun in public" in Illinois that had no exception for individuals who showed an objective, heightened need for a firearm for self-

---

[14] Accordingly, those courts found that using an intermediate-scrutiny standard to analyze regulations that burdened that right was appropriate.  *Drake*, 724 F.3d at 436; *Kachalsky*, 701 F.3d at 96; *Woollard*, 712 F.3d at 876.

[15] The *Peruta* court criticized the intermediate scrutiny analysis in *Kachalsky*, *Drake*, and *Woollard* for two reasons.  First, it found that their analysis was "near-identical to the freestanding 'interest-balancing inquiry' . . . that the majority explicitly rejected[] in *Heller*."  742 F.3d at 1176.  Second, it concluded that the states in those cases "failed to show that the gun regulations did not burden 'substantially more' of the Second Amendment right than was necessary to advance the aim of public safety."  *Id.* at 1177.

defense.  702 F.3d at 940.[16]

No federal court of appeals has held that the Second Amendment does *not* extend beyond the home.  *But see Williams v. State*, 10 A.3d 1167, 1169, 1177 (Md. 2011) (holding that a statute prohibiting carrying a handgun outside the home without a permit "is outside the scope of the Second Amendment" and stating that "[i]f the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly").

To summarize, the courts of appeals have reached differing results as to the scope of the Second Amendment outside the home, and the First Circuit has not decided the question.  And the *Hightower* court expressly agreed with the Fourth Circuit's cautionary words, stating that the scope of the Second Amendment is an area that "courts should enter only upon necessity and only then by small degree."  693 F.3d at 74 (quoting *Masciandaro*, 638 F.3d at 475).

### 4.      Means-Ends Scrutiny

Assuming that a particular restriction burdens the Second Amendment right, the restriction must survive some form of means-ends scrutiny to be constitutional.  *See Hightower*, 693 F.3d at 74 (regulation upheld "whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue.").

In *Hightower*, the First Circuit explicitly refrained from deciding what standard of scrutiny applied to the concealed-carry regulation in that case.  *Id.*  In *Booker*, however, the court found "that a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction

---

[16] In holding that prohibition unconstitutional, the court noted that "[r]emarkably, Illinois is the *only* state that maintains a flat ban on carrying ready-to-use guns outside the home."  702 F.3d at 940 (emphasis in original). Indeed, *Moore* specifically noted that "[n]ot even Massachusetts has so flat a ban as Illinois."  *Id.*

and an important governmental objective."  644 F.3d at 25.

*Booker*'s language has been interpreted as a description of an intermediate scrutiny standard.  *See, e.g.*, *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 396 (D.P.R. 2012).  Indeed, the standard definition of intermediate scrutiny is a showing that "the challenged classification is 'substantially related to an important government objective.'"  *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003) (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)).  That definition is virtually indistinguishable from the standard used in *Booker*.  In *Armstrong*, however, the First Circuit stated plainly that "this court has not adopted intermediate scrutiny as the appropriate type of review for a [Second Amendment] challenge such as Armstrong's."  706 F.3d at 8.

The Second, Third, and Fourth Circuits have explicitly adopted an intermediate-scrutiny standard when examining regulations burdening an alleged Second Amendment right to carry weapons outside the home.  *Kachalsky*, 701 F.3d at 96; *Drake*, 724 F.3d at 436; *Masciandaro*, 638 F.3d at 471.[17]  In reaching that conclusion, those circuits have carefully parsed the language of *Heller* and *MacDonald*, noted the longstanding tradition of firearms regulation in this country, and made parallels to situations where different levels of scrutiny are applied in the First Amendment context.

