UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTOPHER DAVIS, *et al.*,

        Plaintiffs,

        v.

RICHARD C. GRIMES, in his official capacity as CHIEF OF THE WEYMOUTH POLICE DEPARTMENT, *et al.*,

        Defendants.

CIVIL ACTION
NO. 13-10246-FDS

**SUPPLEMENTAL MEMORANDUM OF INTERVENOR
COMMONWEALTH OF MASSACHUSETTS**

MARTHA COAKLEY
ATTORNEY GENERAL

William W. Porter
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108-1598
(617) 727-2200, ext. 2976
BBO No. 542207
Bill.Porter@state.ma.us

May 15, 2014

## INTRODUCTION

This is an action by four individuals and a non-profit organization seeking a declaration that the chiefs of police in two Massachusetts communities, Peabody and Weymouth, have violated the Second Amendment by implementing policies under which "Target and Hunting" restrictions are placed on licenses to carry firearms issued to first-time applicants. The Commonwealth has intervened to defend the constitutionality of the governing statute, Mass. Gen. Laws c. 140, § 131, to the extent it is drawn into question.

In its Memorandum and Order on Motions for Summary Judgment (Doc. 71) ("S.J. Mem."), this Court suggested that these policies violate state law if they preclude first-time applicants from demonstrating, as a reason for licensure, that they have "good reason to fear injury to [their] person or property." G.L. c. 140, § 131(d). *See* S.J. Mem. 3, 26-29. The Court further suggested that the proper course may be to allow a state court to decide this question before a federal court decides the Second Amendment claims in this case, and that the constitutional claims might not need to be reached if the challenged policies violate state law. S.J. Mem. at 32-33. The Court requested that the parties submit supplemental briefs that address: (i) whether the policies violate state law, or (ii) whether additional fact-development is required to fully understand those policies and determine how they were applied to the plaintiffs. In addition, the parties are to address whether abstention is appropriate under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), or whether questions of state law should be certified to the Supreme Judicial Court under Mass. S.J.C. Rule 1:03. S.J. Mem. 34.

The Commonwealth respectfully submits that this Court should abstain under *Pullman* so that potentially determinative state law questions can be decided by a Massachusetts court. As an initial matter, additional fact development is necessary to identify the current policies in Peabody and Weymouth for consideration of applications for licenses to carry by persons not previously licensed. On May 2, 2014, the licensing officials from these communities filed supplemental affidavits that suggest that the policies in these communities may have changed

1

since the parties moved for summary judgment in mid-2013.  It is now necessary to examine defendants' current policies and whether they differ from those in effect when plaintiffs sought unrestricted licenses to carry (between 2008 and 2012).  Once the current Peabody and Weymouth licensing policies are identified, a state court can, if necessary, rule on any question about the validity or application of the policy under state law.  As suggested in this Court's memorandum, these questions might include:

> (i)  Whether, under G.L. c. 140, § 131(d), a licensing authority must provide every applicant for a license-to-carry an opportunity to demonstrate that he or she has "good reason to fear injury to [their] person or property;"
>
> (ii)  What constitutes "good reason to fear injury to person or property" under Section 131(d); and,
>
> (iii)  What factors bear upon the discretion of the licensing authority under Section 131(d) to impose restrictions, if any, on a license to carry when an applicant has established a "good reason to fear injury."

If this Court abstains, the plaintiffs could seek declaratory relief under Mass. G.L. c. 231A, § 2, or reapply for unrestricted licenses and obtain judicial review of any adverse determination under Mass. G.L. c. 140, § 131(f).  Either way, state court proceedings may obviate the need for a federal court to decide the Second Amendment challenges or, at a minimum, clarify or limit the scope of the constitutional claims.  Accordingly, as explained further below, the court should abstain under *Pullman*.[1]

---

[1]  Supreme Judicial Court Rule 1:03 permits this Court to certify "questions of [state] law" to the Supreme Judicial Court for determination.  As explained below, there are questions of fact that must be resolved before the claims in this case come into focus.  Accordingly, it would appear that certification is unavailable.  *See Lumbermens Mut. Cas. Co. v. Belleville Ind.*, 407 Mass. 675, 687-88 (1990) (returning certified question unanswered because factual record was insufficiently developed); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 406 Mass. 369, 372 (1990) (certified questions must be accompanied by sufficient evidentiary facts to allow the court to adequately determine the answers).