For example, the Second Circuit in *Kachalsky* noted that "when analyzing First Amendment claims, content-based restrictions on noncommercial speech are subject to strict

---

[17] In addition, other circuits have used intermediate scrutiny when evaluating other types of firearms regulations outside the "core" right of armed self-protection within the home.  *See, e.g.*, *National Rifle Ass'n of Am.*, 700 F.3d at 205 (federal ban on sale of handguns to juveniles); *Heller II*, 670 F.3d at 1257 (gun registration laws); *Reese*, 627 F.3d at 802 (prohibition on firearms ownership by individuals subject to a domestic protective order).  No court has found that strict scrutiny must be applied to regulations burdening Second Amendment restrictions outside the home, although the Seventh and Ninth Circuits have invalidated laws without reference to a level of scrutiny.  *Peruta*, 742 F.3d at 1175-76; *Moore*, 702 F.3d at 941-42.

scrutiny . . . while laws regulating commercial speech are subject to intermediate scrutiny." 701 F.3d at 94.[18] *Kachalsky* concluded that "applying less than strict scrutiny when the regulation does not burden the 'core' protection of self-defense in the home makes eminent sense in this context." *Id.* The Third Circuit in *Drake* also analogized the Second Amendment to the First Amendment, concluding that intermediate scrutiny applied because strict scrutiny was only triggered when the core "right to possess usable handguns *in the home* for self-defense" was implicated. 724 F.3d at 436 (emphasis in original). Finally, the Fourth Circuit in *Masciandaro* noted that "as we move outside the home, firearm rights have always been more limited[] because public safety interests often outweigh individual interests in self-defense." 638 F.3d at 470. Because of the longstanding tradition of regulating the carrying of firearms in public, *Masciandaro* concluded those regulations need only satisfy intermediate scrutiny to survive constitutional challenge. *Id.* at 471.

Employing that standard, all three circuits have upheld restrictions on the carrying of firearms outside the home. *See Kachalsky*, 701 F.3d at 100-01 (upholding "proper cause" requirement for unrestricted licenses in New York); *Drake*, 724 F.3d at 439-40 (upholding "justifiable need" requirement for licenses in New Jersey); *Woollard*, 712 F.3d at 882 (upholding

---

[18] The New York licensing scheme considered by the Second Circuit in *Kachalsky* is similar to the Massachusetts scheme. The only license that allows the carrying of a handgun without regard to employment is New York Penal Law § 400.00(2)(f), which requires "proper cause" for the issuance of a license. 701 F.3d at 86. Thus, individuals "who desire to carry a handgun outside the home and who do not fit within one of the employment categories [allowing handgun possession] must demonstrate proper cause pursuant to section 400.00(2)(f)." *Id.*

Although "proper cause" is not defined in the statute, the court noted that the "New York state courts have defined the term to include carrying a handgun for target practice, hunting, or self-defense." *Id.* Licenses that are issued for the purpose of target practice or hunting can be restricted to those purposes. *Id.* To establish proper cause to obtain an unrestricted license, an applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Id.* (quoting *Klenosky v. New York City Police Dep't*, 428 N.Y.S.2d 256, 257 (N.Y. App. Div. 1980), *aff'd on op. below*, 421 N.E.2d 503 (1983)). Licensing officers are local judges, police commissioners, or sheriffs. *Id.* at 87 n.6.

"good-and-substantial reason" requirement for licenses in Maryland).  These requirements,

although phrased differently, are "essentially the same—the applicant must show a special need

for self-defense distinguishable from that of the population at large, often through a specific and

particularized threat of harm."  *Drake*, 724 F.3d at 442 (Hardiman, J., dissenting).

 In summary, no federal court decision post-*Heller* has evaluated a firearms-licensing

regime under a strict-scrutiny standard, and none have done so under a rational-basis standard.[19]

The First Circuit has not, however, expressly adopted an intermediate-scrutiny standard.

### C.    Whether the Court Should Reach the Constitutional Issue

As the discussion above makes clear, the most basic issues underlying any constitutional

analysis in this case—including the scope of the Second Amendment and the level of scrutiny to

be applied to the challenged restriction—are unresolved.  The fact that this Court's decision may

therefore be difficult is not, of course, a reason to avoid the constitutional issue.  Nonetheless,

there is a separate, and potentially compelling, reason to do so here.