## BACKGROUND

**Massachusetts Firearms License Framework**

Under Mass. G.L. c. 140, § 131(a) and (b), holders of either Class A or Class B licenses may possess and carry "firearms," "rifles," or "shotguns" in their home or in public. Id. The holder of a Class A license may also (1) "carry or possess a loaded firearm in a concealed manner in any public place or way," or (2) obtain, possess, or carry any "large capacity" firearm. Id. See *Chardin v. Davis*, 465 Mass. 314, 315-17 (2013) (describing statutory scheme).

"[A]ny person residing or having a place of business" in Massachusetts may apply to their local police chief or the State Police colonel for a Class A or Class B license to carry. G.L. c. 140, § 131(d). The licensing authority may issue the license if "it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized under this section" Id. § 131(d).[2] Class A and B licenses may be issued "subject to such restrictions relative to the possession, use or carrying [of firearms] as the licensing authority deems proper". Id. § 131(a) and (b). *See Ruggiero v. Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 260 (1984) (licensing authority may "limit any license granted under § 131 to a specified purpose").

A license applicant or holder may "file a petition to obtain judicial review" in Massachusetts district court within "90 days after receiving notice of . . . denial, revocation or suspension." Mass. G.L. c. 140, § 131(f). An applicant may also petition for review of a decision to issue a restricted, as opposed to unrestricted, license. *Ruggiero*, 18 Mass. App. Ct. at

---

[2] Mass. G.L. c. 140, § 131(d), disqualifies certain categories of persons from obtaining a firearm license. These include persons: (i) convicted of a felony, a firearms-related offense, a misdemeanor punishable by imprisonment for more than two years, or a violent crime; (ii) who have been hospitalized for mental illness and are still disabled by it; (iii) who have been treated or confined for drug addiction or habitual drunkenness, and are not yet cured; (iv) less than 21 years of age; (v) who are aliens; or (vi) currently the subject of an abuse prevention restraining order or an outstanding arrest warrant. Mass. G.L. c. 140, § 131(d).

257.  The court may order that the license be issued or reinstated if, "after a hearing," it "finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same." Mass. G.L. c. 140, § 131(f).  A party may seek further review in Superior Court in an action in the nature of certiorari under Mass. G.L. c. 249, § 4.  *Godfrey v. Chief of Police of Wellesley*, 35 Mass. App. Ct. 42, 46 (1993).

**Relevant Facts**

Each of the individual plaintiffs seeks a license to carry a concealed firearm in public for "self-protection."  Joint Statement of Undisputed Facts ("JS") (Doc. 34) ¶23.  In each case, the licensing authority has denied the plaintiff an unrestricted Class A License to Carry, and instead issued an LTC with a "target and hunting" restriction.  JS ¶ 12, 19, 21.  None of the plaintiffs invoked his right to judicial review under Mass. G.L. c. 140, § 131(f), of the denial of his application for an unrestricted Class A LTC.

**Weymouth**.  In Weymouth, as of 2013, Chief Grimes ordinarily imposed a Target & Hunting restriction on first-time applicants for a Class A LTC.  JS ¶21.  This restriction places the following limitations on a license:

> Restricts possession to the purpose of lawful recreational shooting or competition; for use in the lawful pursuit of game animals and birds; for personal protection in the home; and for the purpose of collecting (other than machine guns). It includes travel to-and-from the activity Location.

JS ¶¶ 7, 8.  In Weymouth, unrestricted licenses for first-time applicants were usually issued to persons with law enforcement or military experience, and business owners who substantiated that they handle large amounts of cash.  Chief Grimes also issued licenses restricted to "employment" to people who are required to carry a firearm by their employer and submit documentation from their employer.  JS ¶9.

In March 2012, plaintiff Christopher Davis submitted an application to the Weymouth Police Department to renew his Class B LTC, which was issued in Foxborough.  Davis requested

an unrestricted Class A LTC. JS ¶11 and Joint Ex. M. In his application, Davis stated that he "was a victim of identity theft as well as criminal harassment by an individual who was deemed 'unfit to stand trial' for . . . psychological reasons. This person was shipping items to my house and I fear for my safety and for the safety of my family." *Id*. In a subsequent letter, Davis said he desired to carry a firearm for protection while hiking and camping with his family in remote areas. JS ¶ 11. The licensing officer in Weymouth informed Davis that, generally, the Town's policy for first-time Class A applicants was to issue unrestricted licenses only to law enforcement, military personnel and business owners, or to persons who have been victims of violent crime or had threats against them. JS ¶11; Davis Decl. (Doc. 39) ¶ 7. On July 3, 2012, Chief Grimes issued Davis a Class A LTC with the restriction of "Target & Hunting." JS ¶12 and Joint Ex. L.