It is well-settled that "prior to reaching any constitutional questions, federal courts must

consider nonconstitutional grounds for decision."  *Tenenbaum*, 660 F.2d at 511; *Gulf Oil Co. v.*

*Bernard*, 452 U.S. 89, 99 (1981).  "Even in cases arising through the *federal* courts, [they] have

always been alert to opportunities to avoid federal constitutional issues by means of a state law

disposition."  *South Dakota v. Neville*, 459 U.S. 553, 568 n.3 (1983) (collecting cases) (emphasis

in original); *see also Alvarado-Cordero v. Hernandez*, 837 F.2d 26, 29 (1st Cir. 1988)

(remanding the case and noting that the trial court, "[b]y deciding the local law claim, . . . may

---

[19] The Massachusetts Supreme Judicial Court, in evaluating the constitutionality of a statute imposing storage requirements on individuals with firearms, found that the statute was constitutional because it had a rational basis.  *See Commonwealth v. McGowan*, 464 Mass. 232, 244 (2013).  However, *Heller* specifically disclaimed use of that standard, 554 U.S. at 628 n.27, and therefore some form of heightened level of scrutiny appears to be appropriate.

not have to reach the federal constitutional issue").

Once a court has jurisdiction over a constitutional claim, it also has jurisdiction over any related statutory claims. *Hagans v. Levine*, 415 U.S. 528, 543 (1974). Although "a federal court may decline to take jurisdiction over a pendent state claim, . . . this does not deprive it of the power to hear the pendent claim if it chooses to, and indeed its discretion to dismiss should not be exercised if economy and convenience favor trying the issues together." *Fortin v. Commissioner of Massachusetts Dept. of Public Welfare*, 692 F.2d 790, 798 (1st Cir. 1982); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984) ("[A] federal court may resolve a case solely on the basis of a pendent state-law claim, and that in fact the court usually should do so in order to avoid federal constitutional questions." (internal citations omitted)).

The Court will therefore consider whether the claims at issue in this case can be resolved under state law without reaching the constitutional issue under the Second Amendment.

### D.   Whether the Policies at Issue Violate State Law

As noted, under Massachusetts law an applicant for a firearms license must establish that he or she (1) is a "suitable person to be issued such a license" and (2) has a "reason" for carrying a firearm. Mass. Gen. Laws ch. 140, § 131(d).[20]   As to the latter requirement, the statute reads as follows:

> [the chief of police or other licensing authority] may issue [a license] if it appears . . . that the applicant has good reason to fear injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized

---

[20] Before 1998, the statute used the phrase "proper purpose" rather than "reason." *See Ruggiero*, 18 Mass. App. Ct. at 259. The reason for the amendment is not in the record, although it does not appear to have made a substantial change in the standard. *See Stavis v. Carney*, 12 Mass. L. Rptr. 3, at *4 n.6 (Super. Ct. Jul. 31, 2000).

under this section . . . .

*Id.*

The statute is not a model of clarity.  However, on its face, it lists two types of "reasons" for which a license may issue:  (1) a "good reason to fear injury" and (2) "any other reason."  It then provides one example of such an "other reason":  "the carrying of firearms for use in sport or target practice only."  *Id.*[21]

Implicit in the statutory framework is the premise that there may be individuals in the Commonwealth who have "good reason to fear injury to person or property," for whom the issuance of a firearms license is appropriate.  Put another way, the legislature clearly contemplated that some subset of applicants could make the necessary showing of a "good reason to fear" injury.   Thus, the statute is intended to permit at least *some* individuals—assuming that they are "suitable persons," and subject to other statutory restrictions—to (1) carry a firearm (2) outside the home (3) for purposes of self-defense.[22]

Beyond that, Massachusetts law offers limited guidance.  The statute vests "considerable latitude" in the licensing authorities as to the "reason" requirement, but the scope of that latitude

---

[21] The Massachusetts Appeals Court has interpreted the former statutory language as follows:

> Without excluding other valid reasons for being licensed, the statute identifies two purposes which will furnish adequate cause to issue a license—"good reason to fear injury to person or property" and an intent to carry a firearm for use in target practice.