On May 2, 2014, Chief Grimes filed a supplemental affidavit in this case. The affidavit states that Weymouth does not have a "categorical" policy to deny unrestricted licenses to carry to first time applicants. Second Suppl. Grimes Aff. (Doc 75, Ex. 1), ¶ 2. Instead, "every applicant for a gun license – whether a first time or renewal applicant – is considered and reviewed individually." *Id*. Weymouth "recently changed its on-line policy to reflect that 'first time' applicants are not subject to any preset limitations regardless of his/her circumstances." *Id*. ¶ 2 and Ex. A (copy of Weymouth LTC application procedures). Chief Grimes also states that "as the foregoing [policy] makes clear, within the discretion accorded me by and under Mass. Gen. Laws. ch. 140, § 131(d), I will consider issuing an unrestricted LTC to a first time applicant who is deemed (i) a suitable person and (ii) who demonstrates that he/she has good reason to fear injury to himself or family or for any other valid reason." Id. ¶ 3.

**Peabody**. In Peabody, former Chief Robert Champagne generally did not issue an unrestricted LTC to persons with no prior licensed firearm experience. Instead, he issued a license with a "Target & Hunting" restriction, as defined above. JS ¶ 8, 10. In some cases, Chief Champagne would issue an unrestricted Class A LTC where a first-time applicant documented

5

that he required the license for employment or business purposes, or where an applicant held an unrestricted license in another state or the military. JS ¶10.

In 2008, plaintiffs Wilson Lobao and Robert Capone were first-time applicants for firearms licenses in Peabody. JS ¶¶18, 22. Both "desire[d] to carry a handgun for the purpose of self-protection outside of their home." JS ¶23. In 2008, Chief Champagne issued a Class B LTC to Lobao restricted to "Target & Hunting." JS ¶19 and Joint Ex. R. In 2012, Chief Champagne issued a Class A LTC to Capone, also restricted to "Target & Hunting." JS ¶21 and Joint Ex. H.

Chief Champagne's successor in Peabody is interim Police Chief Robert M. St. Pierre. On May 2, 2014, the licensing officer for the Peabody Police Department appointed by Chief St. Pierre, Det. Michael Crane, filed a supplemental affidavit stating that Peabody "does not have a 'categorical' policy of denying all first time applicants an unrestricted license to carry," and that "all gun license applicants – whether a first-time applicant or otherwise – are considered and reviewed individually using the general policies the Department has in place." Supp. Grace Aff. (Doc 75, Ex. 2), ¶ 2. Det. Crane also states that, depending on the circumstances, Peabody will issued an unrestricted LTC to a "first-time or renewal applicant" who, in the Chief's discretion, meets the requirements of Section 131(d). *Id*. The affidavit also states that former Chief Champagne would have issued plaintiff Capone an unrestricted LTC had Capone provided additional documentation that his business requires that he carry large amounts of cash. *Id*.

## ARGUMENT

**I.    The Court Should Abstain Because the Resolution of State Law Issues Could Obviate the Need to Decide the Second Amendment Claims.**

    **A.    Additional Fact Finding is Necessary to Identify the Current Policy in Each Community With Respect to First-Time Applications for Licenses to Carry.**

The Commonwealth submits that additional fact-finding is necessary in view of the Supplemental Affidavits of Chief Grimes and Det. Crane, filed on May 2, 2014.

6

The evidence submitted by the parties in July 2013 in support of their motions for summary suggested that the firearms licensing authorities in Peabody and Weymouth generally imposed "target and hunting" restrictions on licenses to carry issued to first-time applicants. The restrictions limited the license to "personal protection in the home," "lawful recreational shooting" and hunting. JS ¶ 8. In his affidavit, Peabody Chief Champagne stated: "As a general rule, I do not ordinarily grant an unrestricted Class A LTC to first time applicants." Champagne Aff., ¶ 3 (Doc. 32). Chief Champagne made exceptions where a first-time applicant required the license for employment as a security guard or for business purposes (because he carries cash or valuables), or where an applicant held an unrestricted license in another state or the military. JS ¶10. In Weymouth, Chief Grimes took a similar approach, embracing a "policy not to issue an unrestricted Class A License to Carry ("LTC) to first time applicants for a gun license." Grimes Aff., ¶ 2 (Doc. 33). Chiefs Grimes also made exceptions where a first time applicant was in law enforcement or the military, or required the license for employment as a security guard or because he carried cash or valuables in his business. *Id*.