*Ruggiero*, 18 Mass. App. Ct. at 259.

[22] The statutory term "carry" means that the possessor of a license can have the firearm on his or her person outside the home.  *See Commonwealth v. Seay*, 376 Mass. 735, 742 (1978) ("We think it clear that the Legislature intended . . . to exempt persons who would keep a firearm only in their homes or places of business for self-protection from the requirement of obtaining a license to carry."); *Chardin v. Police Com'r of Boston*, 465 Mass. 314, 316 (2013) ("In the absence of a restriction, G.L.c. 140, § 131(a) does not prohibit the possession or carrying of a concealed firearm in public.")

has been largely undefined. *See Ruggiero*, 18 Mass. App. Ct. at 259; *Godfrey*, 35 Mass. App. Ct. at 47. *Ruggiero* appears to be the only reported case directly addressing the issue; there, the court held that a licensing authority may require an applicant to show a specific fear of "injury to his person or property," and not merely a general fear shared by the population as a whole. *Id.* at 261 (upholding denial of license where plaintiff stated that he "does not spend his entire life behind locked doors [and] is a potential victim of crimes against his person."). And although the *Ruggiero* court suggested that "[a] statement of acceptable restrictions or guidelines for licenses issued under § 131, composed by the Legislature or by its designate[,] might be helpful to the expedient handling of future licensing applications," *Id.* at 261 n.7, no such legislative guidance has ever been provided.

The statute is thus silent as to how the licensing authorities are to exercise their "latitude" when determining whether an applicant has shown a proper "reason" for carrying a firearm. Clearly, however, a local police chief must make some form of determination in response to every application. A refusal to grant a license is subject to judicial review in the state district court on the ground that the refusal was "arbitrary, capricious, or an abuse of discretion." *Moyer*, 16 Mass. App. Ct. at 546; *see* Mass. Gen. Laws ch. 140, § 131(f). Although each application must be separately evaluated, it appears that a local police chief might nonetheless promulgate guidelines or policies to guide the exercise of his or her discretion and give applicants fair notice of the local department's requirements. *See MacNutt v. Police Comm'r of Boston*, 30 Mass. App. Ct. 632, 635 (1991) (upholding firing test qualification promulgated by firearms-licensing authority and noting that the grant of discretion in chapter 140 "necessarily includes any incidental power reasonably related to the purposes of the granting statute"). Here, both the Weymouth and Peabody Police Chiefs adopted what appear to be categorical policies

concerning the "good reason to fear injury" requirement.  In Weymouth, the police chief "ordinarily" grants only target and hunting licenses to first-time applicants.  (Joint SMF ¶ 9). Unrestricted licenses for first-time applicants are "usually" provided only to members of law enforcement, members of the military, or business owners who substantiate that they deal with large amounts of cash.  (*Id.*).  In Peabody, the police chief will "consider" granting an unrestricted license to a first-time applicant only if he or she requires it for employment purposes, has previously held an unrestricted license in another state, or had such a license as a member of the military.  (*Id.* ¶ 10).

Both police departments have thus apparently adopted a categorical policy that *no* first-time applicant (with certain exceptions not relevant here) can *ever* show a "good reason to fear injury to his person or property." And it appears from the record that the license applications in dispute in this case were denied because of the categorical prohibition, not because the police chief concluded in each instance that the particular reasons given by the applicant were inadequate.

If those are in fact the relevant policies, they are difficult to reconcile with the language of the statute.  The statute plainly indicates that, at a minimum, a person with a "good reason to fear injury" is potentially an appropriate candidate for a license—without regard to whether he or she is a first-time applicant or not.  But the policies here essentially negate the statutory language.  No matter how powerful the reason, and no matter how serious the threat, a large majority of first-time applicants in both towns are disabled from making the requisite showing.[23]

---

[23] The fact that the policies at issue permit certain first-time applicants, such as members of law enforcement or the military, to possess firearms without making any showing of "good reason to fear injury" appears to be largely irrelevant to the question posed here:  whether those policies are unduly restrictive to everyone else.