Because none of the plaintiffs fell within these exceptions, this Court concluded that they "were apparently rejected for unrestricted licenses solely because they were first-time applicants . . . ." S.J. Mem. at 3.[3] Although each of the plaintiffs requested a license to carry for "self-protection, JS ¶¶ 11, 18, 21, the record did not demonstrate that the licensing authority specifically considered self-protection when determining the applicable restriction.[4]

On May 2, however, Peabody and Weymouth licensing officials filed supplemental affidavits, each averring that he does not have a "categorical" policy to deny an unrestricted

---

[3]  This Court later stated: "Both police departments have thus apparently adopted a categorical policy that *no* first time applicant (with certain exceptions not relevant here) can *ever* show a 'good reason to fear injury to his person or property.'" S.J. Mem. at 29.

[4]  This Court concluded that "it appears from the record that the license applications in dispute in this case were denied because of the categorical prohibition, not because the police chief concluded in each instance that the particular reasons given by the applicant were inadequate." S.J. Mem. at 29.

license to carry to first time applicants, and that all such applications are "considered and reviewed individually." Second Suppl. Grimes Aff. (Doc 75, Ex. 1), ¶ 2; Supp. Crane Aff. (Doc 75, Ex. 2), ¶ 2. Weymouth "recently changed its on-line policy to reflect that first time applicants are not subject to any preset limitations regardless of his/her circumstances." Grimes Aff., ¶ 2. Both licensing authorities will consider issuing an unrestricted LTC to a first time applicant who meets Section 131(d) requirements (*i.e.* is a "suitable person" who demonstrates that she has good reason to fear injury to her person or property, or other valid reason.) Second Suppl. Grimes Aff, ¶ 3; Supp. Crane Aff., ¶ 2. Indeed, Chief Grimes states that "absent some compelling reason not to do so," he will "likely issue an unrestricted LTC" to a person who he determines to have met all Section 131(d) requirements. Second Suppl. Grimes Aff, ¶ 4.

It is evident that additional fact-finding is necessary to specifically identify the current policy of each licensing authority with respect to applications for licenses to carry received from first time applicants. The plaintiffs themselves raise the issue, alleging that the Police Chiefs in Peabody and Weymouth are "in fact *presently enforcing* the challenged laws, customs, and practices against Plaintiffs." Am. Compl. (Doc. 6), ¶¶ 13, 15 (emphasis added). Plaintiffs seek a "declaratory judgment that Defendants' policies, customs, and/or practices implementing M.G.L. ch. 140, § 131(a)-(b) & (d) violate the Second Amendment . . . ." *Id*. at p. 12. To obtain declaratory or injunctive relief under 42 U.S.C. § 1983, the action that plaintiffs allege to be unconstitutional must implement the official policy or custom of the local authority. *Los Angeles County v. Humphries*, 131 S.Ct. 447, 452-53 (2010). *See, e.g., Whiteneck v. City of Springfield*, 624 F. Supp. 372. 374-75 (D. Mass. 1985) (city could not be liable under Section 1983 for revocation of license absent showing that revocation was based on official policy or custom). Accordingly, it is essential that the current official policies of the defendant Police Chiefs be established as a matter of fact.

It is only after the Peabody and Weymouth policies are identified that a court can consider whether the policies are consistent with state law. And, it may be that one or more of

the plaintiffs will qualify for an unrestricted license under the current policy, ending any need for further proceedings. As explained below, the Commonwealth urges that the Court abstain under *Pullman* to permit these determinations to be made in state court.

### B. Resolution of State Law Issues Could Obviate the Need to Reach the Second Amendment Claims or, At a Minimum, Clarify the Scope of the Constitutional Claims.