The statute does not, of course, require that a police chief grant a license to *any* first-time applicant who happens to claim such a fear.  The police chiefs are empowered to deny such a request if it is without sufficient merit.  Nor does the statute necessarily prohibit police chiefs from adopting policies that would have the effect of precluding many applicants from making the necessary showing—for example, by requiring that the applicant demonstrate a specific threat, not a generalized threat shared by all members of the public.  *See Ruggiero*, 18 Mass. App. Ct. at 261.[24]  But it does seem to require that the police chiefs permit applicants to have some sort of reasonable opportunity to demonstrate that they have a "good reason to fear injury to person or property" within the meaning of the statute—or, at the very least, avoid imposing restrictions that effectively prohibit the overwhelming majority of applicants from doing so.

It should be noted that is unclear whether any of the applicants here actually provided a "good reason to fear injury to [their] person or property" in their applications.[25]  Thompson (a Weymouth resident) simply indicated that he wanted "to protect himself and his family."  (Joint SMF ¶ 14).  Lobao (a Peabody resident) indicated that he was interested in "self protection," particularly while on his boat.  (Joint Ex. S).  Capone (a Peabody resident) indicated that he was interested in "personal protection in and out of the house," including protecting his wife at home and while in the outdoors, and also protection in connection with his business, which deals in cash and may be a target for robbery.  (Joint Ex. J).  Davis (a Weymouth resident) expressed concern for his safety and the safety of his family because an individual had stolen their identity

---

[24] One can readily imagine other restrictions that might pass muster under the statute: for example, a requirement that any "fear of injury to property" be limited to serious crimes with a significant potential for injury or death, such as arson, and not lesser crimes such as larceny or vandalism.

[25] The Commonwealth contends that no plaintiff in this case has met the good-reason-to-fear-injury requirement.  (Comm. Opp. at 15, n.13).

and harassed them in an incident that resulted in criminal charges.  (Joint Ex. O).[26]  He also

expressed a desire for an unrestricted license for protection while hiking and camping with his

family in remote areas.  (*Id.*).

Whether those reasons are sufficient is not for this Court to decide, at least outside the

constitutional context; the statute delegates those decisions to the police chiefs, subject to review

in the state courts.  It is certainly possible that a police chief might reject one or more of those

reasons as inadequate.  But the statute does not appear to permit the police chiefs to reject all

such applications out of hand simply because they were filed by first-time applicants.

### E.       Whether the Court Should Resolve the State-Law Issue

The policies in dispute here thus appear to violate Mass. Gen. Laws ch. 140, § 131(d).

The Court nonetheless declines to issue a definitive ruling on the question at this stage of the

proceeding, as there are multiple reasons counseling caution under the circumstances presented

here.

First, the parties have focused almost exclusively on the constitutional issues, and the

statutory questions raised here have not been briefed by the parties.  At a minimum, the parties

should have a reasonable opportunity to address the issue before the Court makes any final

ruling.

Second, while it appears that the license denials at issue here were made pursuant to

categorical policies, and that the police chiefs did not make any individualized determination as

to the particular applicant's claimed "good reason to fear injury," the record is not fully

---

[26] There is some evidence that Davis's application was rejected because the police believed that his stated "good reason to fear injury to person or property" was insufficient.  As noted, according to Davis, Officer King of the Weymouth Police Department told him after his application had been denied that he did not qualify for an unrestricted license because he was "not personally threatened by this individual."  (Joint Ex. P).

developed.  It is therefore at least possible that some individualized fact-based determinations as to that issue were in fact conducted, and that one or more applications were denied on that basis.

Third, the policies in dispute may not be as categorical as they appear.  Both Chief Grimes in Weymouth and Chief Champagne in Peabody indicated that they "ordinarily" impose target and hunting restrictions on first-time applicants who do not fall under one of their specified exemptions.[27]  Again, because the record is not fully developed, it is unclear whether the policies truly impose categorical prohibitions, or whether a first-time applicant whose circumstances are not "ordinary" might in fact receive a license.