This Court has raised the question whether the Peabody and Weymouth policies violate state law. S.J. Mem. at 2-3, 26-41. If they do, it is not necessary to reach the Second Amendment claims and the case should be decided on state statutory grounds. *See, e.g., Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 511 (1st Cir. 2011).[5]

The state law question the Court has raised is best understood in the context of the Section 131(d) licensing process. To qualify for a license to carry, an applicant must be a "suitable person to be issued such license" and have a "reason" to be licensed. Id.[6] The reason may be: (i) that "the applicant has good reason to fear injury to his person or property," or (ii) for "the carrying of firearms for use in sport or target practice only," or (iii) for "any other reason." Id. § 131(d). If an applicant is suitable and establishes a proper reason to be licensed, Class A and B licenses may be issued "subject to such restrictions relative to the possession, use or carrying [of firearms] as the licensing authority deems proper." Id. § 131(a) and (b).

On the evidence originally submitted by the parties in support of their motions for summary judgment, it appeared that Peabody and Weymouth did not give individual consideration to a first-time applicant's statement that he needs an unrestricted license in order to

---

[5] Even plaintiffs acknowledge a threshold question under state law. In their Amended Complaint, they seek a "declaratory judgment that M.G.L. ch. 140, § 131(a)-(b) & (d) violate the Second Amendment *to the extent they allow* Defendants to prohibit qualified private citizens from carrying loaded and operable handguns for self-protection by restricting licenses to carry handguns to 'sporting,' 'target,' 'hunting,' and similar purposes." Am. Compl. (Doc. 6), p. 12 (Prayer for Relief) (emphasis added).

[6] In addition, the applicant may not be statutorily disqualified by, for example, a prior felony conviction. G.L. c. 140, § 131(d).

carry a firearm for self-protection. First-time applicants were ordinarily issued a license restricted to "target and hunting." On this point, the Court observed that the statute "does seem to require that the police chiefs permit applicants to have some sort of reasonable opportunity to demonstrate that they have a 'good reason to fear injury to person or property' within the meaning of the statute—or, at the very least, avoid imposing restrictions that effectively prohibit the overwhelming majority of applicants from doing so." S.J. Mem. at 30. Accordingly, the Court suggested that the chiefs' policies may violate state law because they "effectively prohibit . . . *all* first-time applicants from *ever* making such a showing [of good reason to fear injury], either at the outset or (if a restricted license was granted) for the next six years." S.J. Mem. at 3. Thus, the Court has identified an important threshold question of whether the procedures in Peabody and Weymouth for first-time applicants are deficient under Section 131(d) for not making a necessary determination under the statute. *See Motor Vehicle Mfrs. Assn. v. State Farm Mut.*, 463 U.S. 29, 42-43 (1983) (agency decision may be arbitrary or capricious if not based on the relevant factors articulated in the governing statute). *Cf. Long v. Wickett*, 50 Mass. App. Ct. 380, 386 n.8 (2000) (trial court erred where its "decisionmaking process was not completely conducted within the established framework of relevant standards and did not take into account all the proper factors identified by relevant case law as necessary to inform the discretionary exercise").

As this Court stated, a licensing authority may properly set a high bar for what constitutes "good reason to fear injury to person or property" under Section 131(d):

> The statute does not, of course, require that a police chief grant a license to any first-time applicant who happens to claim such a fear [of injury]. The police chiefs are empowered to deny such a request if it is without sufficient merit. Nor does the statute necessarily prohibit police chiefs from adopting policies that would have the effect of precluding many applicants from making the necessary showing—for example, by requiring that the applicant demonstrate a specific threat, not a generalized threat shared by all members of the public.

S.J. Mem. at 30, citing *Ruggiero*, 18 Mass. App. Ct. at 261 (police commissioner not required to issue an unrestricted license where applicant offered inadequate justification).[7] Although the Supreme Judicial Court has not addressed the question, other states have placed restrictive interpretations on the proper-purpose requirements in their handgun permit laws.[8]

If a qualified applicant establishes under Section 131(d) that she has a "good reason to fear injury," the question then arises whether a licensing authority may nonetheless restrict a license to "target and hunting." S.J. Mem. at 29. Class A and B licenses may be issued "subject to such restrictions relative to the possession, use or carrying [of firearms] as the licensing authority deems proper." G.L. c. 140, § 131(a) and (b). Principles of statutory interpretation would hold that a licensing authority's broad discretion to impose license restrictions is not without bounds, and must be exercised consistently with the purposes of the statute as drawn from its plain language. *See Firearms Records Bureau v. Simkin*, 466 Mass. 168, 181 (2013) (licensing authority's discretion to determine suitability under § 131(d) "is not without limits"); *Lynch v. Police Comm'r of Boston*, 43 Mass. App. Ct. 107, 111 (1997) (commissioner's "broad

---

[7] *See also* S.J. Mem. at 30, n.24 (state court might decide that "fear of injury to property" is limited to serious crimes with a significant potential for injury or death, such as arson, and not lesser crimes such as larceny or vandalism").