Fourth, it is unclear whether the Court can rest its decision on state-law grounds.  The amended complaint does not directly assert any claims under state law; both counts instead assert violations of 42 U.S.C. § 1983, which only imposes liability for deprivations of a *federal* right. *See Rio Grande Comty. Health Ctr, Inc. v. Rullan*, 397 F.3d 56, 72 (1st Cir. 2005).  Whether the Court can decide the case on a state-law claim not raised by the plaintiffs is at the very least open to question.

Finally, this case may satisfy the requirements for abstention under *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941).  Under *Pullman*, "federal courts may abstain from deciding a case when a state court's resolution of unclear state law would obviate the need for a federal constitutional ruling."  *Pustell v. Lynn Pub. Sch.*, 18 F.3d 50, 53 (1st Cir. 1994).  *Pullman* abstention "is warranted where (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to

---

[27] As noted, the Weymouth Police Department's website stated that the policy was that licenses would be restricted to recreational target-shooting and hunting if a good reason to fear injury was not given, but a representative of the department specifically said it did not follow that policy.  (*See* Joint Ex. P).

resolve a significant federal constitutional question." *Batterman v. Leahy*, 544 F.3d 370, 373

(1st Cir. 2008) (citing *Ford Motor Co. v. Meredith Motor Co., Inc.*, 257 F.3d 67, 71 (1st Cir.

2001)).  A court may raise the issue of abstention *sua sponte*.  *Ford Motor Co.*, 257 F.3d at 71

n.3.

Certainly there is "substantial uncertainty" as to whether the Massachusetts firearm-

licensing statute allows a local licensing authority to deny categorically any application by a

first-time applicant who seeks a firearm for personal protection, even when the applicant has

shown a "good reason to fear injury."  A state-court decision on that issue would obviate the

need for a federal constitutional decision on the extent of the Second Amendment in this case.

Therefore, the prudent course of action in these circumstances may be to abstain, and perhaps to

certify a question of state law to the Massachusetts Supreme Judicial Court.  *See Bellotti v.

Baird*, 428 U.S. 132, 151-52 (1976) (holding that the trial court should have certified appropriate

questions to the SJC to avoid deciding federal constitutional question); *see also In re Hundley*,

603 F.3d 95, 98-99 (1st Cir. 2010) (per curiam) (describing SJC certification process and

certifying question *sua sponte*).

Under the circumstances, the Court will deny the cross-motions for summary judgment

without prejudice, and direct the parties to file supplemental briefs addressing the issues outlined

in this memorandum and order.  Among other things, the parties should address whether any

additional discovery or fact-finding as to any issue is appropriate; whether the Court's analysis

of the state-law issues raised in this memorandum and order require correction or modification;

whether *Pullman* abstention is appropriate; and whether there are any potentially dispositive

issues of state law as to which certification of a question of law to the Supreme Judicial Court

under Massachusetts Supreme Judicial Court Rule 1:03 is appropriate.

**IV.**     **Conclusion**

For the foregoing reasons, the motion of defendants Robert L. Champagne and Richard

C. Grimes for summary judgment is DENIED without prejudice to its renewal; the motion of

plaintiffs Christopher Davis, William Thompson, Wilson Lobao, Ropert Capone, and

Commonwealth Second Amendment, Inc., is DENIED without prejudice to its renewal; and the

parties are directed to file no later than April 25, 2014, any supplemental memoranda, and any

further motions or requests for relief, addressing at least the following topics:

1.      whether any additional discovery or fact-finding to resolve any issue in this case

        is necessary or appropriate;

2.      whether the Court's analysis of the state-law issues raised in this memorandum

        and order require correction or modification;

3.      whether *Pullman* abstention is necessary or appropriate; and

4.      whether there are any potentially dispositive issues of state law as to which

        certification of a question of law to the Supreme Judicial Court under

        Massachusetts Supreme Judicial Court Rule 1:03 is appropriate.

**So Ordered.**

                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
Dated:  March 26, 2014                  United States District Judge