[8] *See, e.g., Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 92, 100 (2d Cir.2012) (New York limits handgun possession "to persons who have an articulable basis for believing they will need the weapon for self-defense"); *Woollard v. Gallagher*, 712 F.3d 865, 869-70 (4th Cir. 2013) (in Maryland, applicants must demonstrate "that the permit is necessary as a reasonable precaution against apprehended danger," which is determined by an objective inquiry and is not established by a "vague threat" or a general fear of "liv[ing] in a dangerous society"); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) (New Jersey law requires that applicant have "a justifiable need to carry a handgun," which the state has defined in its administrative code as: [T]he urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun") (internal citations omitted).

11

discretion" under taxicab licensing scheme "must nonetheless be exercised to effectuate the purposes of the statute").

To date, Massachusetts courts have not addressed what factors guide or limit the discretion of licensing authorities in setting restrictions, if any, on licenses-to-carry where a qualified applicant establishes a "good reason to fear injury." *Cf. Ruggiero*, 18 Mass. App. Ct. at 261 (where the applicant *failed* to establish a "good reason to fear injury" it was permissible to restrict his license to "target and hunting"). Licensing authorities may impose restrictions reasonably adapted to advancing public safety or crime prevention, or otherwise protecting the public welfare. Such restrictions clearly advance one of the purposes of the firearms licensing scheme. *See Chardin*, 465 Mass. at 315 (general purpose of the licensing provisions of Mass. Gen. Laws c. 140, § 131, is to preserve the "public health, safety, and welfare"). The restrictions that Chiefs Champagne and Grimes imposed on the plaintiffs have a public-safety basis, as both chiefs held the view that persons without previous firearms experience should, under their first license, be restricted to possession of the weapon at home or at the firing range, where they can gain proficiency and advance their skills. The unresolved state-law question suggested in the Court's memorandum, however, is whether "target and hunting" restrictions are permissible where Section 131(d), by its terms, also appears to intend that qualified persons with a specific, well-founded fear of serious personal injury can carry a concealed firearm for self-protection.[9]

These substantial, unsettled questions are of significant public importance under Section 131(d) and may be determinative of the plaintiffs' Second Amendment claims. It may be that a

---

[9] On this issue, this Court concluded: "[T]he legislature clearly contemplated that some subset of applicants could make the necessary showing of a "good reason to fear" injury. Thus, the statute is intended to permit at least some individuals—assuming that they are "suitable persons," and subject to other statutory restrictions—to (1) carry a firearm (2) outside the home (3) for purposes of self-defense." S.J. Mem. at 27.

Massachusetts court would agree with this Court's view – that the statute intends that least "some subset" of first time applicants receive an unrestricted license to carry – and would further hold that public-safety concerns can be addressed through a more rigorous "suitability" process involving heightened training, proficiency and firearm-handling skills. *See MacNutt v. Police Comm'r of Boston*, 30 Mass. App. Ct. 632, 635 (1991) (upholding firing test qualification promulgated by firearms-licensing authority and noting that the grant of discretion in chapter 140 "necessarily includes any incidental power reasonably related to the purposes of the granting statute"). A state court ruling might explain that the Peabody and Weymouth policies are inconsistent with state law, and might prescribe procedures to follow, or standards to apply, going forward. In that case, a state court judgment could obviate the constitutional claims (if the policies violate state law), or clarify or limit the constitutional claims if the local policies are modified as a result of the state court judgment. As explained below, these factors counsel decidedly in favor of *Pullman* abstention.

      **C.**      **This Court Should Abstain Under *Railroad Commission v. Pullman* from Deciding the Second Amendment Claims.**

This Court should abstain under *Railroad Comm. of Texas v. Pullman Co.*, 312 U.S. 496 (1941), from reaching the Second Amendment claims pending a Massachusetts court's resolution of state-law questions concerning the licensing policies in Peabody and Weymouth. In these circumstances, abstention would serve its proper purpose -- "to avoid 'federal-court error in deciding state law questions antecedent to federal constitutional issues'". *Casiano-Montanez v. State Ins. Fund Corp.*, 707 F.3d 124, 128 (1st Cir. 2013), quoting *Arizonans for Official English v. Arizona*, 523 U.S. 43, 76 (1997). If, despite its doubts, this Court rules that the local policies are permissible under state law and, on that basis, reaches the Second Amendment questions, its ruling will be "merely advisory" if a Massachusetts court later rules that the policies violate Section 131(d); and that is a result the Court should "seek to avoid in any case." *Casiano-*

13

*Montanez*, 707 F.3d at 130.  Thus, abstaining in this case would serve dual purposes: "avoiding advisory constitutional decision-making, as well as promoting the principles of comity and federalism by avoiding needless federal intervention into local affairs." *Pustell v. Lynn Pub. Schs.*, 18 F.3d 50, 53 (1st Cir. 1994).  And, contrary to plaintiffs' objection, the *Pullman* doctrine does not "involve the abdication of federal jurisdiction, but only the postponement of its exercise. . . ."  *Harrison v. NAACP*, 360 U.S. 167, 177 (1959).

Abstention under *Pullman* "is warranted when (1) substantial uncertainty exists over the meaning of the state law in question, and (2) settling the question of state law will or may well obviate the need to resolve a significant federal constitutional question." *Barr v. Galvin*, 626 F.3d 99, 107 (1st Cir. 2010) (quotation marks omitted).  Both requirements are met here.  First, as explained above, Massachusetts appellate courts have not answered the questions raised in this Court's summary judgment memorandum.  A state law that has never been interpreted by a state court is considered to be necessarily "unresolved and unsettled" for purposes of abstention.  17A *Moore's Federal Practice* § 122.02[2][b] (3d ed. 2012) (noting that this was "the situation the *Pullman* case presented"); *see Barr*, 626 F.3d at 108 (finding state law unsettled where Massachusetts courts had not had opportunity to address it "in the first instance"); *Pustell*, 18 F.3d at 54 (finding state law unsettled where Massachusetts Supreme Judicial Court had "deliberately left [it] unresolved").

Second, a dispositive ruling by a Massachusetts court on the state-law questions could eliminate the need for a federal court to reach the Second Amendment questions, especially if the state-law ruling results in the issuance of an unrestricted license to one or more of the plaintiffs. This case thus presents "the paradigm of the 'special circumstances' that make abstention appropriate" --  where state law "is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question". *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979).

This case is analogous to *Pullman* itself.  *Pullman* involved an equal-protection challenge to a Texas Railroad Commission regulation that required every sleeping car operated in Texas to have conductors (who, at the time, were all white) in addition to porters (who were all black). 312 U.S. at 497.  The Pullman Company challenged the regulation on grounds that it exceeded the Commission's authority under state statutory law; the Pullman porters intervened, challenging the regulation on grounds that it discriminated against them in violation of the Fourteenth Amendment.  *Id.* at 498.  The Supreme Court held that, in these circumstances, the proper course was for the district court to abstain from reaching the equal-protection issue pending a decision by the Texas courts interpreting the state statute.  *Id.* at 501.  The Court reasoned that, were the Texas courts to find that the statute did not authorize the Commission's regulation, there would be "an end of the litigation," and "the constitutional issue does not arise." *Id.*  That result would in turn promote the rule that "federal courts ought not to enter" into a sensitive area of constitutional law "unless no alternative to its adjudication is open." *Id.* at 498.[10]  Here, if the Massachusetts courts find that the Peabody or Weymouth policies are contrary to Section 131(d), the litigation would conclude, and there would be no need for this Court to address the constitutional issue.  Abstention is also appropriate if state-court rulings would narrow or clarify the constitutional questions.  Either circumstance urges abstention.  *See Pustell*, 18 F.3d at 53-54 (district court should have abstained where there was an alternative "state law basis to vindicate [the plaintiffs'] claims").

The plaintiffs have argued that the discretion of local licensing authorities to impose restrictions is so broad under Section 131 that there is no question in this case appropriate for state-court determination.  Pl. Supp. Briefing 1-3, 8.  Their analysis is flawed.

---

[10] As demonstrated by *Pullman*, abstention can be appropriate even if no state-court action is pending. 312 U.S. at 501; *see Barr*, 626 F.3d at 108 n.3 ("Though the existence of a pending state court action is sometimes considered as a factor in favor of abstention, the lack of such pending proceedings does not necessarily prevent abstention by a federal court.").

Plaintiffs first assert that the power of licensing authorities to impose restrictions "as they deem proper," G.L. c. 140, § 131(a), (b), is entirely unrelated to the requirements for licensure in Section 131(d), such that restrictions may be imposed regardless of how they affect the purpose (or "reason") for which a license is issued.  A Massachusetts court would, however, seek to construe the statute as "a consistent and harmonious whole" and discern the Legislature's intent "from all its words."  *Commonwealth v. Wade*, 467 Mass. 496, 501 (2014), quoting *EMC Corp. v. Commissioner of Revenue*, 433 Mass. 568, 574 (2001).  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (statutes "should not be read as a series of unrelated and isolated provisions").  The SJC recently rejected the argument that G.L. c. 140, § 131F, which governs nonresident licenses to carry firearms, is a "wholly self-contained statute," and held that the "suitable person" requirement in Section 131(d) for resident licenses also applies to non-resident licenses under Section 131F, even though not expressly stated in the latter section.  *Firearms Records Bureau v. Simkin*, 466 Mass. at 175-78.  Thus, plaintiffs are wrong to assume that the Supreme Judicial Court would view the power to impose license restrictions under §§ 131(a) and (b) in isolation.

Plaintiffs also contend that, because Section 131(d) states only that a licensing authority "may issue" a license to carry, there is no limit on the discretion of the authority to deny a license, even to a "suitable person" who establishes a "good reason for fear injury to his person or his property."  *Id*. § 131(d).  A licensing authority indeed has broad discretion (or "considerable latitude") in making a licensing decision.  *Chardin*, 465 Mass. at 316.  But this discretion "is not without limits."  *Simkin*, 466 Mass. at 181.  In denying an application, a licensing authority "shall state the reasons" for its action.  G.L. c. 140, § 131.  *See Police Comm'r of Boston v. Robinson*, 47 Mass. App. Ct. 767 (1999).  And, upon judicial review, a court may order a license issued if the authority lacked "any reasonable grounds" for denial or revocation.  *See Simkin*, 466 Mass. at 181-83 (ordering reinstatement of license to carry because authority lacked a "reasonable ground" to conclude that a licensee was not suitable).  Thus, plaintiffs are wrong to argue that a licensing authority can deny or restrict licenses to carry

without any limitations whatsoever.  *See MacNutt v. Police Comm'r of Boston*, 30 Mass. App. Ct. 632, 636 (1991) ("The broad grant of discretion implicit in a statute which lacks guidelines 'may be limited properly by judicial interpretation' to measures which are not arbitrary or capricious), quoting *Caswell v. Licensing Commn. for Brockton*, 387 Mass. 864, 874 (1983).

Accordingly, abstention is proper because this case raises unresolved, and potentially determinative, state law questions about the Commonwealth's firearms licensing scheme.  In view of the pending Second Amendment claims, a state-court interpretation of Section 131(d) is particularly important because Massachusetts courts "must interpret statutes wherever possible to avoid constitutional doubts . . . ."  In re Santos, 461 Mass. 565, 566 (2012).  *See Rugg v. Town Clerk of Arlington*, 364 Mass 264, 268 (1973) ("It is our duty, if reasonably possible, so to interpret the statute as to avoid unnecessary decision of serious constitutional questions.").  The unresolved state-law questions in this case touch important matters of legislative policy, and have ramifications for hundreds of Massachusetts cities and towns that issue licenses to carry.  In the interests of comity and wise judicial administration the state courts should first address these questions to potentially "spare[] the federal courts of unnecessary constitutional adjudication."  Harrison v. NAACP, 360 U.S. 167, 177 (1959).

## CONCLUSION

For the foregoing reasons, the Commonwealth respectfully requests that the Court stay this case and abstain from determination of the Second Amendment claims pending a determination of questions of state law in an action in state court.

MARTHA COAKLEY
*ATTORNEY GENERAL OF MASSACHUSETTS*

/s/ William W. Porter
William W. Porter (BBO # 542207)
Assistant Attorney General
Government Bureau
One Ashburton Place
Boston, MA  02108
617.963.2976

May 15, 2014                                             bill.porter@state.ma.us

Certificate of Service

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to those indicated on the NEF as non registered participants on or before May 14, 2014.